**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| v. | ) | **CRIMINAL NO. CCB-16-0267** |
| | ) | |
| **DANTE BAILEY, et al.** | ) | |
| | ) | |
| **Defendants.** | ) | |

**GOVERNMENT'S CONSOLIDATED MOTIONS RESPONSE**

The United States of America, by and through counsel, submits this consolidated response to the defendants' pretrial motions in this case.

**TABLE OF CONTENTS**

I. INTRODUCTION AND PROCEDURAL BACKGROUND ....................................................6

II. STATEMENT OF FACTS ..............................................................................................10

  A. The History, Structure, and Membership of Murdaland Mafia Piru (MMP) .....................11

  B. The October 15, 2012 Attempted Murder of S.H., a/k/a Nooks ..........................................14

  C. The November 22, 2012 Murder of Antoine Ellis, a/k/a Poopy ..........................................15

  D. The February 12, 2015 Murder of James Edwards, a/k/a Bangout......................................16

  E. The September 29, 2015 Murder of Brian Johnson, a/k/a Nutty B......................................18

  F. The April 28, 2016 Murder of Anthony Hornes ..................................................................19

  G. The August 10, 2016 Murder of Ricardo Johnson, a/k/a Uncle Rick ...............................21

III. ARGUMENT...................................................................................................................26

  A. Motions for Severance, by Shakeen Davis (ECF 385), Corloyd Anderson (ECF 420), Jamal Lockley (ECF 497), Corloyd Anderson (ECF 506), Sydni Frazier (ECF 596), and Dante Bailey (ECF 753) ...............................................................................................................26

    1. The Defendants Were Properly Joined..............................................................28

2.   A Joint Trial Will Not Prevent Any Defendant from Receiving a Fair Trial.......29

3.   An Insufficient Showing Has Been Made Regarding the Need for Co-
     Defendants' Testimony at Trial...........................................................30

4.   There Are No *Bruton* Problems Requiring Severance ..........................................31

B. Motions to Suppress Wiretap Evidence Seized Pursuant to Court Orders Issued under 18
   U.S.C. § 2510, *et seq.*, by Corloyd Anderson (ECF 399), Jacob Bowling (ECF 424), Adrian
   Spence (ECF 431), Jamal Lockley (ECF 492), and Ayinde Deleon (ECF 545).................32

1.   The Affidavits Provided Ample Probable Cause for the Requested Wiretaps.....33

2.   The Affidavits Demonstrated the Necessity for the Interceptions ......................36

3.   The Minimization Requirements Were Properly Observed .................................41

4.   The Investigators Relied on the Wiretap Authorizations in Good Faith.............44

C. Motions to Suppress Fruits of Search Warrants and Tracking Warrants Issued under Fed. R.
   Crim. Pro. 41 ...........................................................................................................46

1.   Applicable Law .........................................................................................46

2.   The Warrants Were Supported by Probable Cause ....................................47

   a.   Motion to Suppress Fruits of Search Warrant Executed at 3901 Princely Way
        on July 3, 2015; Warrantless Search of Mercury Marauder Parked Outside
        3901 Princely Way on July 3, 2015; and November 6, 2015 Search Warrant
        for DNA, by Dante Bailey (ECF 412)..........................................................47

   b.   Motion to Suppress Fruits of Search Warrant Executed at 4 Wyegate Court
        on July 31, 2015, by Dontray Johnson (ECF 487) ......................................55

   c.   Motion to Suppress Fruits of May 4, 2016 Tracking Warrants on Cell Phones
        with Call Numbers (802) 839-8109 and (410) 622-0701, by Dante Bailey
        (ECF 404, 408)...........................................................................................59

   d.   Motion to Suppress Fruits of Search Warrant Executed at 7607 Reserve
        Circle on May 17, 2016, by Dante Bailey (ECF 29, 412) ...........................62

   e.   Motion to Suppress Fruits of Search Warrant Executed at 32 Stockmill Road
        on September 27, 2016, by Ayinde Deleon (ECF 544) ..............................63

   f.   Motion to Suppress Fruits of Search Warrant Executed at 1868 Oxford
        Square on September 27, 2016, by Jamal Lockley (ECF 493) ..................65

g.   Motion to Suppress Fruits of Search Warrant Executed at 6808 Townbrook Drive on September 27, 2016, by Jacob Bowling (ECF 422) ....................67

h.   Motion to Suppress Fruits of Search Warrants Executed at 38 Windbluff Court and 500 Wabash Avenue on September 27, 2016, by Corloyd Anderson (ECF 398) ..............................................................................................68

i.   Motions to Suppress Fruits of January 17, 2017 Search Warrant on Thirty-Six Electronic Devices, by Dante Bailey (ECF 409), Jacob Bowling (ECF 423), and Jamal Lockley (ECF 495) ........................................................71

j.   Motion to Suppress Fruits of Search Warrant for DNA Executed on January 3, 2017, by Sydni Frazier (ECF 592) ........................................................73

k.   Motion to Suppress Fruits of February 10, 2017 Search Warrant on Three Cell Phones, by Sydni Frazier (ECF 591) ...................................................75

l.   Motion to Suppress Fruits of Search Warrant Executed at 7002 Upper Mills Circle on January 25, 2017, by Sydni Frazier (ECF 592) .........................77

m.  Motion to Suppress Fruits of Search Warrant Executed at 800 Arncliffe Road on May 15, 2017, by Randy Banks (ECF 751) ...........................................79

3.   The Officers Relied on the Warrants in Good Faith ................................................80

D. Motions to Suppress Social Media Evidence Seized Pursuant to Warrants Issued under 18 U.S.C. § 2703(a) and (b)(1)(A) .......................................................................................81

1.   The Magistrate Judges Had Jurisdiction to Issue the Warrants Pursuant to the Stored Communications Act ..............................................................................82

2.   The Warrants Were Supported by Probable Cause ...............................................89

a.   Motions to Suppress Fruits of May 2, 2016 Warrant on Instagram Account "5almighty_gang2," by Dante Bailey (ECF 403, 411, 755) ..................................................................................................89

b.   Motions to Suppress Fruits of August 16, 2016 Warrant on iCloud Account Associated with Email Address "wolfmobb@icloud.com," by Dante Bailey (ECF 410, 755) ...................................................92

c.   Motion to Suppress Fruits of January 19, 2017 Warrant on Instagram Account "dirtyboydroyd," by Jamal Lockley (ECF 494) ...............93

          d.       Motion to Suppress Fruits of January 17, 2017 Warrant on Facebook Account "sydni.frazier.7," by Sydni Frazier (ECF 594) .................94

          e.       Motion to Suppress Fruits of February 22, 2017 Warrant on Instagram Account "getmneyboy," by Sydni Frazier (ECF 594) ....................95

   3.      The Officers Relied on the Warrants in Good Faith ...........................................96

E. Motion to Suppress Cell Site Location Information Seized Pursuant to Court Order Issued under 18 U.S.C. § 2703(d) (ECF 525) ...............................................................................96

F. Motions to Suppress Statements, by Dante Bailey (ECF 28), Corloyd Anderson (ECF 397), Jacob Bowling (ECF 421), Dontray Johnson (ECF 489), Jamal Lockley (ECF 496), Ayinde Deleon (ECF 543), Sydni Frazier (ECF 593), Randy Banks (ECF 750), Devon Dent (ECF 754), and Malcolm Lashley (ECF 757) .............................................................................97

   1.      Applicable Law ....................................................................................................98

   2.      Relevant Facts ...................................................................................................100

          a.       Statements by Devon Dent on May 10, 2012 (ECF 754)  ...........100

          b.       Statements by Dontray Johnson on July 31, 2015 (ECF 489) .......100

          c.       Statements by Dontray Johnson on Oct. 4, 2015 (ECF 489)  ........101

          d.       Statements by Dante Bailey on May 17, 2016 (ECF 28) ..............101

          e.       Statements by Jacob Bowling on Sept. 27, 2016 (ECF 421) .........102

          f.       Statements by Corloyd Anderson on Sept. 27, 2016 (ECF 397) ...103

          g.       Statements by Devon Dent on October 26, 2016 (ECF 754) .........104

          h.       Statements by Malcolm Lashley on Nov. 22, 2016 (ECF 757) .....104

          i.       Statements by Sydni Frazier on Jan. 25, 2017 (ECF 593) ............105

   3.      The Defendants' Statements Followed Valid Miranda Waivers (Or Were Unprompted by Police Questioning), and Were Voluntarily Made ..................105

G. Motion to Suppress Recorded Jail Visit on September 29, 2015, by Dontray JOHNSON (ECF 488) .......................................................................................................................109

   1.      Relevant Facts ...................................................................................................110

    2.    The Jail Visit Was Not Intercepted in Violation of the Federal Wiretap Statute ...................................................................................................................110

H.  Motions to Suppress Fruits of Warrantless Searches ........................................115

    1.    Motion to Suppress Warrantless Searches and Seizures of Evidence, by Dante Bailey (ECF 512) .........................................................................115

          a.    Warrantless Seizure of Heroin on April 23, 2015 ..........................115

          b.    Warrantless Arrest on April 28, 2015 .............................................120

          c.    Warrantless Seizure of Marijuana on June 18, 2015 .......................120

    2.    Motion to Suppress Evidence Recovered on October 3 and October 4, 2015, by Dontray Johnson (ECF 486) ...........................................................123

    3.    Motion to Suppress Tangible and Derivative Evidence, by Randy Banks (ECF 751) .......................................................................................................123

          a.    Warrantless Seizure of Heroin and U.S. Currency on March 24, 2015 ...................................................................................................123

          b.    Warrantless Seizure of U.S. Currency on May 12, 2016 ................124

I.  Miscellaneous Trial Motions.............................................................................126

    1.    Motion to Suppress Art Work and Music Videos, by Shakeen Davis (ECF 690) ...................................................................................................126

    2.    Motion in Limine, Law Enforcement Personnel, by Shakeen Davis (ECF 388) ...................................................................................................127

    3.    Motion for Government to Provide Notice of Expert Witnesses, by Shakeen Davis (ECF 389) ...........................................................................127

    4.    Motion for Rule of Completeness, Recorded Conversations, by Shakeen Davis (ECF 390) ...........................................................................128

    5.    Motion for Production of Summary Charts Prior to Trial, by Shakeen Davis (ECF 391) ...........................................................................128

J.  Motion for Bill of Particulars, by Shakeen Davis (ECF 694) ...........................129

K.  Motion to Dismiss RICO Count Based on Multiple Conspiracies, by Shakeen Davis (ECF 689) .....................................................................................................132

L.   Motion to Compel Early Disclosure of Brady, Giglio, Jencks, and Other Relevant Material (ECF 749) ................................................................................................134

M.   Motion for Disclosure of Statements of Co-Conspirators Intended to be Offered Pursuant to Fed. R. Evid. 801(d)(2)(E), by Jamal Lockley (ECF 499) ................................................137

N.   Motions for Notice Pursuant to Fed. R. Evid. 404(b), by Shakeen Davis (ECF 386), Corloyd Anderson (ECF 400), Dante Bailey (402, 414), Jacob Bowling (ECF 419), and Jamal Lockley (ECF 498) ................................................................................................138

O.   Motions for Notice Pursuant to Fed. R. Evid. 609, by Shakeen Davis (ECF 387) and Jacob Bowling (ECF 419) ................................................................................................139

P.   Motions to Adopt Motions of Other Defendants by Corloyd Anderson (ECF 395), Dante Bailey (407, 756), Jacob Bowling (ECF 417), Adrian Spence (ECF 434), Dontray Johnson (ECF 490), Jamal Lockley (ECF 500), Shakeen Davis (ECF 746, 759), Ayinde Deleon (ECF 747), Randy Banks (ECF 748), Devon Dent (ECF 752), and Malcolm Lashley (ECF 758) ................................................................................................143

Q.   Motions for Leave to File Additional Motions by Dante Bailey (ECF 30), Jacob Bowling (418), Dontray Johnson (ECF 491), and Jamal Lockley (ECF 501) ................................144

IV.   Conclusion ................................................................................................144

## I.   INTRODUCTION AND PROCEDURAL BACKGROUND

On September 22, 2016, a federal grand jury for the District of Maryland returned a Superseding Indictment[1] charging twenty-four members and associates of a subset of the Bloods gang known as Murdaland Mafia Piru (MMP) with conspiracy to participate in a racketeering enterprise, in violation of 18 U.S.C. § 1962(d) (Count One); conspiracy to distribute one kilogram or more of heroin and 280 grams or more of cocaine base, in violation of 21 U.S.C. § 846 (Count Two); and other drug and gun offenses.  ECF 46.  A Second Superseding Indictment returned on

---

[1]     The original indictment, returned on May 26, 2016, charged the lead defendant, Dante BAILEY, with a single count of possession of firearms and ammunition by a felon in violation of 18 U.S.C. § 922(g).  ECF 17.

June 1, 2017 charged two new defendants in the racketeering and drug trafficking conspiracies, and added a number of charges, including charges of murder in aid of racketeering in violation of 18 U.S.C. § 1959(a)(1) against Dante BAILEY,[2] for the February 12, 2015 murder of James Edwards (Count 3), and against Dontray JOHNSON, for the September 29, 2015 murder of Brian Johnson (Count 8).  ECF 515.

As of this filing, thirteen defendants have pleaded guilty,[3] and thirteen defendants remain in the case.  The remaining defendants are Dante BAILEY, a/k/a Gutta, a/k/a Almighty, a/k/a Wolf; Dontray JOHNSON, a/k/a Gambino, a/k/a Bino; Adrian Jamal SPENCE, a/k/a Spittle, a/k/a SP; Randy BANKS, a/k/a Dirt; Ayinde DELEON, a/k/a Murda, a/k/a Yin; Jamal LOCKLEY, a/k/a T-Roy, a/k/a Droid; Jacob BOWLING, a/k/a Jakey; Corloyd ANDERSON, a/k/a Bo; Devon DENT, a/k/a Tech; Tiffany BAILEY, a/k/a Tiff; Shakeen DAVIS, a/k/a Creams; Sydni FRAZIER, a/k/a Sid; and Malcolm LASHLEY, a/k/a Spook.

A motions hearing is scheduled for June 1, 2018.  The Court has tentatively scheduled trial for November 5, 2017 through February 1, 2019 and—if necessary due to the number of defendants—a second trial from March 18, 2019 through May 5, 2019.

The defendants have filed a total of eighty-three pretrial motions that remain outstanding.[4]

---

[2]      We capitalize the last names of defendants in the case.

[3]      The defendants who have pleaded guilty are: William BANKS, a/k/a Trouble; Dominick WEDLOCK, a/k/a Rage; Dwight JENKINS, a/k/a Huggie; Melvin LASHLEY, a/k/a Menace; William JONES, a/k/a Smalls; Jarmal HARRID, a/k/a J-Rock; Jamal SMITH, a/k/a Mal; Takuma TATE, a/k/a Oop; Maurice POLLOCK, a/k/a Reese; Charles BLACKWELL, a/k/a Ci-Bo; Kenneth TORRY, a/k/a Kenny; Jay GREER, a/k/a Champagne; and Delante LEE, a/k/a Tay.

[4]      Not counted in this tally is a motion to sever by Sydni FRAZIER, *see* ECF 595, which he later corrected, *see* ECF 596.  One of the remaining defendants, Tiffany BAILEY, has not filed any motions, and the government expects that she will plead guilty prior to the motions hearing. A second defendant, Adrian Jamal SPENCE, has asked that the government refrain from responding to his motions while plea negotiations continue.  In light of this request, the government

These consist of motions for severance, motions to suppress statements, motions to suppress the fruits of search warrants and warrantless searches, a motion for a bill of particulars, a motion to dismiss the racketeering conspiracy count on the ground of multiple conspiracies, motions to compel discovery, motions for disclosure of evidence pursuant to Federal Rules of Evidence 404(b) and 609, various *in limine* motions, motions to adopt the motions of other defendants, and motions for leave to file additional motions. Where the relevant facts and legal issues overlap, the government will address groups of motions together.

A chart of pending motions filed by each defendant follows:

| Defendant | Motion | ECF No. |
|---|---|---|
| Bailey, D. | Motion to Suppress Statements | 28 |
| | Motion to Suppress Tangible and Derivative Evidence | 29 |
| | Motion for Leave to File Additional Motions | 30 |
| | Motion for Notice of 404(b) Evidence | 402 |
| | Motion to Suppress Instagram Search | 403 |
| | Motion to Suppress Tracking Warrants | 404 |
| | Motion to Adopt Motions of Other Defendants | 407 |
| | Motion to Suppress Two Tracking Warrants | 408 |
| | Motion to Suppress Cell Phone Search | 409 |
| | Motion to Suppress iCloud Search | 410 |
| | Motion to Suppress Instagram Search | 411 |
| | Motion to Suppress Fruits of Search Warrants on Residences, Person, Vehicle | 412 |
| | Motion for 404(b) Notice | 414 |
| | Motion to Suppress Warrantless Searches | 512 |
| | Motion to Sever Defendant | 753 |
| | Motion to Suppress Evidence Derived from Searches of Social Media and iCloud | 755 |
| | Motion to Adopt Motions of Other Defendants | 756 |
| Johnson | Motion to Suppress Evidence from October 3 and 4, 2015 | 486 |
| | Motion to Suppress Evidence Seized from Residence | 487 |
| | Motion to Suppress Statements from September 29, 2015 | 488 |
| | Motion to Suppress Statements from July 31 and October 3, 2015 | 489 |
| | Motion to Adopt Motions of Other Defendants | 490 |
| | Motion for Leave to File Additional Motions | 491 |
| Spence | Motion to Suppress Custodial Statement | 430 |

respectfully requests additional time to respond to SPENCE's motions if it becomes necessary to do so.

| | | |
|---|---|---|
| | Motion to Suppress Title III Evidence | 431 |
| | Motion to Suppress GPS Evidence | 432 |
| | Motion to Suppress Evidence Obtained Pursuant to Search and Seizure Warrant | 433 |
| | Motion to Adopt Motions of Other Defendants | 434 |
| **Banks, R.** | Motion to Adopt Motions of Other Defendants | 748 |
| | Motion to Compel Discovery and the Early Disclosure of Brady, Giglio, Jencks, and Other Relevant Material | 749 |
| | Motion to Suppress Statements | 750 |
| | Motion to Suppress Tangible and Derivative Evidence | 751 |
| **Deleon** | Motion to Suppress Statement | 543 |
| | Motion to Suppress Search Warrant | 544 |
| | Motion to Suppress Intercepted Communications | 545 |
| | Motion to Adopt Motions of Other Defendants | 747 |
| **Dent** | Motion to Adopt Motions of Other Defendants | 752 |
| | Motion to Suppress Statements | 754 |
| **Lockley** | Motion to Suppress Evidence Obtained by Electronic Surveillance and Intercepted Communications | 492 |
| | Motion to Suppress Tangible and Derivative Evidence—Search of Residence and Automobile | 493 |
| | Motion to Suppress Tangible and Derivative Evidence—Search of Instagram Social Media Account | 494 |
| | Motion to Suppress Tangible and Derivative Evidence—Search of Cell Phones | 495 |
| | Motion to Suppress Statements of Defendant | 496 |
| | Motion to Sever Defendant for Trial | 497 |
| | Motion for Notice of Intent to Introduce Evidence of Uncharged Conduct and Prior Convictions | 498 |
| | Motion for Disclosure of Statements of Co-Conspirators Intended to be Offered Pursuant to Fed. R. Evid.  801(d)(2)(E) | 499 |
| | Motion to Adopt Motions of Other Defendants | 500 |
| | Motion for Leave to File Additional Motions | 501 |
| | Motion to Suppress Fruits of Warrantless Search of Cell Site Location Information | 525 |
| **Anderson** | Motion to Adopt Motions of Other Defendants | 395 |
| | Motion to Suppress Statement | 397 |
| | Motion to Suppress Search Warrant | 398 |
| | Motion to Suppress Title III Warrant | 399 |
| | Motion for Disclosure of 404(b) Evidence | 400 |
| | Motion to Sever Defendant | 506 |
| **Bowling** | Motion to Adopt Motions of Other Defendants | 417 |
| | Motion for Leave to Amend, Supplement, Withdraw and/or File Additional Motions | 418 |
| | Motion for Disclosure Pursuant to Fed. Evid. 404(b) and 609 | 419 |
| | Motion for Severance | 420 |

| | | |
|---|---|---|
| | Motion to Suppress Statements | 421 |
| | Motion to Suppress Tangible Evidence and Derivative Evidence (Residence) Warrant | 422 |
| | Motion to Suppress Tangible Evidence and Derivative Evidence (Cellphone) Warrant/Warrantless | 423 |
| | Motion to Suppress Evidence Obtained by Electronic Surveillance and Interception by Wire | 424 |
| **Davis** | Motion to Sever Defendant | 385 |
| | Motion for Notice of Intent to Introduce Uncharged Misconduct | 386 |
| | Motion for Notice of Intent to Introduce Prior Convictions of Government Witnesses | 387 |
| | Motion in Limine as to Law Enforcement Testimony | 388 |
| | Motion for Notice of Intent to Introduce Expert Testimony | 389 |
| | Motion to Play Related Portions of Audio Recordings | 390 |
| | Motion for Ruling on Summary Charts Prior to Trial | 391 |
| | Motion to Dismiss RICO Count Based on Multiple Conspiracies | 689 |
| | Motion to Suppress Art Work and Music Videos | 690 |
| | Motion for Bill of Particulars | 694 |
| | Motion to Adopt Motions of Other Defendants | 746 |
| | Supplemental Motion to Adopt Motions of Other Defendants | 759 |
| **Frazier** | Motion to Suppress Tangible Evidence | 590 |
| | Motion to Suppress Cell Phone Evidence | 591 |
| | Motion to Suppress DNA Evidence | 592 |
| | Motion to Suppress Statements | 593 |
| | Motion to Suppress Social Media | 594 |
| | Corrected Motion to Sever Defendant | 596 |
| **Lashley, Ma.** | Motion to Suppress Statements | 757 |
| | Motion to Adopt Motions of Other Defendants | 758 |

## II.    STATEMENT OF FACTS

The Defendants are members and associates of a violent subset of the Bloods gang known as Murdaland Mafia Piru (MMP), sometimes referred to as the "Mob" or "Mobsters."   Between 2011 and the date of the Second Superseding Indictment, MMP dominated the drug trade in large swaths of Northwest Baltimore and neighboring Baltimore County and wreaked havoc in the surrounding communities.   The defendants were responsible for at least five murders; six attempted murders (three of which resulted in life-threatening bodily injury); numerous additional conspiracies to commit murder, assaults, and robberies; and six years of high-volume street-level

drug trafficking.  They used violence and threats of violence to eliminate would-be rivals and silence witnesses.  They profited from the scourge of addiction.  And they left behind a legacy of fear, misery, and contempt for the rule of law.

The evidence in the case comes from a wide array of sources, including three ATF-led wiretaps in July and August 2016, eight HSI-led wiretaps in June and July 2015, 26 controlled purchases of narcotics and firearms; search warrants executed on 22 residences and vehicles, 86 cell phones, and 27 social media accounts; cell site location information for over a dozen cell phones; hundreds of recorded jail calls and visits; dozens of intercepted jail mailings; DNA and ballistic evidence; and scores of witnesses.  Over the course of the investigation, law enforcement officers have seized 42 firearms, over a kilogram of heroin, over 280 grams of crack cocaine, and gang paperwork from a variety of locations.

In the section that follows, we summarize the history, structure, and membership of MMP and provide a high-level overview of some of the acts of violence committed in furtherance of the gang.[5]  Additional facts pertaining to specific motions are discussed in the "Argument" section of this response.

**A.  The History, Structure, and Membership of Murdaland Mafia Piru (MMP)**

MMP is descended from the Tree Top Piru (TTP) subset of the Bloods gang.  TTP was formed in Compton, California in the 1970s and derives its name from a group of streets in Compton named after trees.  Eventually, TTP spread throughout other states across the country, and it became prevalent in Maryland beginning in the late 1990s.

---

[5]       This is by no means a complete discussion, as, for safety reasons, we have not named or alluded to witnesses whose identities have not been disclosed.  Pursuant to the parties' discovery agreement, the government will identify such witnesses and provide *Jencks* material one week before trial.

In February 2008, the United States Attorney's Office for the District of Maryland indicted twenty-eight leaders of TTP on racketeering charges, effectively ending TTP's control in Maryland.  According to MMP gang paperwork, the 2008 indictment "destroyed" TTP because it led to accusations of "snitching" and "creat[ed] separation between brothers."  MMP was formed in response to the federal indictment, and replaced TTP in Baltimore.  Although MMP adopted some of the same practices as TTP, it developed its own ideology—in particular, an association with the terminology and symbols of the Italian Mafia, and a preoccupation with money and murder.

Since at least 2011, MMP has been led by Dante BAILEY, a/k/a Gutta, who is referred to as the "Don" or "Godfather" of the gang.  After his release from prison in 2011, BAILEY flew to California to meet with West Coast leaders of TTP and gain their official approval for the MMP set in Maryland.  BAILEY was responsible for writing and disseminating many of MMP's charter documents.

MMP was organized hierarchically, with a "Don" or "Godfather" at the top (BAILEY) and various "Bosses," "Underbosses," "Capos," "Lieutenants," and "Mobsters" underneath. According to MMP gang paperwork, certain ranking members had specialized functions, such as the "Five-Star General," whose job was "training soldiers to defend our family," and the "Boss of All Bosses," whose job was overseeing the gang's finances and "orchestrat[ing] a dues system." Prospective members of MMP were required to successfully complete an initiation process and recite an oath of loyalty called the "Omerta Code."

MMP gang paperwork lays out certain rules of conduct by which members are governed. Members who violate these rules or who disobeyed an order from a superior are subjected to disciplinary measures, which range from fines or work assignments for minor violations, to

physical beatings or stabbings for more serious violations, to murder for the most serious violations.  Violations that are punishable by death include "[a]ny acts or attempted acts of treason" and "[a]ny co-operation with authorities that lead[s] to incriminating others."  Other MMP rules include: "[w]hen at war fight like you are ready to die," and "[w]henever we are forced to strike, our only option is to kill."  MMP members enhanced their status within the gang by carrying out acts of violence against rivals; for instance, members could earn a "lightning bolt" tattoo for "killing for the Mob."  Several MMP members, including BAILEY, have lightning bolt tattoos on their faces or bodies.

MMP members and associates operated street-level drug distribution shops in various locations in Baltimore City, where they sold heroin, cocaine, crack cocaine, fentanyl, and marijuana, among other controlled substances.  MMP's primary drug shops were at the BP gas station in the 5200 block of Windsor Mill Road (which MMP considered to be its headquarters), and at the intersection of Gwynn Oak Avenue and Liberty Heights Avenue.  The drug shop in the 5200 block of Windsor Mill Road was particularly lucrative because of its close proximity to Interstate 70, which made it easily accessible to drug customers driving from western Maryland and neighboring states.  It was not unusual for the defendants to sell over a kilogram of drugs per week at this location, which could translate to over $100,000 in drug revenue.  MMP members and associates frequently stashed drugs and firearms on the premises of the BP gas station and made drug sales at the gas pumps or within the store itself.

MMP members were required to pay dues to the gang consisting of a portion of the proceeds of their drug sales, and they were subject to reprisal—and sometimes murder—for failing to do so.  Non-members who wished to sell drugs in MMP's territories were forced to pay a "tax" or were targeted for violence.

MMP is believed to be responsible for dozens of murders and shootings since 2011.  This prosecution, however, focuses on a smaller universe of five murders, six attempted murders, and several additional conspiracies to commit murder.  We discuss the facts pertaining to some of these violent crimes below.

### B.   The October 15, 2012 Attempted Murder of S.H., a/k/a Nooks

In October 2012, Dante BAILEY ordered a hit on S.H., a/k/a "Nooks," because S.H. was rumored to be cooperating with law enforcement, and because he had stolen drug customers from MMP members in the 5200 block of Windsor Mill Road.  Adrian Jamal SPENCE agreed to supply money for the hit.  On October 15, 2012, BAILEY and a group of MMP members attended Club Mirage in downtown Baltimore, where they saw S.H. standing in line outside the club.  At BAILEY's direction, William BANKS attempted to murder S.H., shooting him numerous times in the head and torso at close range with a .45 caliber firearm.  A bystander was also shot in the leg as he attempted to flee.  S.H. recovered from his injuries after a prolonged hospitalization.  Later, BAILEY paid W. BANKS a few hundred dollars for carrying out the hit (albeit unsuccessfully).

A high-resolution surveillance camera captured the shooting.  Roughly twenty minutes beforehand, the footage shows Dante BAILEY arrive at Club Mirage with William BANKS, Dontray JOHNSON, Randy BANKS, Devon DENT, MMP member Davon Temple, a/k/a Nizzy,[6] and now-deceased MMP members James Edwards, a/k/a Bangout, and Maurice Braham, a/k/a Mookie.  JOHNSON wears a red shirt with "MOBB SQUAD" in white letters on the back.  They stand in a large crowd waiting to enter the club.  At one point, JOHNSON walks up behind the

---

[6]     Temple discusses his MMP membership in several recorded jail calls with the indicted defendants.  He is serving a life sentence in state custody for a different murder and is not charged in this case.

victim and films him with a tablet device.  W. BANKS disappears out of camera view for a period of time, but then returns wearing a gray sweatshirt with the hood pulled over his head.  He stands near his MMP cohorts for a minute or so and then opens fire on the victim.  Panic erupts as members of the crowd flee in every direction.  BAILEY, however, seems unperturbed, and walks away slowly while looking over his shoulder in the direction of W. BANKS and the victim.

BAILEY recounted the events surrounding the attempted murder of S.H. in a semi-autobiographical screenplay that investigators recovered from his residence on May 17, 2016.  The screenplay includes a scene in which "Nooks" (*i.e.*, the victim, S.H.) serves drug customers in the 5200 block of Windsor Mill Road, and a scene in which "Gutta" (*i.e.*, BAILEY) learns that "Nooks" is "a rat."  A notation on one pages states: "We have to insert a scene where Spittle [*i.e.*, SPENCE] asks about Nooks & the nigga say he a rat & a bitch & a snake."  Later, there is a scene in which "Nooks gets hit" at "Club Mirage."  In this scene, "Gutta" and "Dirt" (*i.e.*, R. BANKS) see "Nooks" standing in line outside the club, and they decide to "shut this bitch down" and "make it look like 4th of July."

### C.  The November 22, 2012 Murder of Antoine Ellis, a/k/a Poopy

In November 2012, Dante BAILEY ordered the murder of MMP member Antoine Ellis, a/k/a Poopy, as a sanction for violating the rules of the gang.  According to BAILEY, Ellis had joined BGF and was trying to "play both sides"; he would alternately sell drugs in BGF territory and pretend to be a member of BGF, and then sell drugs in MMP territory and fly the MMP flag.  On Thanksgiving Day 2012, Dontray JOHNSON carried out the murder, shooting Ellis to death in the field across the street from the BP gas station in the 5200 block of Windsor Mill Road.

A surveillance camera at the BP gas station captured the shooter with the victim immediately before the murder.  The footage shows a short, stocky individual wearing a gray

sweatsuit (the shooter) and a thinner individual in jeans (the victim) leave the gas station and walk toward the field across the street.  The individual in the sweatsuit is consistent in size and stature with JOHNSON.  Another surveillance camera shows the same individual in the gray sweatsuit running away from the field where the murder occurred, alone, shortly after the murder.

Contemporaneous posts to JOHNSON's Facebook profile "gambinommp" shed light on his state of mind and motivation for committing the murder.  On November 22, 2012, at 12:08p.m., a few hours before the murder, JOHNSON posted the comment: "198 n risen"—a reference to that year's murder tally in Baltimore City.   Then, at 8:36p.m., several hours after the murder, JOHNSON posted another comment that said: "time to go ,batman has work to do .the city has to be cleaned up from it bull shitter n boot- lickers,i love gothem city…ckooock dooodooooo do… hi hi hi hi hi hi dummies…….love u bro."

Consistent with his *modus operandi*, BAILEY rewarded JOHNSON with $200 for his loyalty in carrying out the Ellis murder.  On November 24, 2012, at 2:12a.m., JOHNSON posted a comment to his Facebook profile that said: "Nig** told me I'm one of the loyalist young nig** he knows then gave me a couple hunnid…I said what's this for he said for being u .started to give it back but I ain't want to b rude."   In response, Dante BAILEY (using Facebook profile "DantetheGreat") commented: "Oh yeah…"

### D.  The February 12, 2015 Murder of James Edwards, a/k/a "Bangout"

On February 12, 2015, Dante BAILEY shot fellow MMP member James Edwards, a/k/a Bangout, to death with a .40 caliber firearm.  According to BAILEY, Edwards had to be killed because he had become disillusioned with MMP and was making threats against other members of the gang.

BAILEY had discharged the same weapon he used to kill Edwards just three nights earlier,

on February 8, 2015.  On that night, at roughly 10:05p.m., police responded to the BP gas station in the 5200 block of Windsor Mill Road based on a report of shots fired.  They recovered six .40 caliber casings and a live .40 caliber round from the gas station lot.  One bullet had penetrated the window of a nearby residence.

The confrontation was captured by a surveillance camera at the BP gas station.  The footage shows BAILEY arrive at the gas station with Corloyd ANDERSON at around 9:21p.m.  ANDERSON drives away by himself at around 9:40p.m., but BAILEY lingers on camera until roughly 9:50p.m., when he walks around the corner of the gas station out of view.  (On this side of the gas station is a strip of stores and a parking lot.)  At roughly 10:01p.m., Dominick WEDLOCK and William JONES pull up to the gas pumps in a white Mustang sedan, followed closely by a dark sedan that resembles the navy blue that Lexus BAILEY was known to drive.  WEDLOCK confronts a group of three males at a neighboring pump, and the three men retreat into their car.  WEDLOCK then approaches the driver's side of the dark sedan.  After a brief conversation, the driver of the dark sedan exits the vehicle and fires several shots at the three men in the car, who flee on foot.  JONES then slashes a tire on the victims' car.

Edwards' body was discovered in the 300 block of Collins Avenue shortly after 1:00a.m. on February 12, 2015.  He had been shot once in the face, twice in the head, and twice in the chest.  A firearms comparison expert determined that the casings and projectiles from the murder scene were fired with the same gun as the casings and projectiles from the scene of the discharging at the BP gas station.

At the time of his death, Edwards was using a cell phone with number (410) 259-8098, but the phone was not found with his body.  Investigators issued a subpoena for toll records from the service provider for the phone, Verizon.  The Verizon records show that BAILEY sent eleven text

messages to Edwards in the two-hour period before he was murdered, and none afterward.[7]

Roughly one week after the murder, on February 19, 2015, MMP member Davon Temple, a/k/a Nizzy, participated in a recorded jail call with an incarcerated MMP member in which they discussed the murder.[8]  Temple told the incarcerated MMP member: "You know we lost a brother too. . . . Bangout . . . He got shot one time in his face, three in the head, three in the chest."  At the time of the call, the nature of Edwards' gunshot wounds had not been released to the public.

### E.  The September 29, 2015 Murder of Brian Johnson, a/k/a Nutty B

On September 29, 2015, Dontray JOHNSON murdered MMP member Brian Johnson, a/k/a Nutty B, because he refused to pay gang dues JOHNSON was collecting for Dante BAILEY and his wife Tiffany BAILEY.[9]  MMP gang dues were typically derived from the sale of drugs, and in this case, they were intended to help pay BAILEY's lawyer's fees and support his wife and children while he was incarcerated in the Baltimore County Detention Center on state drug charges.

In the weeks leading up to the murder, BAILEY gave JOHNSON the go-ahead to kill any MMP member who did not contribute money to his cause.  About two weeks before the murder, JOHNSON called an MMP meeting in a park near Woodlawn Cemetery.  JOHNSON told everyone there that they had to start paying dues, and anyone who did not comply would face a serious sanction.  Some people contributed money there at the meeting.  The victim did not attend the meeting and did not contribute money.

---

[7]      At the time, BAILEY was using a cell phone with phone number (443) 415-9975.

[8]      The jail call was made from the inmate account of Avery Douglas to phone number (667) 207-4928, which is saved as "Bruh Nizz" in the contacts list of a cell phone seized from Dominick WEDLOCK incident to his arrest on February 12, 2015.  Temple is also recognizable by his voice.

[9]      There is no known relation between Dontray JOHNSON and the victim, Brian Johnson.

The murder took place in broad daylight outside the convenience store attached to the BP gas station in the 5200 block of Windsor Mill Road.  It was captured by multiple surveillance cameras.  The footage shows Dontray JOHNSON, Melvin LASHLEY, Sydni FRAZIER and now-deceased MMP associate Dominick Kane, a/k/a Fish, standing together inside the attached convenience store as though they are waiting for someone.  When the victim approaches the store, JOHNSON exits to confront him, and LASHLEY and Kane follow closely behind.  They surround the victim.  There appears to be a verbal altercation, and then Kane strikes the victim in the face.  The victim starts to defend himself, but JOHNSON immediately pulls out a gun and shoots him in the chest at close range, sending him flying backward through the glass storefront.  JOHNSON and Kane bolt from the scene.  LASHLEY lingers for a minute or so while the victim writhes on the floor, in obvious distress.  Then he helps an associate place the victim in the backseat of a vehicle, and himself quickly flees the area.

A few hours after the murder, JOHNSON visited Dante BAILEY at the Baltimore County Detention Center and used coded language to recount what had happened in a recorded conversation.  BAILEY approved the murder, telling JOHNSON to keep doing what he was doing to enforce the dues system, even if it meant "blow[ing] another nig**'s head off."  JOHNSON assured BAILEY he would continue enforcing the gang dues and ordering MMP members to "kick that money out."

The following day, September 30, 2015, LASHLEY participated in a recorded jail call with incarcerated MMP member William JONES.  LASHLEY advised JONES that he was there when "Nutty B" (*i.e.*, Brian Johnson) was killed and described what happened.  An unknown male joined the call and asked whether the killing was "within the circle."  LASHLEY replied in the affirmative.  In a subsequent recorded jail call on October 15, 2015, LASHLEY informed JONES

19

that the triggerman was "Bino" (*i.e.*, Dontray JOHNSON).

**F. The April 28, 2016 Murder of Anthony Hornes**

Anthony Hornes was a casualty of a violent feud between MMP's Liberty Heights/Gwynn Oak drug shop and a rival drug organization in neighboring Howard Park in Spring 2016.  The rash of violence began on April 26, 2016, when an MMP member killed Carlos Younger, a/k/a Los, for unknown reasons.  Two days later, on April 28, 2016, at roughly 7:39p.m., Younger's associates struck back, killing MMP member Maurice Braham, a/k/a Mookie, in the 4700 block of Gwynn Oak Avenue.  Hornes was killed roughly two hours later in the 4700 block of Haddon Avenue, just a few blocks away.

Shortly after Braham was killed, Dante BAILEY and Jamal LOCKLEY armed themselves and went looking to retaliate against members of the rival drug organization they believed were responsible.  BAILEY saw Hornes standing in the rivals' territory and shot him in the head with a 9mm caliber firearm, killing him.  LOCKLEY was the getaway driver.

At the time of the murder, BAILEY was using a Sprint cell phone with number (802) 839-8109, and LOCKLEY was using a T-Mobile cell phone with number (443) 709-7780.  Cell site location data from Sprint and T-Mobile shows that both phones were hitting off cell towers in the area where Hornes was killed around the time of the murder.

The day after the murder, on April 29, 2016, at 10:02p.m., MMP member Darius Stepney, a/k/a Peewee, made a recorded jail call to a male associate using phone number (434) 227-1119.  Stepney told the unknown male that he believed the "Los" (*i.e.*, Younger) and "Mookie" (*i.e.*, Braham) murders were connected.  Stepney said he wondered if "Mookie's" killers wanted some "smoke out that way" and asked where "Gutta" (*i.e.*, BAILEY) was.  The male associate replied that "something already happened about that" and that it was on the news.  He then read from a

newspaper article, saying "4700 block of Haddon 34-year-old Anthony Hornes of the 3800 block of Crandale suffered from a gunshot wound."

As it turned out, Hornes had little, if any, connection to the Howard Park drug trafficking organization, and nothing to do with Braham's murder. He had spent the day training for a job at Yellow Cab, and the evening at home with his wife and her children. He went out to buy cigarettes and never returned.

## G. The August 10, 2016 Murder of Ricardo Johnson, a/k/a Uncle Rick

Dante BAILEY arranged for Ricardo Johnson, a/k/a Uncle Rick, to be killed because he was rumored to be snitching, and because he had clashed with another MMP member, Dwight JENKINS. Sydni FRAZIER and one or more others carried out the murder in the early morning hours of August 10, 2016.

The victim's body was discovered in the backseat of a stolen van parked beside the light rail tracks in the 2200 block of Kloman Street in Baltimore at roughly 6:25a.m. on August 10. Johnson's wrists and ankles had been bound, and he had been shot over twenty times in the head, neck, torso, and buttocks. There was partially burned flammable material stuffed in the gas tank fill spout, suggesting that the killers had tried to set the van on fire. Numerous 9mm caliber casings and projectiles were recovered from in and around the van. Further investigation revealed that Johnson had been abducted outside his residence at 1101 West Lanvale Street at roughly 2:30a.m. on August 10, while he was on the phone with his girlfriend. The girlfriend heard what sounded like a scuffle and impassioned voices, and then the phone abruptly hung up. She immediately called 911 and ran to the scene, but neither she nor police could locate Johnson.

Later on August 10, at roughly 5:17p.m., members of the BPD Dirt Bike Task Force were in the area of 2100 Tucker Lane (in MMP territory) when they observed an unknown black male—

later identified as Sydni FRAZIER—riding a neon green dirt bike.  Because the use of dirt bikes is illegal in Baltimore City, the officers attempted to stop FRAZIER and confiscate the bike. FRAZIER fled on foot and, in the process, abandoned the dirt bike and a backpack and gloves he had been wearing.  FRAZIER was able to evade the officers and was not arrested at that time. However, the officers obtained video footage of FRAZIER on the dirt bike from nearby surveillance cameras.

The abandoned backpack was found to contain a jacket, two cell phones, and two loaded 9mm caliber handguns.  Both guns were a ballistic match to the casings recovered from the Johnson murder scene.  In addition, the BPD DNA/Serology laboratory located a match between DNA found on the jacket in the backpack and a sample that was previously in the Combined DNA Index System ("CODIS") database for Sydni FRAZIER.  As a result of the CODIS DNA hit, BPD Homicide Detective Gary Niedermeier obtained a state search warrant for a full DNA profile from FRAZIER.  The BPD DNA/Serology laboratory determined that FRAZIER's DNA profile matched DNA from the jacket and from the *insides* of the gloves recovered next to the backpack.[10] Furthermore, the *victim's* DNA matched DNA from the *outsides* of the gloves.[11]

The two cell phones found in the discarded backpack were forensically analyzed pursuant to a state search warrant.  The contents of the phones make clear that they belonged to FRAZIER. The first phone was an AT&T "flip" phone with phone number (443) 447-0282.  In the weeks

---

[10]     For the sample from the exterior left glove, the match was 47.7 billion times more probable than a coincidental match to an unrelated individual in the African American population.  For the sample from the exterior right glove, the match was 10.8 trillion times more probable than a coincidental match to an unrelated individual in the African American population.

[11]     For the sample from the interior of the left glove, the match was 382 septillion times more probable than a coincidental match to an unrelated individual in the African American population. For the sample from the interior of the right glove, the match was 626 million times more probable than a coincidental match to an unrelated individual in the African American population.

leading up to Johnson's murder, the AT&T phone was in contact numerous times with phone numbers belonging to FRAZIER's girlfriend and mother.

The second cell phone from the backpack was a T-Mobile "smart" phone with phone number (443) 640-8950—a number FRAZIER had provided to an undercover officer posing as a drug customer in May 2016.  The phone contains multiple photographs and videos of FRAZIER, as well as outgoing text messages in which he identifies himself as "Sid."  Five days before the murder, on August 5, 2016, at 6:59p.m., FRAZIER received a text message from phone number (410) 831-5525, saying, "Get a box of rubber gloves. We don't want to touch nuffn."  FRAZIER replied: "Come on yo u hot that's a mandatory."  On August 10, 2016, at 11:18a.m.—roughly five hours after Ricardo Johnson's body was discovered—the (410) 831-5525 number sent FRAZIER another text message attaching a screenshot of a news article titled, "Search for witnesses after man found fatally shot in back of minivan by light rail station."  At the time, police had not yet identified the victim as Ricardo Johnson.

The second of FRAZIER's phones also sheds light on FRAZIER's motivation for carrying out the murder.  The phone contains a roughly eight-minute audio recording of a conversation with a group of male associates on July 27, 2016.  During the conversation, one of the male associates talks about how "fucked up this city is" and refers to the murder of a young rap artist's brother. FRAZIER points out that the murder victim "told," *i.e.*, cooperated with law enforcement.  The associate objects, saying, "But at the end of the day, they kilt his brother. That's his blood brother!" FRAZIER replies: "I understand. A rat not supposed to live, though.  If my brother a rat, and I gotta kill him yo, I might have to do that, my nigga.  That tellin' shit is serious, yo."

Cell site location data from AT&T and T-Mobile shows that FRAZIER's phones were in the vicinity of 1101 West Lanvale Street around the time the victim was abducted and in the

vicinity of 2100 Tucker Lane around the time of the dirt bike chase.  There are gaps in the cell site location data for the phones during the period between the abduction and roughly 6:25a.m. when the victim's body was discovered.

Around the time of Johnson's murder, investigators were monitoring a federal wiretap on Dwight JENKINS' cell phone.  JENKINS was intercepted in several wiretap calls with MMP members and associates in which he recounted a fight he had with the victim a few weeks before the murder, and threatened to hurt him the next time he saw him.  For instance, on July 17, 2016, a call was intercepted between JENKINS and Jamal LOCKLEY in which JENKINS referred to a dispute he had with "Rick" and said, "I swear to God, I'm a hurt this nigga."  LOCKLEY replied, "Say no more."[12]  In a subsequent call on July 18, 2016, JENKINS described an incident in which he was hanging out with "Sid" (*i.e.*, FRAZIER) when "Rick" (*i.e.*, the victim, Ricardo Johnson) walked by, and FRAZIER told JENKINS that Johnson owed him $70.  Specifically, JENKINS said: "[E]arlier yesterday I'm down on Bennett [Street], standing in the middle of the street. Rick comes down the block. I'm talking to Sid.  Sid like, there go Rick.  Rick turns around and go back up the street. He like damn Unc, he owe me seventy dollars. And he ain't even gonna pull me cause you standing here.  I'm like man, fuck Ricky."

Toll records for FRAZIER's phone number, (443) 640-8950, show that FRAZIER talked

---

[12]     In addition, on July 18, 2016, a call was intercepted from JENKINS to an unknown male whom JENKINS referred to as "Butch."  In the call, JENKINS told "Butch" that when he saw "Rick," he was going to "beat the shit out of him . . . I'm gonna knock his teeth out, I'm telling you, watch.  You gonna hear about it."  Later that day, another call was intercepted between JENKINS and Donte Blackston, a/k/a Chi-Chi, in which JENKINS again recounted the fight with "Rick" and said: "Yo, when I see him, I'm gonna bang him in his mouth. Watch. I got something for him . . . Faggot motherfucka. He's a fucking punk. But I'm going to catch him, though. … I'm a catch him."  The day after the murder, on August 11, 2016, a friend of JENKINS sent him a Facebook message saying, "Rick got killed."  JENKINS replied: "Fuck that nigga, we was beefing last week real heavy."

to JENKINS on July 19, 2016—two days after JENKINS' fight with the victim—and again on August 10, 2016, the day Johnson was killed.

Two days after the murder, on August 12, 2016, a wiretap call was intercepted from Jamal LOCKLEY to MMP member Melvin LASHLEY.  In the call, LOCKLEY told LASHLEY that "Uncle Slick"—a reference to the victim—"got wore out."   LASHLEY responded, "Yeah, somebody said he got hit seventeen times."  LOCKLEY said, "Fuck no! Damn!"  At that time, the fact that Ricardo Johnson had been shot an excessive number of times was not public knowledge.

A week later, on August 19, 2016, Dante BAILEY made a recorded jail call from Northern Neck Regional Jail to Jamal LOCKLEY.  During the call, BAILEY said, "Oh yeah, and, uh, I heard about your uncle"—another reference to the victim, a/k/a "Uncle Rick."  LOCKLEY replied, "Oh yeah?"  BAILEY said: "They was trying to catch the light rail"—a veiled reference to Johnson's murder in the proximity of the MTA light rail tracks.  This prompted laughter in the background.

Several weeks after the murder, the victim's missing iPhone—which he had been using on the night of the murder but was not found at the murder scene—was used to access the internet in and around the area of the 900 block of Bennett Place.  This is an area FRAZIER was known to frequent based on cell phone evidence and police records.[13]

In January 2017, FRAZIER posted a photograph to his Instagram profile "getmneyboy" that pictured him posing in the 5200 block of Windsor Mill Road and making an "M" gang sign for MMP.  He added the comment: "I seen my homie kill my other homie call dat nigga RICo /

---

[13]     For instance, on November 17, 2017, the Baltimore Police Department executed a search and seizure warrant at 961 Bennett Place, Baltimore, Maryland, where they recovered an ATM card in the name of Sydni FRAZIER, as well as heroin, drug packaging material, scales, a blender, and numerous rounds of live ammunition, among other contraband.

heard they put the police on me beta Watch out for that RICO."  The second reference to "RICO" is in all capital letters, like the abbreviation for the federal racketeering statute, but the first reference—written "RICo"—appears to be a play on the victim's name, Ricardo.  FRAZIER posted the comment a few days after the DNA warrant was served on him, when the murder was likely on his mind.

On January 25, 2017, FRAZIER was arrested and charged with possession of firearms and ammunition by a felon in violation of 18 U.S.C. § 922(g).  After his arrest, FRAZIER waived his *Miranda* rights and agreed to take part in a videotaped interview, during which he made a series of demonstrably false statements.  For instance, when asked about the dirt bike chase on August 10, 2016, FRAZIER claimed that the person on the bike was not him, and that he never rode dirt bikes or wore gloves.  However, FRAZIER's own Facebook profile picture shows him riding a similar neon green dirt bike.  Another publicly accessible Instagram photograph of FRAZIER shows him atop a dirt bike, while wearing gloves.  In addition, when shown a picture of the victim, FRAZIER denied knowing him.  However, as discussed above, wiretap evidence demonstrates that FRAZIER did know Ricardo Johnson, and, in fact, that Johnson owed FRAZIER money shortly before the murder.

## III.   ARGUMENT

### A. Motions for Severance by Shakeen Davis (ECF 385), Jacob Bowling (ECF 420), Jamal Lockley (ECF 497), Corloyd Anderson (ECF 506), Sydni Frazier (ECF 596), and Dante Bailey (ECF 753)

Defendants   Shakeen   DAVIS,   Jacob   BOWLING,   Jamal   LOCKLEY,   Corloyd ANDERSON, Sydni FRAZIER, and Dante BAILEY have moved to sever their trials.  All six argue that the scope of the conspiracy and different degrees of culpability among defendants create a risk of prejudicial spillover and juror confusion.   ANDERSON and LOCKLEY allege that they

are not members of MMP and therefore that evidence pertaining to the gang's activity will unfairly prejudice them.  ECF 497, at 2–4; ECF 506, at 1–2.  BOWLING alleges that his only crimes were drug crimes and therefore that evidence pertaining to violent crimes will unfairly prejudice him.  ECF 420, at 1.  LOCKLEY and DAVIS raise the possibility of *Bruton* problems.  ECF 385, at 3; ECF 497, at 4.  Finally, DAVIS argues that a joint trial may deny him exculpatory testimony by his co-defendants.  ECF 385, at 2.

The motions for severance consist largely of legal boilerplate.  None of the defendants raise irreconcilable defenses or point to any specific evidence that would be admissible against co-defendants at a joint trial but inadmissible as to them.  For the reasons stated below, these motions should be denied.[14]

When defendants are properly joined under Federal Rule of Criminal Procedure 8(b), as in this case, severance under Federal Rule of Criminal Procedure 14 is justified "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence."  *Zafiro v. United States,* 506 U.S. 534, 539 (1993).  The party moving for severance must establish that "actual prejudice would result from a joint trial, and not merely that a separate trial would offer a better chance of acquittal."  *United States v. Reavis,* 48 F.3d 763, 767 (4th Cir. 1995) (citations and internal quotations omitted), *cert. denied,* 515 U.S. 1151 (1995).  Moreover, Rule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief, if any, to the district court's sound discretion.  *Zafiro*, 506 U.S. at 538.

---

[14]    The government understands that limitations in courtroom capacity may require severance in the event that ten or more defendants proceed to trial in November.  However, we respectfully submit that it would be premature to sever defendants for that reason now when it is probable that additional defendants will plead guilty over the next several months.  None of the defendants have put forward valid *legal* reasons why they should be severed.

It is well-settled that there is a preference in the federal system for joint trials of defendants who are indicted together. *Id.* at 537. Indeed, the Fourth Circuit has held that "[b]arring special circumstances, . . . the general rule is that defendants indicted together should be tried together for the sake of judicial economy." *United States v. Rusher*, 966 F.2d 868, 877 (4th Cir.) (internal quotations omitted), *cert. denied*, 506 U.S. 926 (1992). Specifically, courts have recognized that severance creates an unnecessary burden and inefficiency for the court, the government, and the witnesses, by requiring the presentation of the same case on multiple occasions. As a result, claims of potential prejudice generally are addressed through limiting instructions rather than severance. *See Zafiro*, 506 U.S. at 539; *United States v. Hayden,* 85 F.3d 153, 160 (4th Cir. 1996); Fed. R. Evid. 105.

### 1.     The Defendants in this Case Were Properly Joined.

As an initial matter, it is important to note that the defendants in this case were properly joined pursuant to Federal Rule of Criminal Procedure 8(b). Specifically, the defendants are all charged in the same racketeering conspiracy and drug trafficking conspiracy and therefore plainly "are alleged to have participated in . . . the same series of acts or transactions constituting an offense or offenses." Fed. R. Crim. P. 8(b). Indeed, a case involving a single conspiracy is precisely the type of case in which co-conspirators should be tried together, since much of the evidence presented by the government in its case-in-chief will pertain to all defendants. *See, e.g., Zafiro,* 506 U.S. at 537–38; *United States v. Akinkoye,* 185 F.3d 192, 197 (4th Cir. 1999), *cert. denied,* 528 U.S. 1177 (2000) ("Generally, we adhere to the rule that defendants charged with participation in the same conspiracy are to be tried jointly."). Accordingly, the presumption in this case is that all of the defendants should be tried together.

### 2.   A Joint Trial Will Not Prevent any Defendant from Receiving a Fair Trial.

A district court should grant a severance under Rule 14 only if there is a "serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro,* 506 U.S. at 539.  There is no such risk in this case.  None of the defendants allege irreconcilable defenses such that one defendant's claim of innocence depends upon a co-defendant's guilt.  *See id.* at 538.  And the defendants are roughly evenly matched in terms of their culpability: all six are alleged to have committed both drug trafficking offenses *and* firearm-related offenses in furtherance of the racketeering conspiracy.[15]

The Court should reject the arguments by ANDERSON, LOCKLEY, and BOWLING that they will be prejudiced by evidence of gang activity and violence.  The evidence at trial will establish that all three were intimately involved in MMP's affairs.  ANDERSON was a high-ranking member, or "Boss," of MMP, who supplied many kilograms of heroin to members of the gang over the lifetime of the conspiracy.  BOWLING was also a long-time member of MMP who, in a recorded jail call on July 24, 2016, agreed to carry out a sanction against a fellow MMP member for violating gang rules.  *See* ECF 515, at 35.  LOCKLEY participated with BAILEY in the April 28, 2016 murder of Anthony Hornes in retaliation for the murder of an MMP member, *see id.* at 32–33, and in an August 2016 conspiracy to murder William BANKS based on a belief that he was cooperating with law enforcement against MMP, *id.*, at 37–38.

---

[15] Indeed, four of the six—BAILEY, LOCKLEY, FRAZIER, and DAVIS—are alleged to have committed murders or attempted murders in furtherance of the gang.  With respect to BOWLING, the Second Superseding Indictment alleges that he illegally possessed a firearm on July 13, 2016, *see* ECF 515, at 35; and possessed a Glock 9mm caliber magazine on September 27, 2016, *see id.* at 39.  ANDERSON is alleged to have illegally possessed a loaded, stolen Glock 9mm firearm on September 27, 2016.  *See id.* at 39 & Count 24.

It is frequently the case that members of a criminal gang play different roles in the conspiracy—some might generate revenue for the gang by engaging in high-volume retail drug sales, while others might serve as enforcers or "muscle."   As Dante BAILEY explained in a promotional interview on YouTube, "We got teams for money and murder—whatever you want to do."  Although the defendants may have played different roles in the charged conspiracy, _all_ of them benefitted from the violence carried out by MMP members to preserve the gang's territories, eliminate rivals, and silence witnesses.  Any risk of prejudice from perceived differences in the defendants' levels of relative culpability can be resolved by "less drastic measures [than severance], such as limiting instructions."  *Zafiro,* 506 U.S. at 539; *see also United States v. Brugman*, 655 F.2d 540, 543 (4th Cir. 1981) ("The language of Rule 8(b) assumes certain evidence may be admitted against one defendant not necessarily applicable to another."); *United States v. Baker,* 10 F.3d 1374, 1388 (9th Cir. 1993) (finding no prejudice despite differences in culpability), *cert. denied,* 513 U.S. 934 (1994); *See also Akinkoye,* 185 F.3d at 197 (holding that there is no right to severance merely "because the evidence against one defendant is not as strong as that against the other") (citing *United States v. Brooks*, 957 F.2d 1138, 1145 (4th Cir.), *cert. denied*, 505 U.S 1228 (1992)).

### 3.   An Insufficient Showing Has Been Made Regarding the Need for Co-Defendants' Testimony at Trial.

DAVIS contends that severance is necessary because it is possible that a co-defendant would be willing to provide exculpatory information if subpoenaed to testify at his severed trial, but would be unwilling to do so at a joint trial.  Under the governing law, this argument, too, must fail.

The Fourth Circuit has definitively held that a defendant's attempt to have his trial severed from that of a codefendant "is far less likely to succeed when the request is based on the asserted

need for a co-defendant's testimony." *Reavis,* 48 F.3d at 767–68.  Specifically, when a motion to sever is based on the alleged need for a codefendant's testimony, a defendant must show: (1) a bona fide need for the testimony of his codefendant; (2) the likelihood that the codefendant would testify at a second trial and waive his Fifth Amendment privilege; (3) the substance of the codefendant's intended testimony; and (4) the exculpatory nature and effect of such testimony.  *Id.* (citations omitted).  The second element of this test is not met when an offer to testify is conditioned on the codefendant's case being tried first.  *United States v. Parodi,* 703 F.2d 768, 779 (4th Cir. 1983).

In this case, DAVIS has not even attempted to meet his burden of showing that he needs a co-defendant's testimony, that any co-defendant would in fact provide exculpatory testimony at trial, or that the co-defendant would not invoke his Fifth Amendment privilege not to testify. Accordingly, this Court should reject that argument as a reason for any severance in this case.

### 4. There Are No *Bruton* Problems Requiring Severance.

DAVIS and LOCKLEY also contend that severance would be required if the government were to violate the Confrontation Clause of the Sixth Amendment, as construed in *Bruton v. United States,* 391 U.S. 123 (1968), by introducing the testimonial confession of a non-testifying defendant that directly implicates another defendant in wrongdoing.  *See* ECF 201, at 10–11.  The defendants have not identified any such confessions, and the government does not intend to use any.[16]  To the extent the government seeks to admit any such confessions, it will do so by calling the confessor to the witness stand.

---

[16] Although not raised by any of the defendants in their pretrial motions, we note that Devon DENT made certain statements to investigators about "Gutta" (*i.e.*, Dante BAILEY) during a prisoner transport on October 26, 2016.  *See* Ex. 1 (ATF ROI, Dent Statements, Oct. 26, 2016).  The government does not intend to elicit testimony about any of DENT's statements that directly implicated BAILEY in wrongdoing.

In any event, the proper remedy for a potential *Bruton* violation is not to sever the trials of the defendants, but instead to edit or redact the testimonial statement in order to eliminate the Confrontation Clause problem.  As the Supreme Court held in *Richardson v. Marsh,* 481 U.S. 200, 211 (1987), the Confrontation Clause is not violated when a non-testifying codefendant's confession is redacted to eliminate any reference to the other codefendant's existence.  Moreover, the Supreme Court has specifically held that there is no Sixth Amendment violation unless the confession sought to be introduced contains "facially incriminating statements," rather than merely statements which become incriminating when linked to other evidence.  *Richardson,* 481 U.S. at 208–09; *see also Akinkoye,* 185 F.3d at 197–98 (finding that when a non-testifying codefendant's statement is redacted and read into evidence such that the statements do not refer to the existence of the defendant, severance is not required).

**B. Motions to Suppress Wiretap Evidence Seized Pursuant to Court Orders Issued under 18 U.S.C. § 2510, *et seq.*, by Corloyd Anderson (ECF 399), Jacob Bowling (ECF 424), Adrian Spence (ECF 431), Jamal Lockley (ECF 492), and Ayinde Deleon (ECF 545)**

Between June and August 2016, ATF obtained federal wiretap authorization for a series of phones belonging to Dwight JENKINS (TT1), Jacob BOWLING (TT2), Jamal LOCKLEY (TT3), and Corloyd ANDERSON (TT4).  The wiretap on JENKINS' phone intercepted multiple calls to and from LOCKLEY.  The wiretap on BOWLING's phone intercepted multiple calls to and from Malcolm LASHLEY and Melvin LASHLEY.  The wiretap on LOCKLEY's phone intercepted multiple calls to and from ANDERSON, BOWLING, and Melvin LASHLEY. The wiretap on ANDERSON's phone failed to intercept any calls because ANDERSON had discontinued use of his phone by the time the wiretap order was issued.  It did, however, yield global positioning system ("GPS") data for ANDERSON's phone, which investigators relied upon in applying for a warrant to search ANDERSON's residence at 38 Windbluff Court, Owings Mills, Maryland 21117

(discussed further below).

BOWLING, ANDERSON, LOCKLEY, and DELEON challenge the wiretap authorizations.  In very similar filings, they argue that (1) the wiretap authorizations were not supported by probable cause, (2) normal investigative procedures were not exhausted and therefore the wiretaps were not necessary, and (3) the statutory minimization and termination-upon-attainment requirements were not properly observed.  None of the defendants cite to the relevant portions of the wiretap affidavits or provide case-specific arguments to support their claims.  *Id*.

As an initial matter, "[t]he defendant has the burden of demonstrating that a wiretap order is invalid."  *United States v. Jayson*, 52 F.3d 322, *5 (4th Cir. 1995) (unpub.) (citing *United States v. Nunez*, 877 F.2d 1470, 1472 (10th Cir. 1989)); *see also United States v. Quintana*, 70 F.3d 1167, 1169 (10th Cir. 1995) ("[A] wiretap authorization order is presumed proper, and a defendant carries the burden of overcoming this presumption.").  Furthermore, "great deference" should be paid to the determination of the issuing judge.  *United States v. DePew*, 932 F.2d 324, 327 (4th Cir. 1991); *see also United States v. McKinney*, 785 F. Supp. 1214, 1220 (D. Md. 1992) ("determinations by an issuing judge are accorded substantial deference").

We address the defendants' arguments in turn below.  The wiretap application paperwork for TT1 and TT2 is attached as Exhibit 2; the wiretap application paperwork for TT3 is attached as Exhibit 3; and the wiretap application paperwork for TT4 is attached as Exhibit 4.

### 1.     The Affidavits Provided Ample Probable Cause for the Requested Wiretaps

Section 2518(3) of Title 18 of the United States Code authorizes a district court to enter an order permitting a wiretap if (1) "there is probable cause for belief that an individual is committing, has committed, or is about to commit an offense enumerated in [18 U.S.C. §] 2516"; (2) "there is probable cause for belief that particular communications concerning that offense will be obtained

33

through such interception"; and (3) there is probable cause for belief that the [target facilities] are being used, or are about to be used in connection with the commission of such offense."  18 U.S.C. § 2518(3)(a), (b), (d); *see also United States v. Sellers*, 512 Fed. Appx. 319, 328 (4th Cir. 2013).

The Fourth Circuit has held that the "probable cause required for issuance of a wiretap order is the same as that which is necessary to obtain the issuance of a search warrant." *United States v. Talbert*, 706 F.2d 464, 467 (4th Cir. 1983); *United States v. Brewer*, 204 Fed. Appx. 205, 207 (4th Cir. 2006).  Section 2518(3)(b) does not require proof beyond a reasonable doubt, but rather a "fair probability" that evidence of criminal conduct will be obtained through interception of communications.  *Id.*  Moreover, "[a]pplications for electronic surveillance orders, like search warrants, are to be read 'in a common sense and realistic fashion.'"  *McKinney*, 785 F. Supp. at 1219 (quoting *United States v. Errera*, 616 F. Supp. 1145, 1149 (D. Md. 1985), and *Illinois v. Gates*, 462 U.S. 213, 237–38 (1983)).  In a close case, reviewing courts should resolve doubts in favor of upholding wiretap orders, as they do with respect to search warrants.  *See United States v. Ventresca*, 380 U.S. 102, 109 (1965).

Here, the defendants do not, and cannot, point to a single probable cause deficiency in any of the wire applications and affidavits at issue in this case.  The initial wiretap affidavit for TT1 and TT2 clearly provided probable cause for the interception.  The affidavit detailed a roughly six-month long investigation into MMP and its drug shops in the Windsor Mill/Forest Park and Gwynn Oak/Liberty Heights neighborhoods in Baltimore.  Ex. 2 (TT1 & TT2 Wiretap Paperwork), Aff. at 5–24.  It outlined the criminal histories of JENKINS (the user of TT1) and BOWLING (the user of TT2), including a number of prior drug convictions.  *Id.* at 12–13.  It provided information about JENKINS' and BOWLING's involvement in drug trafficking from reliable confidential sources. *Id.* at 17–22.  With respect to TT1, the affidavit explained how, at the direction of law enforcement,

34

a confidential source contacted JENKINS on TT1 to arrange for controlled purchases of heroin and/or crack cocaine from him on three separate occasions in May 2016. *Id.* at 25–31. Similarly, with respect to TT2, the affidavit explained how, at the direction of law enforcement, a confidential source contacted BOWLING on TT2 to arrange for controlled purchases of crack cocaine from him on two separate occasions in June 2016. *Id.* at 31–34. Finally, the affidavit also included a "toll analysis" describing recent phone contact between TT1, TT2, and other phone numbers used by individuals known to be involved in drug trafficking, including LOCKLEY. *Id.* at 36–37.

The wiretap application for TT3 also clearly demonstrated probable cause to support the authorization. Like the initial affidavit, the TT3 affidavit detailed the investigation into MMP, *see* Ex. 3 (TT3 Wiretap Paperwork), Aff. at 3–19, outlined LOCKLEY's criminal history, which included four prior felony drug convictions, *id.* at 10; and provided information about LOCKLEY's drug trafficking activities from reliable confidential sources, *see id.* at 15–20. It explained how, at the direction of law enforcement, a confidential source contacted LOCKLEY on TT3 to arrange for a controlled purchase of crack cocaine on March 10, 2016. *Id.* at 23–24. Although more was not needed, the affidavit went on to describe coded, drug and gang-related conversations between LOCKLEY and JENKINS on TT1, accompanied by an analysis of the coded language based on the affiant's extensive training and experience. *Id.* at 25–26. For instance, the affidavit described a July 2, 2016 conversation in which LOCKLEY told JENKINS to direct Melvin LASHLEY to "stop doing threats to" the members of a rival drug shop, which, the affiant explained, might cause problems for MMP's drug trafficking business by attracting police attention and interrupting sales. *Id.* at 26. In the conversation, LOCKLEY complained that LASHLEY was "talking bout he gonna kill all y'all … he rolled past talking bout all y'all gonna die." *Id.*

35

The final wiretap application for TT4 was also supported by ample probable cause.  It, too, detailed the investigation into MMP, *see* Ex. 4 (TT4 Wiretap Paperwork), Aff. at 3–22; outlined ANDERSON's criminal history, which included two prior felony drug convictions, *id.* at 10; and provided information about ANDERSON's drug trafficking activities from reliable confidential sources, *see id.* at 15–22.  For instance, one confidential source explained that ANDERSON was "a 'weight' heroin supplier for MMP" and "was known to distribute as much as 1000-1500 grams of heroin per transaction."  *Id.* at 20.  The affidavit went on to describe coded, drug-related conversations between ANDERSON on TT4, and LOCKLEY and BOWLING on TT3.  *Id.* at 30–35.  Each intercepted communication was, again, accompanied by an analysis of the coded language based on the affiant's extensive training and experience.  The affiant's interpretation of the coded language was buttressed by the recent controlled purchases of narcotics from both LOCKLEY and BOWLING, and by the information about ANDERSON provided by reliable confidential sources.  Finally, the affidavit included a toll analysis detailing other drug-related contacts occurring over TT4.  *Id.* at 36–37.

All these factors together established far more than a "fair probability" that JENKINS, BOWLING, LOCKLEY, and ANDERSON were using TT1, TT2, TT3, and TT4, respectively, to facilitate their drug trafficking.

### 2.    The Affidavits Demonstrated the Necessity for the Interceptions

Sections 2518 (1)(c) and (3)(c) of Title 18 require the government, in seeking wiretap authorization, to show either that "other investigative procedures have been tried and failed" <u>*or*</u> that "they reasonably appear to be unlikely to succeed or to be too dangerous."  18 U.S.C. § 2518(1)(c), (3)(c).  The "necessity" requirement was designed "to ensure that the relatively intrusive device of wiretapping was not routinely employed as the initial step in an investigation

nor resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Smith*, 31 F.3d 1294, 1297 (4th Cir. 1994); *United States v. Kahn*, 415 U.S. 143, 153 n.12 (1974).

The Fourth Circuit has explained that law enforcement officers "need not exhaust every conceivable investigative possibility before seeking a wiretap order." *United States v. Clerkley*, 556 F.2d 709, 715 (4th Cir. 1977). Rather, "the exhaustion requirement is to be tested in a practical and common-sense fashion." *Id*. Although the government cannot show exhaustion through "a mere boilerplate recitation of the difficulties of gathering useful evidence," *United States v. Oriakhi*, 57 F.3d 1290, 1298 (4th Cir. 1995), the burden on the government is "not great, and the adequacy of such a showing is to be tested in a practical and commonsense fashion that does not unduly hamper the investigative powers of law enforcement agents." *Wilson*, 484 F.3d at 281; *see also Sellers*, 512 Fed. Appx. at 329 ("[T]he showing of 'necessity' for the wiretap is not prodigious and the Government need only present specific factual information sufficient to establish that it has encountered difficulties in penetrating the criminal enterprise or in gathering evidence such that wiretapping becomes reasonable.").

Courts have also found that a proper showing of exhaustion can more easily be made in complex cases, such as this one, in which the goal of wiretapping certain phones is to successfully investigate and prosecute large-scale organizations. *See Clerkley*, 556 F. 2d at 714; *United States v. Vargas*, 116 F.3d 195, 197 (7th Cir. 1997); *United States v. Leavis*, 853 F.2d 215, 221 (4th Cir. 1998) (government's affidavit provided sufficient evidence to allow the reviewing court to determine that a confidential informant would not be able to proffer information regarding the upper levels of the target conspiracy).

The Fourth Circuit has held that the determination of the issuing judge that a wiretap is

37

necessary is reviewed under a highly deferential "abuse of discretion" standard. *United States v. Wilson*, 484 F.3d 267, 280 (4th Cir. 2007); *see also Oriakhi*, 57 F.3d at 1298 ("considerable deference" should be given to a district court's determination that exhaustion requirement is met); *Smith*, 31 F.3d at 1298 (standard of review should be one that gives the issuing judge's exhaustion determination "considerable deference").

Here, the initial wiretap affidavit for TT1 and TT2 provided a thorough analysis of the goals of the investigation and the various investigative techniques that had been attempted, which established the necessity for the authorization. Ex. 2, Aff. at 37–53. The affidavit described investigators' use of confidential sources, physical surveillance, pen registers, and consensually-monitored calls, all of which furthered the investigation but fell short of achieving the overall goals of the investigation. *Id.* at 38–49. The affidavit also described why other investigative techniques, such as undercover officers, search warrants, trash pulls, interviews, and grand jury subpoenas, were not used, or were used minimally, and would not have succeeded in achieving the goals of the investigation. *Id.* at 44–45, 49–53. For instance, the affidavit described how an undercover officer ("UC") had arranged to purchase drugs from Sydni FRAZIER on May 6, 2016, but FRAZIER evidently figured out that his new customer was a UC and cancelled the deal after directing him to four separate locations. *Id.* at 40–41. The affidavit explained that, in light of MMP's known proclivity for violence and ready access to firearms, investigators determined that the use of UCs to infiltrate the organization carried too great a safety risk. *See id.* at 41; *see also id.* at 49 (explaining that a consensual wiretap of CS-2's phone had limited success because the target subjects suspected CS-2 of cooperating with the police, which put CS-2's security in danger). In short, the wiretap authorization was the culmination of a deliberate, thorough investigation and was necessary to further its goals.

Similarly, the subsequent affidavits for TT3 and TT4 described the investigative techniques used and those techniques that were not attempted.  *See* Ex. 3, Aff. at 29–46; Ex. 4, Aff. at 38–58. The affidavits did not simply regurgitate boilerplate language.  Rather, they provided the Court with an update on those techniques that investigators continued to employ even after the initiation of the wiretaps.  For example, the affidavit for TT4 explained that investigators had obtained casino records for ANDERSON showing that he had deposited over $125,000 in cash in Maryland Live! Casino, and that, while useful in demonstrating that ANDERSON had unexplained income, the records could not by themselves show that the money was the proceeds of drug trafficking.  *See* Ex. 4, Aff. at 56–57.

BOWLING claims that the goals of the investigation could have been achieved through the continued use of confidential sources to make controlled purchases of small quantities of drugs from him.  ECF 424, at 10.  That is not the case.  As detailed in the affidavit, there was no reason to believe that small-volume purchases of drugs would have given those confidential sources any insight into BOWLING's sources of supply, his stash locations, or his role in MMP.  *See* Ex. 2, Aff. at 38–39.  Furthermore, as discussed above, investigators reasonably determined that using confidential sources to attempt to infiltrate the upper echelons of the organization carried too great a safety risk.

BOWLING also claims that the exhaustion requirement was not met because no search warrant was executed at his residence prior to the wiretap application.  ECF 424, at 13.  But the affidavit makes clear that, "[a]t present, investigators have not established probable cause to search any other locations associated with the MMP DTO [drug trafficking organization]."  *See* Ex. 2, Aff. at 47.  Indeed, one of the unmet goals of the investigation justifying wiretap authorization was "the identification of other locations and facilities used in furtherance of the TARGET

OFFENSES." *Id.* at 9–10.  The affidavit also explained that pre-wiretap search warrants were not likely to meet the goals of the investigation: although agents had executed one search warrant prior to the wiretap—at Dante BAILEY's residence on May 17, 2016—that warrant had "not revealed the full extent of the DTO's operations." *Id.* at 46–47.  Moreover, as explained in the affidavit, the execution of additional search warrants would likely alert other co-conspirators to the investigation and result in the destruction of evidence and/or flight.  *Id.* at 48.  Indeed, the affidavit set forth that after the search warrant at BAILEY's residence, CS-2 informed investigators that other members of MMP became concerned about the seizure of the BAILEYS' cell phones, and they "were likely to change telephone numbers soon as a result." *Id.*

The Court should also reject the defendants' contention that the government failed to terminate the wiretaps upon achieving the goals of the investigation.  The goals justifying wiretap authorization were not achieved until shortly before the conclusion of the investigation.  Two of the stated goals of the investigation were to identify the sources of supply for drugs and firearms, and to identify locations where drugs, firearms, and/or drug proceeds were located.  *Id.* at 9–10. Even when the wiretaps concluded, investigators still had not identified likely stash locations, and they had not identified ANDERSON's source of supply of heroin.

The roughly two-month long wiretap investigation was ultimately successful in gathering sufficient evidence to obtain search warrants for a number of residences and vehicles.  The search warrants relied heavily on intercepted communications.  The warrants were very successful, resulting in the seizure of five firearms; over 120 rounds of ammunition; body armor; distribution quantities of heroin, cocaine, and marijuana; MMP gang paperwork; numerous cell phones and other electronic devices; drug proceeds (including over $2,500 from ANDERSON and over $1,300 from DELEON), and other evidence.  The investigation also resulted in a federal indictment

charging twenty-four defendants with racketeering conspiracy and drug trafficking conspiracy, among other crimes.  Much of the evidence used to obtain the indictment derived directly from the wiretap authorizations.

In sum, when the government's wiretap affidavits are considered as a whole, it is clear that the affiants explained in detail, using case-specific information, how other investigative procedures either had been tried and failed, or reasonably appeared to be unlikely to succeed or to be too dangerous.  *See* 18 U.S.C. § 2518(1)(c), (3)(c).  That is all that the necessity requirement demands.

### 3.   The Minimization Requirements Were Properly Observed

The Fourth Circuit has directed courts to consider three principal factors in assessing whether minimization requirements were properly observed: "(1) the nature and scope of the alleged criminal enterprise; (2) the government's reasonable expectation as to the content of, and parties to, the conversations; and (3) the degree of judicial supervision while the wiretap order is being executed."  *Clerkley*, 556 F.2d at 716.  The thoroughness of the government's precautions to bring about minimization and the degree of judicial supervision over the surveillance practices provide strong circumstantial evidence of a reasonable effort to minimize interception of innocent conversation.  *United States v. Charles*, 213 F.3d 10, 22 (1st Cir. 2000); *see also United States v. Carter*, 449 F.3d 1287, 1296-97 (D.C. Cir. 2006) (noting that the prosecutor instructed agents on minimization and reviewed call records for compliance); *United States v. Eiland*, 398 F. Supp.2d 160, 175 (D.D.C. 2005) (citing government's procedures and judicial supervision as factors tending to show government's compliance with minimization requirement).

Where, as here, "law enforcement officials are confronted with a large, far flung and on going criminal activity involving multiple parties," the Fourth Circuit has held that "they are afforded greater latitude in conducting wiretaps."  *Clerkley*, 556 F.2d at 716; *see also United States*

*v. Quintana*, 508 F.2d 867, 874 (7th Cir. 1975) ("Large and sophisticated narcotics conspiracies may justify considerably more interception than would a single criminal episode.  This is especially so where, as here, the judicially approved purpose of the wiretap is not so much to incriminate the known person whose phone is tapped as to learn the identity of far flung conspirators and to delineate the contours of the conspiracy."); *United States v. Cox*, 462 F.2d 1293, 1300–01 (8th Cir. 1972) ("[W]here as here, the investigation is of an organized criminal conspiracy conversing in a colloquial code, surveillance of most of the telephone calls made during several days does not constitute a failure to minimize simply because in retrospect it can be seen that a substantial portion of them had no evidentiary or investigative value."); *Charles*, 213 F.3d at 22 (observing that, when an investigation involves a drug ring of unknown proportion, "the need to allow latitude to eavesdroppers is close to its zenith"); *United States v. Daly*, 535 F.2d 434, 441 (8th Cir. 1989) (holding that leeway is especially important when "the purpose of the intercept order(s) is to learn the identities of far-flung conspirators and define the reach of the conspiracy, as well as to incriminate the person whose phones are tapped"); *United States v. Earls*, 42 F.3d 1321, 1325 (10th Cir. 1994).

In addition, where, as here, conspiracies use "codes and specialized jargon, making criminal conversations more difficult to detect and decipher, there is yet [another] reason for affording investigators some leeway." *United States v. Uribe,* 890 F.2d 554, 557 (1st Cir. 1989); *see also United States v. Sanchez*, 961 F.2d 1169, 1179 (5th Cir. 1992); *Daly,* 535 F.2d at 441. Moreover, because participants in a conspiracy may "often discuss[] personal and criminal matters in the same conversations," *United States v. Wilson*, 835 F.2d 1440, 1445 (D.C. Cir. 1987), *abrogated on other grounds by Bloate v. United States*, 130 S. Ct. 1345 (2010), it is unreasonable for monitoring agents to cease monitoring every time non-criminal matters are mentioned.  *See*

42

*also United States v. Mansoori*, 304 F.3d 635, 645 (7th Cir. 2002).[17]

Even if there is a failure to properly minimize some calls, the remedy is not suppression of all the intercepted conversations.  *See Cox*, 462 F.2d at 1301–02; *United States v. Sisca*, 361 F.Supp. 735, 746–47 (S.D.N.Y. 1973); *United States v. Mainello*, 345 F. Supp. 863, 874–77 (E.D.N.Y. 1972).  Rather, the remedy is simply to suppress the portions of any calls identified by the defendant that resulted from the failure to properly minimize.  *See id.*

Here, the defendants do not point to any specific problem with the minimization protocols used in this case or to any specific calls that were not properly minimized, instead relying on a vague claim that there was some deficiency in minimization on the part of the government.  That is simply not the case.

The Orders issued by Judge Hollander required the government to conduct its monitoring in accordance with the minimization requirements of Chapter 119 of Title 18, United States Code, and specifically outlined how to determine whether intercepted communications were to be minimized.  Ex. 2, Order at 9; Ex. 3, Order at 9; Ex. 4, Order at 9.  They also noted that "[a]

---

[17]       In assessing a defense minimization challenge, courts generally draw a line at the two- or three-minute mark and exclude such short-duration calls from consideration.  *See, e.g., United States v. Yarborough*, 527 F.3d 1092, 1098 (10th Cir. 2008) ("[C]onsistent with Supreme Court and Tenth Circuit precedent, in analyzing the reasonableness of the government's minimization efforts, we exclude calls under two minutes."); *United States v. Homick*, 964 F.2d 899, 903 (9th Cir. 1992) (expressing reluctance to conclude that listening to all calls for two minutes or less irrespective of relevance violated minimization requirements); *United States v. Cleveland*, 964 F. Supp. 1073, 1092-94 (E.D. La. 1997) (excluding calls less than three minutes in duration).  *See also United States v. Dumes*, 313 F.3d 372, 380 (7th Cir. 2002) ("Following *Scott*, some courts have held that calls less than two minutes do not require minimization.  We certainly agree that minimization of short calls is not required."); *United States v. Hinton*, 543 F.2d 1002, 1012 (2d Cir. 1976) (monitoring all calls for a maximum of five minutes not unreasonable where interceptees frequently communicated in code and where discussions initially personal often turned later to criminal conduct).  The rationale for listening to the first several minutes of a conversation is that "even a seasoned listener would have been hard pressed to determine with any precision the relevancy of many of the calls before they were completed."  *Scott v. United States*, 436 U.S. 128, 142 (1978).

memorandum outlining all of the guidance for minimization and application of privileges, as well as a copy of the application and this Order, will be provided to all monitors." *Id.*

At the time of each authorization, the prospective monitors were provided with a minimization memorandum and copies of the relevant application, order, and affidavit to review. *See, e.g.*, Ex. 5 (TT1 & TT2 Minimization Memo). These memoranda instructed the monitors about their minimization obligations, including the special procedures for the minimization of text messages, *see id.* at 12, how to deal with situations where no party to a conversation is a suspected participant in criminal conduct, where one party is a suspect and where both parties are suspects, *see id.* at 7–8, and the nature of any potential privileges that would require minimization. *See id.* at 8–10. The monitors were also advised of their minimization obligations orally by the supervising AUSAs, and they signed an acknowledgement stating that they had received and reviewed the minimization memorandum and relevant authorization paperwork.

In sum, the thoroughness of the government's precautions to bring about minimization, the degree of judicial supervision over the surveillance practices, and the defendants' failure to identify any specific problems with the minimization protocols (either in concept or in practice) should lead the Court to conclude the minimization requirements were properly met.

### 4. The Investigators Relied on the Wiretap Authorizations in Good Faith

Even assuming that one or all of the above-described authorizations were invalid, the exclusionary rule should not apply because the officers acted in good faith reliance on Judge Hollander's orders. *See United States v. Leon*, 468 U.S. 987 (1984). The Fourth Circuit and other courts have recognized that the *Leon* good faith exception applies in the wiretap context just as it does in the context of search warrants and other court orders. *See United States v. Brewer*, 204 Fed. Appx. 205, 208 (4th Cir. 2006) ("Even if Brewer is correct that the affidavits did not set forth

adequate probable cause, or that the exhaustion requirements . . . had not been met, the affiants were entitled to rely on the facially valid wiretap orders pursuant to the good faith exception of *United States v. Leon* . . ."); *United States v. Moore*, 41 F.3d 370, 376–77 (8th Cir. 1995) (applying *Leon* good faith reasoning in wiretap context); *United States v. Errera*, 616 F. Supp. 1145, 1149 (D. Md. 1985) (same); *United States v. Miller*, 50 F. Supp. 3d 717, 729 (D. Md. 2014) (same); *United States v. Ambrosio*, 898 F. Supp. 177, 187 (S.D.N.Y. 1995) (same, citing cases and noting some conflict among the courts).

Under the *Leon* good faith exception, "a court should not suppress the fruits of a search conducted under the authority of a warrant, even a subsequently invalidated warrant, unless a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization." *United States v. Bynum*, 293 F.3d 192, 195 (4th Cir. 2002)).  Officers are presumed to have acted in good faith except in certain narrowly defined circumstances: "(1) if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) if the issuing magistrate wholly abandoned his judicial role…(3) if the affidavit supporting the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) if under the circumstances of the case the warrant is so facially deficient…that the executing officers cannot reasonably presume it to be valid." *United States v. DeQuasie*, 373 F.3d 509, 519–20 (4th Cir. 2004).

Here, even if the Court disagrees with the government's assertion that the wiretaps were properly authorized, certainly the agents' reliance on the wiretap orders was reasonable. The wiretap applications and orders were facially valid, provided information establishing that TT1, TT2, TT3, and TT4 were being used in furtherance of drug activity, and provided pages of

information about why other investigative techniques would not be successful.  There is no suggestion that the affiants made knowingly false statements in the affidavits or that Judge Hollander "wholly abandoned" her judicial role.  Any reasonable officer or agent would have relied on an order issued under such affidavits, and *Leon* therefore applies.

### C. Motions to Suppress Fruits of Search Warrants and Tracking Warrants Issued under Fed. R. Crim. Pro. 41

#### 1. Relevant Law

A judicial officer's determination that there is probable cause to issue a search warrant is a "practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Montieth*, 662 F.3d 660, 664 (4th Cir. 2011) (quoting *Illinois v. Gates*, 462 U.S. 213, 235 (1983)).  Probable cause means far "less than evidence which would justify condemnation or conviction," *Brinegar v. United States*, 338 U.S. 160, 175 (1949), and even less than that required by the preponderance-of-the-evidence standard, *see Gates*, 462 U.S. at 235; *United States v. Humphries*, 372 F.3d 653, 657 (4th Cir. 2004) ("[T]he probable cause standard does not require that the officer's belief be more likely true than false.").  Probable cause may be established through information provided by any reliable source or sources, *Draper v. United States*, 358 U.S. 307, 313 (1959), or even through an anonymous tip that has been corroborated, *see Gates*, 462 U.S. at 241.

The Fourth Circuit has held "that the nexus between the place to be searched and the items to be seized may be established by the nature of the item and the normal inferences of where one would likely keep such evidence." *United States v. Servance*, 394 F.3d 222, 230 (4th Cir.), *vacated on other grounds*, 544 U.S. 1047 (2005).  Thus, warrants are to be upheld "even when the affidavit supporting the warrant contains no factual assertions directly linking the items sought" to the place

46

to be searched.  *United States v. Grossman*, 400 F.3d 212, 217 (4th Cir. 2005).

The statement of probable cause need not be written with "[t]echnical elaborate specificity," *United States v. Ventresca*, 380 U.S. 102, 108 (1965), and a "magistrate has the authority … to draw such reasonable inferences as he will from the material supplied to him by applicants for a warrant," *Bynum*, 293 F.3d at 197.  "Because probable cause is evaluated through a totality-of-the-circumstances analysis rooted in common sense," a reviewing court should give "great deference" to an issuing judicial officer's decision to issue a warrant based on the facts before him.  *Montieth*, 662 F.3d at 664.

Finally, as discussed further in Section III.B.4 above, the exclusionary rule does not apply when law enforcement officers act in "objectively reasonable" reliance on a warrant later held invalid.  *See Leon*, 468 U.S. at 922.

### 2.     The Warrants Were Supported by Probable Cause

#### a.     Motion to Suppress Fruits of Search Warrant Executed at 3901 Princely Way on July 3, 2015; Warrantless Search of Mercury Marauder Parked Outside 3901 Princely Way on July 3, 2015; and November 6, 2015 Search Warrant for DNA, by Dante BAILEY (ECF 412)

BAILEY has moved to suppress evidence seized pursuant to a state search warrant executed at his residence at 3901 Princely Way, Pikesville, Maryland on July 3, 2015.  He has also moved to suppress evidence seized during a warrantless search of a Mercury Marauder parked outside the residence on the same day.  Finally, he has moved to suppress DNA swabs taken from him pursuant to a state search warrant issued on November 6, 2015.  With respect to the residence, BAILEY claims that the officers' entry into the residence prior to securing the warrant rendered the search illegal, and that the warrant affidavit failed to establish probable cause.  As to the vehicle, BAILEY claims that the search was conducted without probable cause to believe that

evidence of a crime would be found therein.  Finally, BAILEY argues that the warrant for his DNA impermissibly relied on evidence recovered during the warrantless search of the vehicle.  For the reasons discussed below, the evidence was lawfully obtained, and BAILEY's motion to suppress should be denied.

i.  <em>Relevant Facts</em>

On July 3, 2015, Officer Ackerman of the Baltimore County Police Department (BCPD) conducted a traffic stop of a dark blue Lexus with Maryland registration 2BP9969 based on a window tint violation.  Officer Corbin arrived at the scene to assist with the stop.  When he approached vehicle, Officer Corbin saw that there was a person laying down in the backseat.  Out of concern for officer safety, he opened the rear car door.  Upon doing so, he immediately noticed the odor of burnt marijuana.  Officer Corbin identified the subject in the backseat as juvenile male S.T., and the driver of the vehicle as Tiffany BAILEY (Dante BAILEY's wife).  When Officer Corbin explained the reason for the stop and stated that he smelled marijuana, Tiffany BAILEY responded that she had not smoked marijuana in the vehicle recently.  She then stated that the officers could search the car.

At that point, the officers directed Tiffany BAILEY and S.T. to step out of the vehicle so that they could conduct a search.  From the passenger compartment of the car, the officers recovered (1) a plastic bag containing a tan powder substance (which field-tested positive for heroin, with a gross weight of roughly 27 grams), and (2) a plastic bag containing six small plastic bags, each containing a white rock substance (which field-tested positive for crack cocaine, with a gross weight of roughly 24 grams).  The officers also recovered marijuana from Tiffany BAILEY's bra and purse and nine ziplock bags of suspected crack cocaine from S.T.'s shoe.  The officers placed both subjects under arrest. Tiffany BAILEY informed the officers that she resided

48

at 3901 Princely Way in Pikesville, Maryland.   After being advised of her Miranda rights, Tiffany BAILEY stated that there was no heroin or cocaine at the residence, but that she did have a small amount of marijuana and a pipe at the residence.

BCPD officers were aware that Dante BAILEY had been observed driving the dark blue Lexus with Maryland registration 2BP9969 on prior occasions.  In fact, BAILEY had been arrested in the vehicle on April 23, 2015, when BCPD officers recovered roughly 23 grams of heroin from the car.   In addition, a reliable confidential informant told investigators that BAILEY was a substantial heroin dealer in Baltimore County, and that he/she had observed BAILEY in possession of large amounts of heroin in his residence at 3901 Princely Way in Pikesville, Maryland.

Based on the foregoing, BCPD officers sought a search warrant for the residence at 3901 Princely Way.  While the affiant prepared the warrant application, BCPD Detectives Mark Fisher and Dimitri Goodwin—who were in plainclothes in an unmarked car—proceeded to 3901 Princely Way to conduct pre-raid surveillance.  They requested that a patrol vehicle also respond to the area. When they arrived at the residence at approximately 7:30 p.m., the detectives noticed several cars drive past the residence, and saw that the occupants of the cars were staring at the residence and looking around, as though trying to detect the presence of law enforcement.  When the marked patrol vehicle arrived at short time later, Detective Fisher heard a voice call out from an open upstairs window to the rear of the residence.  Believing that the occupants were now aware of the police presence, Detective Fisher and a uniformed officer approached the residence and knocked on the front door.  They heard someone approach the door and inquire, "Who is it?"  Detective Fisher identified himself as a police officer.  He then heard the individual running away from the door.  Believing that evidence would likely be destroyed, they knocked again, again announced themselves as police officers, and, at approximately 8:00 p.m., forced entry into the residence.

Once inside, they secured the location and detained two individuals located inside, who were identified Jay GREER and a juvenile male, T.W.   The officers remained inside the residence until the search warrant was signed, at approximately 11:30 p.m.

While waiting for the search warrant to be signed, the officers noticed a blue Mercury Marauder with a Georgia license plate parked in a parking lot in front of 3901 Princely Way.  The officers ran a check on the license plate and discovered (1) that the tag did not match the vehicle and (2) that the tag had been reported stolen on January 22, 2015.  The detectives requested that a K-9 unit respond and scan the car.  At approximately 11:00 p.m., BCPD Officer Kelly and his trained and certified drug detection dog Inferno arrived and scanned the car.   Inferno gave a positive alert for the presence of controlled substances.  BCPD officers then conducted a search of the Mercury Marauder.  From the passenger compartment of the car, they recovered, among other things, a metal grinder with marijuana residue, various identifications, and a prescription bottle in the name Lashawn Williams.  From the trunk, they recovered two loaded, stolen firearms—a Smith & Wesson .357 magnum handgun and a Beretta 9mm handgun.  DNA samples were collected from the textured areas of the firearms and from other items in the vehicle.

At approximately 11:30p.m. on July 3, 2015, Baltimore County Circuit Judge Robert Cahill signed the warrant authorizing the search of 3901 Princely Way for various items related to drug trafficking and indicia of occupancy.  *See* Ex. 6 (Search Warrant, 3901 Princely Way).  During the search of the residence, the officers recovered various paperwork in the name of Dante BAILEY, Tiffany BAILEY, Dominick WEDLOCK, and Lashawn Williams, a digital scale, a gun holster, a key to the Mercury Marauder, numerous ziplock glassine baggies, a grinder containing marijuana residue, a partially consumed marijuana cigarette, and a money counter.  Dante BAILEY was arrested and charged with possession of a firearm by a convicted felon.

50

On November 6, 2015, Baltimore County Circuit Judge Justin King signed a search warrant authorizing the search of Dante BAILEY's person to obtain DNA/buccal swabs. *See* Ex. 7 (Search Warrant, Bailey DNA). The affidavit describes the search of the blue Mercury Marauder, the recovery of the firearms, and the swabbing of those firearms for DNA evidence. On November 13, 2015, buccal swabs were collected from BAILEY pursuant to the warrant.

ii.   *The Warrant for 3901 Princely Way Was Supported by Probable Cause*

The search warrant for 3901 Princely Way was facially valid and established probable cause to believe that evidence of drug trafficking would be found in the residence. Specifically, the facts supporting probable cause included the following:

- On July 3, 2015, BCPD officers conducted a traffic stop of a dark blue Lexus with Maryland tag 2BP9969 that Dante BAILEY was known to drive. The driver was identified as Dante BAILEY's wife, Tiffany BAILEY. The officers searched the car pursuant to Tiffany's consent, and recovered roughly 27 grams of suspected heroin and 24 grams of suspected crack cocaine. Ex. 6, Aff. at 2–3.

- Tiffany BAILEY told the officers that she lived at 3901 Princely Way, Pikesville, Maryland, and that there was marijuana inside the residence. *Id.* at 4.

- On April 23, 2015, Dante BAILEY had been arrested while driving the Lexus and officers recovered 23 grams of heroin from the vehicle. BAILEY provided his address as 3901 Princely Way, Pikesville, Maryland. *Id.* at 3

- A reliable confidential informant told investigators that BAILEY was a substantial heroin dealer in Baltimore County and that he keeps large amounts of heroin at his residence at 3901 Princely Way. *Id.*

- BCPD officers conducted surveillance at the residence and observed that the Lexus was routinely parked next to the residence in June 2015. *Id.*

- BAILEY had a long criminal history that included multiple convictions for crimes of violence and handgun offenses. *Id.* at 5–34.

- Based on the affiant's training and experience, drug traffickers frequently maintain drugs, drug paraphernalia, drug proceeds, ledgers and other papers, and firearms in their residences. *Id.* at 34–36.

Measured under any standard, this evidence was more than sufficient to establish probable

cause.  Furthermore, the warrantless entry into the residence to secure the location was reasonable and in no way tainted the warrant.  Although "warrantless entries into a person's home are presumptively unreasonable," there is a longstanding exception to the warrant requirement "when exigent circumstances exist." *United States v. Turner*, 650 F.2d 526, 528 (4th Cir. 1981).  Pursuant to this exception, the Fourth Circuit has recognized that "when officers have probable cause to believe that contraband is present and, in addition, they reasonably believe that the evidence may be destroyed or removed before they can secure a search warrant, a warrantless entry is justified." *Id.*  In determining whether exigent circumstances exist, courts consider "(1) the degree of urgency involved and the amount of time necessary to obtain a warrant; (2) the officers' reasonable belief that the contraband is about to be removed or destroyed; (3) the possibility of danger to police guarding the site; (4) information indicating the possessors of the contraband are aware that the police are on their trail; and (5) the ready destructibility of the contraband."  *Id.* (exigent circumstances justified warrantless entry where there was a rational basis for officers' belief that the individual inside the residence was aware of police presence and that drug evidence might be destroyed); *United States v. Moses,* 540 F.3d 263, 270 (4th Cir. 2008) (exigent circumstances justified warrantless entry into a suspected stash house where a commotion in the area provided a reasonable basis for police officers to believe that individuals in the residence were aware of police presence).  Here, as in *Turner* and *Moses*, the BCPD officers had a well-founded belief that there was evidence of drug trafficking inside 3901 Princely Way (evidence that is readily destructible), that the occupants were aware the police were on their trail, and that they were likely to dispose of evidence in the time it took to secure the warrant.  Accordingly, they were justified in making entry to secure the location and ensure that evidence was not destroyed.

        Even if exigent circumstances did not justify BCPD's warrantless entry into the residence,

suppression would not be appropriate because the illegal entry in no way tainted the subsequently issued warrant.  Suppression is not required "if the search warrant was based upon a source genuinely independent of the prior illegal entry."  *United States v. Campbell*, 945 F.2d 713, 714 (4th Cir. 1991) (citing *Murray v. United States*, 487 U.S. 533 (1987)).  In *Murray*, the Supreme Court held that evidence seized pursuant to a subsequently issued warrant would be admissible provided that the seizure was genuinely independent of the earlier illegal activity. *Murray*, 487 U.S. at 542.  Here, as in *Murray*, the officers had already begun applying for the warrant before making entry into the house.  Moreover, as in *Murray*, each and every fact contained in the search warrant affidavit was known to law enforcement before warrantless entry was made, and the issuing judge was not presented with any information obtained during the warrantless entry. Therefore, the evidence seized pursuant to the warrant was independent of any prior illegal activity, and BAILEY's motion should be denied.

iii. *The Warrantless Search of the Mercury Marauder Was Justified by Probable Cause*

BAILEY next moves to suppress the two firearms and other evidence recovered from the blue Mercury Marauder.  As a threshold matter, BAILEY has not demonstrated that he has standing to challenge this search.  Fourth Amendment rights "may not be vicariously asserted." *Rakas v. Illinois*, 439 U.S. 128, 133–34 (1978).  The defendant bears the burden of showing that he had a legitimate expectation of privacy in the area searched, by establishing that he had either an ownership or possessory interest in the property.  *See United States v. Castellanos*, 716 F.3d 828, 833–34 & n.4 (4th Cir. 2013); *United States v. Rusher*, 966 F.2d 868, 873–74 (4th Cir. 1992). Here, BAILEY has claimed no such ownership or possessory interest.  Unless BAILEY does so, the motion to suppress should be denied.

Even if BAILEY can establish his standing to contest the search of the vehicle, the officers

had probable cause to search based on the drug dog's positive alert.  As a preliminary matter, the use of a drug dog to scan the vehicle—which was in a common parking lot and not within the curtilage of BAILEY's home—did not constitute a "search" for Fourth Amendment purposes.  *See United States v. Jeffus,* 22 F.3d 554, 556–57 (4th Cir. 1994) (use of drug dog not itself a "search," but fact that drug dog "alerts" constitutes probable cause to search).  Furthermore, once the trained and certified drug detection dog gave a positive alert for the presence of narcotics, this fact alone amounted to probable cause to search the entirety of the vehicle.  *See United States v. Kelly,* 592 F.3d 586 (4th Cir 2010) (holding that a positive dog alert on the driver's door was probable cause to search both the passenger compartment and the trunk of the vehicle); *see also Illinois v. Caballes,* 543 U.S. 405, 409–10 (2005); *United States v. Mason,* 628 F.3d 123, 130 (4th Cir. 2010).  Because the warrantless search was preceded by a positive drug dog alert, there was probable cause to search the vehicle, and the motion to suppress should be denied.

> iv.   *The Warrant for BAILEY's DNA Was Supported by Probable Cause*

The search warrant for BAILEY's DNA was also supported by probable cause.  The affidavit explained that two loaded, stolen firearms were recovered from the trunk of a Mercury Marauder parked outside of BAILEY's residence on July 3, 2015, and that the handguns and parts of the vehicle were swabbed for DNA.  Ex. 7, Aff. at 2–3.  The affidavit also established BAILEY's connection to the vehicle, namely: (1) a Baltimore County police sergeant had seen BAILEY driving the vehicle on a prior occasion; (2) a concerned citizen reported seeing BAILEY leaving 3901 Princely Way and accessing the trunk of the vehicle, and (3) the key to the vehicle was located inside BAILEY's residence.  *Id.* at 1–2.  Finally, the affidavit explained that BAILEY had prior criminal convictions for a handgun violation and armed robbery and was prohibited from possession firearms.  *Id.* at 3.  Certainly, these facts established a fair probability that evidence of

the crime of possession of firearms by a felon would be found in BAILEY's DNA.

      **b.  Motion to Suppress Fruits of Search Warrant Executed at 4 Wyegate Court on July 31, 2015, by Dontray Johnson (ECF 487)**

JOHNSON moves to suppress physical evidence seized during the execution of a state search warrant on his residence and vehicle on July 31, 2015, namely: drug packaging material, scales, a bullet-proof vest, a bag containing 70 rounds of .22 caliber ammunition, roughly 32 grams of heroin (packaged in numerous baggies and gel caps), $1480 in U.S. currency, a framed photograph of JOHNSON with other MMP members, paperwork that the officers recognized as an "owe sheet" used to keep track of drug debts, and four cell phones.  The search warrant was signed by Baltimore County Circuit Court Judge Justin King on July 29, 2015.  *See* Ex. 8 (Search Warrant, 4 Wyegate Ct.).  This motion should be denied.

The search warrant was facially valid and established probable cause to believe that evidence pertaining to the crime of possession of a firearm by a felon would be found in the subject residence and vehicle.  Specifically, the facts supporting probable cause were as follows:

- In June and July 2015, several state wiretaps were authorized for cell phones used by Adrian Jamal SPENCE, a known heroin distributor.  The wiretaps were authorized by the Baltimore County Circuit Court Judge Justin King.

- In July 2015, the police intercepted three wiretap calls between SPENCE and an unknown male—later identified as JOHNSON—using phone number (443) 210-4466, in which the two used coded language to discuss a suspected firearms transaction.

- Specifically, on Monday, July 6, 2015, call B2348 was intercepted from (443) 273-4466 to SPENCE.  SPENCE asked "you got both of 'em?"  The unknown male replied: "I got to go and get the other one on Tuesday.  Just call me when you are ready.  We got to go to my house anyway."

- On Wednesday, July 8, 2015, call B02645 was intercepted from SPENCE to (443) 273-4466, in which SPENCE asked the unknown male if he was going to give SPENCE the "80" or the "deuce deuce."  The unknown male told SPENCE he would to give him the "80."  Based on their training, knowledge, and experience, investigators believed the term "80" referred to a .380 caliber firearm, and the term "deuce deuce" referred to a .22 caliber firearm.

- On July 16, 2015, call B03239 was intercepted from (443) 273-4466 to SPENCE, in which SPENCE indicated he wanted to meet the unknown male to get "the speakers to the radio, the loud joints." Based on their training, knowledge, and experience, investigators believed SPENCE was referring to bullets for a firearm.

- As a result of these wiretap calls, the police believed that the unknown male had a .380 caliber firearm and a .22 caliber firearm at his "house" and was planning to transfer the .380 caliber firearm, and ammunition, to SPENCE.

- A confidential informant (CI) who had provided reliable information in the past told police that Dontray JOHNSON used phone number (443) 273-4466 and that he lived at 4 Wyegate Court, Owings Mills, Maryland 21117.

- A database search revealed that Dontray JOHNSON had a 2006 federal conviction for possession of a firearm by a convicted felon, and that he shared a residence in Baltimore with a Toi Cutchember, who also used the address 4 Wyegate Court, Owings Mills, Maryland 21117. This information tended to corroborate the CI's statement that phone number (443) 273-4466 was used by a Dontray JOHNSON who lived at 4 Wyegate Court, Owings Mills, Maryland 21117.

- Police conducted physical surveillance at 4 Wyegate Court, Owings Mills, Maryland 21117, where they observed a 2002 Acura with Maryland registration 7CA1012 that was dually registered to JOHNSON and Toi Cutchember. Police observed JOHNSON and Cutchember leave the residence at 4 Wyegate Court and get into the 2002 Acura.

*See* Ex. 8, Aff. at 4–6.

Under the totality of the circumstances, the affidavit certainly supplied ample factual material from which the judge could conclude that there was a fair probability that evidence of possession of firearms by a felon was likely to be found inside 4 Wyegate Court and the 2002 Acura. *See Bynum*, 293 F.3d at 197; *Montieth*, 662 F.3d at 664. Although the affiants were *not* required to make "factual assertions directly linking the items sought" to the subject residence and vehicle, *see Grossman*, 400 F.3d at 217; *Servance*, 394 F.3d at 230, they clearly did so here. The affidavit explained that detectives interpreted the wiretap calls to mean that JOHNSON and SPENCE were "discussing the transfer of either a .380 caliber firearm or a .22 caliber firearm," and that JOHNSON "has to go to his residence to retrieve that firearm." Ex. 8, at 2. The affidavit

also explained that detectives had learned through the course of their investigation "that members of this drug trafficking organization use vehicles to transport and store firearms."  *Id.* at 3.

JOHNSON also claims that the police exceeded the scope of the warrant by seizing two items that, he contends, were not evidence of illegal possession of firearms: (1) a framed photograph of JOHNSON wearing red and posing with other members of MMP (*e.g.*, Dante BAILEY, Randy BANKS, Devon DENT, and Jay GREER), *see* Ex. 9 (4 Wyegate Ct., Gang Photograph); and (2) paperwork that the officers recognized as an "owe sheet," or tally of drug debts, *see* Ex. 10 (4 Wyegate Ct., Owe Sheet).  This argument, too, should be rejected.

The Supreme Court has held that courts should assess the permissible scope of a search warrant "in a commonsense and realistic fashion," requiring practical accuracy but not technical precision.  *See United States v. Ventresca*, 380 U.S. 102, 108 (1965).  Here, the warrant authorized the seizure of evidence relating to the crime of possession of a firearm by a prohibited person, in violation of Maryland Annotated Code, Public Safety Articles 5-101–206 and 18 U.S.C. § 922(g), including items such as "firearms, ammunition, boxes, manuals, paperwork pertaining to the firearms, . . . photos of Dontray Samuel P. Johnson in possession of firearms including those stored as files, images or saved to cellular devices, computers or computer media" and "indications of occupancy, residency and/or ownership of the premises above described, including but to limited to utility and phone bills, cancelled envelopes and keys."  Ex. 8, at 3–4.  The framed photograph of JOHNSON fell squarely within the scope of the warrant because it tended to demonstrate that JOHNSON resided at 4 Wyegate Court, and therefore to tie him to the ammunition seized from the premises.  *See United States v. Wardrick*, 350 F.3d 446 (4th Cir. 2003) (holding that gas and electric bills, refund notice, driver's license, and holsters could be seized under search warrant for defendant's residence, even though not listed therein, inasmuch as they linked defendant to the

premises where illegal firearms were found, and holsters further linked defendant to illegal possession of firearms).  The owe sheet, too, tended to link JOHNSON to the residence, as it included a list of phone numbers for known associates of JOHNSON's, including "Gutta" (*i.e.*, BAILEY).  *See* Ex. 10, at 3.

Even if the photograph and owe sheet did not fall within the scope of the warrant, they were properly seized pursuant to the "plain view" exception to the warrant requirement, as was the heroin and drug trafficking paraphernalia.  The Supreme Court has held that officers may properly seize articles of incriminating character that they come across while performing a search in a given area pursuant to a valid search and seizure warrant.  *See Horton v. California,* 496 U.S. 128, 135 (1990); *see also United States v. Uzenski*, 434 F.3d 690 (4th Cir. 2006).  In such "plain view" situations, the police have an original justification for intruding on a person's private property, and can extend that justification to seize those items whose incriminating nature is immediately apparent.  *Horton*, 496 U.S. at 136–37; *see also United States v. Wells*, 98 F.3d 808, 809–10 (4th Cir. 1996); *United States v. Legg*, 18 F.3d 240, 242 (4th Cir. 1994).

Here, the Baltimore County officers were authorized by the warrant to search any areas in JOHNSON's residence that could contain the items to be seized, which included firearms, ammunition, cell phones, documents, and receipts.  They properly searched inside dresser drawers, shopping bags, shoeboxes, and safes where such items might be concealed.  In the course of searching these areas, they came across a photograph of JOHNSON wearing red and posing with other known members of the drug trafficking conspiracy, and paperwork that they recognized as a tally of drug debts.  They reasonably concluded that both the photograph and the owe sheet were evidence of JOHNSON's involvement in the drug trafficking conspiracy under investigation. These items were in plain view within containers the officers were authorized to search, and their

"incriminating character" was "immediately apparent." *See Horton,* 496 U.S. 128; *Uzenski*, 434 F.3d 690. Accordingly, the officers were justified in seizing them, regardless whether they constituted evidence of illegal possession of firearms.

### c. Motion to Suppress Fruits of May 4, 2016 Tracking Warrants on Cell Phones with Call Numbers (802) 839-8109 and (410) 622-0701, by Dante Bailey (ECF 404, 408)

In two identical motions, Dante BAILEY has moved to suppress real-time location data obtained from Sprint pursuant to two tracking warrants—one for the cell phone with call number (802) 839-8109, subscribed to Tiffany BAILEY but used by Dante BAILEY, and one for the cell phone with call number (410) 622-0701, subscribed to Tiffany BAILEY and used by Tiffany BAILEY. The warrants, which were supported by the same affidavit, were signed by U.S. Magistrate Judge William Connelly on May 4, 2016. *See* Ex. 11 (Tracking Warrant, Bailey Phones). BAILEY's motions should be denied.

As a threshold matter, BAILEY lacks standing to challenge the tracking warrant on Tiffany BAILEY's phone. As discussed above, BAILEY bears the burden of showing that he had a legitimate expectation of privacy in the area searched, by establishing that he had either an ownership or possessory interest in the property. *Castellanos*, 716 F.3d at 833–34 & n.4. BAILEY cannot do so here: as detailed in the affidavit, *see* Ex. 11, at ¶¶ 27–28, Tiffany BAILEY was both the registered subscriber and the user of the phone with number (410) 622-0701. BAILEY has not put forward any evidence to the contrary. Accordingly, he cannot demonstrate that he had a legitimate expectation of privacy in the phone. *See Castellanos*, 713 F.3d at 834.

In any event, the tracking warrants were facially valid and established probable cause to believe that the location of the subject phones would provide evidence of drug trafficking and illegal possession of firearms. Specifically, the facts supporting probable cause included the

following:

- On July 3, 2015, Baltimore County Police officers conducted a traffic stop of a dark blue Lexus with Maryland tag 2BP9969 that Dante BAILEY had been seen operating a short time earlier. The driver was identified as Dante BAILEY's wife, Tiffany BAILEY. The officers searched the car pursuant to Tiffany's consent, and recovered bags of heroin and crack cocaine, with net weights of roughly 26 grams and 21 grams, respectively. *See* Ex. 11, at ¶¶ 7–10.

- Later that day, investigators intercepted wiretap call B-02049 between Adrian Jamal SPENCE, using phone number (443) 707-5054, and Dante BAILEY, using phone number (405) 472-8094. BAILEY told SPENCE that Tiffany "got locked up with like an ounce and a half of cain and fifty yams" and "that was all the shit I made, fuck." *Id.* at ¶¶ 11–12.

- Based on the traffic stop, investigators applied for and obtained a state search warrant for the BAILEYS' residence at 3901 Princely Way, Pikesville, Maryland. In a search of the house, they recovered a digital scale, drug packaging material, a money counter, a gun holster, and the keys to a Mercury Marauder parked outside the residence. *Id.* at ¶¶ 13, 16.

- A drug dog scanned the Mercury Marauder parked outside and gave a positive alert for the presence of narcotics. In a subsequent search of the vehicle, officers recovered a metal grinder with marijuana residue and two loaded, stolen handguns. *Id.* at ¶¶ 14–15.

- BAILEY, who had multiple prior felony convictions, was arrested and charged with possession of a firearm by a convicted felon. *Id.* at ¶¶ 15–16.

- The following day, July 4, 2015, BAILEY made a series of recorded jail calls from the Baltimore County Detention Center in which he used coded language to direct Jay GREER and Kenneth TORRY to continue operating the drug trafficking business in his absence. BAILEY said he would "work through Spittle [*i.e.*, SPENCE] and my wife [*i.e.*, Tiffany BAILEY]." *Id.* at ¶¶ 17–22.

- On April 5, 2016, BAILEY posted bail and was released from jail. Shortly thereafter, he began posting photographs and videos of himself to an Instagram account bearing username "**5almighty_gang2**." Several of BAILEY's posts indicated to investigators that BAILEY may be in possession of firearms. For instance, on April 13, 2016, BAILEY posted a photo—which appeared to be taken with a cell phone—of several people holding various types of firearms, with the comment "YALL READY FOR THE TAKEOVER. MM100." On May 3, 2016, BAILEY posted a video of himself firing a handgun at a gun range. *Id.* at 24–25.

- Several of BAILEY's Instagram posts indicated to investigators that he may be using the Instagram "app" on his cell phone to communicate with others via direct

messaging regarding narcotics transactions.  For instance, on April 23, 2015, BAILEY posted a photo of several bundles of black hair with the comment, "20in Indian hair on deck. $100 a bundle. IT ALL GOES DOWN IN MY DM." Investigators believed that "DM" referred to Instagram's direct messaging feature, and that BAILEY may be using hair sales as a cover-up for narcotics distribution. Id. at ¶¶ 26.

- On April 7, 2016, a reliable confidential source told investigators that she/he had seen a Glock .40 in the BAILEYS' new residence at 7607 Reserve Circle, Baltimore, MD, since Dante BAILEY's release from prison.  The CS also reported that BAILEY's cell phone number was (802) 839-8109, and Tiffany BAILEY's cell phone number was (410) 622-0701.  Id. at ¶ 27.

- Investigators issued a subpoena for subscriber information and toll records for the two phone numbers from the service provider, Sprint.  The records showed that both numbers were registered to Tiffany BAILEY at 7607 Reserve Circle, and that they were in frequent contact with one another.  Id. at ¶ 28.

This surfeit of evidence established far more than a "fair probability" that Dante BAILEY and Tiffany BAILEY were involved in drug trafficking and illegal possession of firearms.

Contrary to BAILEY's assertions, the affidavit also spelled out why *location information* for the BAILEYS' cell phones would provide evidence of the crimes under investigation.  First, the affiant explained that he knew based on his extensive training and experience that "drug traffickers commonly carry cellular telephones with them and use them to remain in communication with co-conspirators, sources of supply, and customers via voice calls, text messaging, e-mail, and social media websites such as Instagram, and to otherwise assist them in their drug trafficking activities."  *Id.* at ¶ 6.  The affidavit also provided specific examples, outlined above, of the BAILEYS' use of cell phones to further their criminal activities.  The affidavit went on to explain that, in connection with physical surveillance, "real-time GPS information for the Target Telephones will assist investigators in determining the whereabouts of Dante and Tiffany BAILEY and the locations of drug and firearms transactions and stash houses."  *Id.* at ¶¶ 29. Clearly, if Dante BAILEY was dealing drugs and slinging guns, and was carrying his cell phone

while he did so, then location information for his cell phone would yield evidence of these crimes (*i.e.*, by enabling investigators to surveil him and to identify locations where he was keeping drugs and guns).  The affiant was not required to elaborate further on this subject.

### d.  Motion to Suppress Fruits of Search Warrant Executed at 7607 Reserve Circle on May 17, 2016, by Dante BAILEY (ECF 29, 412)

BAILEY has moved to suppress evidence recovered pursuant to a federal search warrant executed at his residence at 7607 Reserve Circle, Apt 203 on May 17, 2016, including over 90 grams of heroin, three cell phones, a laptop, and MMP gang paperwork and paraphernalia.  The search warrant was signed by U.S. Magistrate Judge Stephanie A. Gallagher on May 20, 2016.  *See* Ex. 12 (Search Warrant, 7607 Reserve Circle).  In two separate motions, BAILEY claims that the warrant was not supported by probable cause.  His motions should be denied.

The search warrant was facially valid and established probable cause to believe that evidence pertaining to the crime of possession of a firearm and ammunition by a felon would be found in the residence.  The affidavit included all the same factual material that supported the tracking warrants on BAILEY's cell phone, discussed in the section above.  In addition, the affidavit described in meticulous detail the ATF's investigation of BAILEY's recent trip to a gun range, where he had illegally rented several handguns and purchased over a hundred rounds of ammunition.  *Id.* at ¶¶ 16–23.  Finally, the affidavit provided a wealth of information connecting BAILEY to the residence at 7607 Reserve Circle, including jail mail sent by BAILEY to his wife at the address, cell phone records, and GPS information obtained via the above-described tracking warrants.  *Id.* at ¶¶ 24–29.

BAILEY's claim that the firearms and ammunition were "rented from the range," and therefore unlikely to be found in the residence, ECF 412, at 2, should be rejected.  The affidavit explained that the ammunition was *purchased*, not rented, *id.* at ¶ 18, and that BAILEY would

have been free to take home with him any unspent cartridges, *id.* at ¶ 19. The warrant specifically authorized the seizure of ammunition, as well as documents, cell phones, and indicia of occupancy. Because the warrant was supported by probable cause and met the particularity requirements, the motions to suppress should be denied.

### e.   Motion to Suppress Fruits of Search Warrant Executed at 32 Stockmill Road on September 27, 2016, by Ayinde Deleon (ECF 544)

DELEON has moved to suppress evidence recovered pursuant to a federal search warrant executed at his residence at 32 Stockmill Road, Apt. E, Pikesville, Maryland on September 27, 2016. The warrant, which also authorized the search of several other residences belonging to the defendants, was issued by U.S. Magistrate Judge A. David Copperthite on September 26, 2016. *See* Ex. 13 (Search Warrant, 12 Takedown Residences & Vehicles). The evidence recovered from DELEON's residence included over 90 grams of marijuana, drug packaging material, a digital scale, over $1300, several cell phones and computers, a stun gun, and MMP gang paperwork and paraphernalia. DELEON claims that "the vast majority of the search warrant affidavit involves the alleged criminal activity of co-defendants" and that the agents' interpretation of the conversations attributable to DELEON were "mere speculation by the affiant." ECF 544, at 2–3. This motion should be denied.

The search warrant was facially valid and established probable cause to believe that evidence pertaining to the crimes of drug trafficking and possession of firearms by a felon would be found in DELEON's residence. Although DELEON is correct in noting that the warrant authorized the search of numerous locations and vehicles and, therefore, contained information about the criminal activity of co-defendants, there was a wealth of factual material specific to DELEON and his residence. The facts supporting probable cause included the following:

- A federal grand jury for the District of Maryland issued an indictment charging DELEON

with racketeering conspiracy and drug trafficking conspiracy.  The investigation revealed that DELEON was a member of MMP, a violent gang that sold crack cocaine and heroin in Northwest Baltimore.  *Id.* at ¶¶ 14–15, 93.

- According to confidential sources, DELEON was a high-ranking member of MMP and one of the original leaders.  *Id.* at ¶ 93.

- DELEON was captured in a recorded jail call on April 24, 2016 in which he agreed to smuggle controlled substances ("twenty-five" of the "orange shit") to an inmate at the Maryland Correctional Institute in Hagerstown.  DELEON was captured in another recorded jail call expressing concern that he would be targeted by an undercover officer who was making controlled buys in MMP's drug territory.  *Id.* at ¶¶ 94–95.

- A reliable confidential source (CS) conducted a controlled meeting with DELEON on May 17, 2016, during which DELEON (a convicted felon) stated that he was in possession of firearms and may be willing to sell one of them to the CS for $450.  Approximately two weeks later, the CS conducted another controlled meeting with DELEON while wearing an audio recording device.  In the recorded conversation, DELEON referred to two 9mm firearms in his possession but declined to sell either of them to the CS, stating, "I need them." *Id.* at ¶¶ 96–98.

- On two occasions, law enforcement officers observed DELEON driving a BMW registered to him and parking outside the target residence.  Law enforcement officers also surveilled DELEON as he exited the residence and reentered shortly thereafter.  And, on one occasion, they observed DELEON standing on the private balcony of the residence. *Id.* at ¶¶ 99–103.

- Based on the affiant's extensive experience in investigating drug trafficking crimes, violent crimes, and firearms offenses, the affiant knew that drug traffickers often maintain, among other things, drugs, drug trafficking paraphernalia, proceeds of drug crimes, books and ledgers, cell phones, and firearms and ammunition in their homes and vehicles.  *Id.* at ¶¶ 4–12.

Under the totality of the circumstances, the affidavit supplied ample factual material from which Judge Copperthite could conclude that there was a fair probability that evidence of drug trafficking and possession of firearms by a felon was likely to be found inside the residence.  *See Bynum*, 293 F.3d at 197; *Montieth*, 662 F.3d at 664.  The affiant was not required to make "factual assertions directly linking the items sought" to the subject residence, *see Grossman*, 400 F.3d at 217; *Servance*, 394 F.3d at 230, beyond explaining that drug traffickers commonly keep such items in their homes.  Furthermore, the affiant provided direct quotations from the referenced jail calls

and recorded conversations, and explained why he interpreted the language the way he did,
drawing from his "training, experience, and knowledge of this investigation."  This allowed the
issuing judge to make an independent determination, and draw reasonable inferences, about the
nature of those calls.  *See Gates,* 462 U.S. at 240.  There was certainly a substantial basis for Judge
Copperthite to determine that the warrant should be issued.

### f.   Motion to Suppress Fruits of Search Warrant Executed at 1868 Oxford Square on September 27, 2016, by Jamal Lockley (ECF 493)

LOCKLEY has moved to suppress evidence recovered from his residence at 1868 Oxford
Square Road, on September 27, 2016.  *See* Ex. 13.  The warrant was supported by the same
affidavit that supported the warrant to search DELEON's residence, and was also signed by U.S.
Magistrate Judge A. David Copperthite.  The evidence recovered from LOCKLEY's residence
included numerous cell phones, over $1500, and miscellaneous documents and indicia of
occupancy.[18]  LOCKLEY claims (1) that the warrant "does not contain sufficient detail to support
a fair probability that evidence would be found" in his home, (2) that the affidavit fails to
"adequately particularize the place to be searched and the items to be seized," (3) that the affiant's
decoding of recorded conversations is "self-serving," and (4) that the facts offered in support of
probable cause are "not current." ECF 493, at 2–3.  This motion should be denied.

The search warrant was facially valid and established probable cause to believe that
evidence pertaining to drug trafficking would be found in LOCKLEY residence.  Specifically, the
facts supporting probable cause included the following:

- A federal grand jury for the District of Maryland issued an indictment charging LOCKLEY with racketeering conspiracy, drug trafficking conspiracy, and other violations of federal

---

[18]    The defendant has also moved to suppress any evidence recovered from the warrantless
search of a 2002 Acura on September 27, 2016. The government does not intend to introduce any
evidence recovered from that vehicle.

law.  The investigation revealed that LOCKLEY was a member of MMP, a violent gang that sold crack cocaine and heroin in Northwest Baltimore.  *Id.* at ¶¶ 14–15, 53.

- Beginning in July 2016, the ATF was intercepting wire communications occurring over LOCKLEY's cell phone pursuant to an order issued by U.S. District Judge Ellen L. Hollander.    In July and August 2016, LOCKLEY was intercepted in numerous calls discussing drug transactions with co-defendants Corloyd ANDERSON and Melvin LASHLEY.  *Id.* at  ¶¶ 21, 111–12, 124–131; *see also id.* at ¶ 139 (describing wiretap call between Adrian Jamal SPENCE and Takuma TATE in which they discussed LOCKLEY's involvement in heroin trafficking).

- In March 2016, a confidential informant conducted a controlled purchase of roughly 28 grams of crack cocaine from LOCKLEY.  LOCKLEY drove a 2008 Lexus to the location of the controlled purchase.  The confidential informant informed investigators that the only vehicle LOCKLEY drives is the 2008 Lexus.  *Id.* at ¶¶ 56–59.

- In July and August 2016, law enforcement officers observed the 2008 Lexus at LOCKLEY's residence.  In August 2016, officers observed LOCKLEY exit the target residence carrying a black bag, walk to the driver's side of the Lexus and place the bag into the rear passenger area of the car, and then drive away from the location.  *Id.* at ¶¶ 59–60.

- In September 2016, LOCKLEY provided the target residence as his address when given pulled over for a traffic violation.  *Id.* at ¶ 55.

- Based on the affiant's extensive experience in investigating drug trafficking crimes, violent crimes, and firearms offenses, the affiant knew that drug traffickers often maintain, among other things, drugs, drug trafficking paraphernalia, proceeds of drug crimes, books and ledgers, cell phones, and firearms and ammunition in their homes and vehicles.  *Id.* at ¶¶ 4–12.

This evidence was more than sufficient to establish probable cause.  The affidavit described, with particularity, a March 2016 controlled purchases of crack cocaine from LOCKLEY and recent intercepted wiretap conversations in which he discussed ongoing drug trafficking activity.  The affidavit also established that LOCKLEY resided at the target address, parked his Lexus at the target address, and used that Lexus to sell controlled substances.

LOCKLEY's claims that the probable case was "stale" and the interpretation of coded language "self-serving" should be rejected.  As described above, the affidavit included intercepted wiretap calls in the month immediately prior to the application for the warrant.  Furthermore, the

affiant transcribed the relevant portions of the referenced wire calls, and explained why he interpreted the coded language the way he did, drawing from his "training, experience, and knowledge of this investigation."   This allowed the issuing judge to make an independent determination, and draw reasonable inferences, about the nature of those calls.   *See Gates*, 462 U.S. at 240.

Because there was a substantial basis for Judge Copperthite to determine that the warrant should be issued, LOCKLEY's motion to suppress should be denied.

### g. Motion to Suppress Fruits of Search Warrant Executed at 6808 Townbrook Drive on September 27, 2016, by Jacob Bowling (ECF 422)

BOWLING has moved to suppress evidence recovered pursuant to a federal search warrant executed at his residence at 6808 Townbrook Drive, on September 27, 2016.   *See* Ex. 13.   The warrant, also signed by U.S. Magistrate Judge A. David Copperthite, was supported by the same affidavit that supported the warrants to search DELEON's and LOCKLEY's residences, described above.   The evidence recovered from BOWLING's residence included a Glock magazine, numerous ziplock bags, a digital scale, a razor, photographs of BOWLING with other MMP members, a cell phone, and indicia of occupancy.   BOWLING simply claims that "probable cause was lacking."   ECF 422, at 2.   This motion to suppress should be denied.

The search warrant was facially valid and established probable cause to believe that evidence pertaining to the crimes of racketeering conspiracy and drug trafficking conspiracy would be found in BOWLING's residence.   Specifically, the facts supporting probable cause included the following:

- A federal grand jury for the District of Maryland issued an indictment charging BOWLING with racketeering conspiracy, drug trafficking conspiracy, and other violations of federal law. The investigation revealed that BOWLING was a member of MMP, a violent gang that sold heroin and crack cocaine in Northwest Baltimore. *Id.* at ¶¶ 14–15, 61.

- A confidential source identified BOWLING as a member of MMP who sold crack cocaine and heroin in MMP's territory in the 5200 block of Windsor Mill Road. *Id.* at ¶ 67.

- Beginning in June 2016, the ATF was intercepting wire communications occurring over BOWLING's cell phone pursuant to an order issued by U.S. District Judge Ellen L. Hollander. *Id.* at ¶ 21.   In July 2016, BOWLING was intercepted in numerous wire calls discussing drug trafficking activity with co-defendant Melvin LASHLEY and others. *See id.* at ¶¶ 68–69, 107–10.

- On July 28, 2016, a confidential source conducted a controlled purchase of approximately 34 grams of crack cocaine from BOWLING.  BOWLING and the confidential source then discussed future drug transactions. *Id.* at ¶¶ 68–71.

- On August 25, 2016, a confidential source conducted a controlled purchase of approximately 58 grams of crack cocaine from BOWLING. *Id.* at ¶¶ 72–78.

- Lawfully obtained GPS tracking data frequently placed BOWLING at the subject residence during nighttime hours.   Law enforcement officers also observed a vehicle known to the driven by BOWLING parked at the residence, and observed BOWLING exiting the residence. *Id.* at ¶¶ 81–86.

- Based on the affiant's extensive experience in investigating drug trafficking crimes, violent crimes, and firearms offenses, the affiant knew that drug traffickers often maintain, among other things, drugs, drug trafficking paraphernalia, proceeds of drug crimes, books and ledgers, cell phones, and firearms and ammunition in their homes and vehicles. *Id.* at ¶¶ 4–12.

BOWLING does not, and cannot, point to any deficiencies in the probable cause supporting the warrant.  There was certainly a substantial basis for the Judge Copperthite to conclude that there was a fair probability that evidence of drug trafficking would be found in BOWLING's residence.

### h. Motion to Suppress Fruits of Search Warrants Executed at 38 Windbluff Court and 500 Wabash Avenue on September 27, 2016, by Corloyd Anderson (ECF 398)

ANDERSON has moved to suppress evidence recovered pursuant to federal search warrants executed at his residence at 38 Windbluff Court and his business at 500 Wabash Avenue on September 27, 2016. *See* Ex. 13.  The warrant was supported by the same affidavit that supported the warrant to search DELEON's, BOWLING's, and LOCKLEY's residences, described above.  From ANDERSON's residence, ATF agents recovered a loaded, stolen Glock

9mm pistol, $2500 in U.S. currency, a cell phone, and financial paperwork. From his business, agents recovered a certificate of occupancy, state license, assorted financial documents, receipt book and ledger book, and an electronic tablet device. ANDERSON argues that the warrants lacked probable cause because the affidavit contained a "few scant paragraphs involv[ing] the defendant herein and his residence." ECF 398, at 2. ANDERSON also claims that the any interpretation by the affiant of the defendant's recorded conversations are "self-serving" and "subject to the opinions of the agents." *Id.* at 2–3. This motion should be denied.

The warrant was facially valid and established probable cause to believe that evidence of the crimes of racketeering conspiracy and drug trafficking conspiracy would be found in the premises. Specifically, the facts supporting probable cause to search ANDERSON's residence at Windbluff Court included the following:

- A federal grand jury for the District of Maryland issued an indictment charging ANDERSON with racketeering conspiracy and drug trafficking conspiracy. The investigation revealed that ANDERSON was a member of MMP, a violent gang that sold heroin and crack cocaine in Northwest Baltimore. *Id.* at ¶¶ 14–15, 120.

- A reliable confidential source identified ANDERSON as the brother of Dante BAILEY and a large-scale supplier of heroin for MMP who is known to distribute as much as 1,000 to 1,500 grams of heroin per transaction. *Id.* at ¶ 123.

- In July and August 2016, ANDERSON was intercepted in numerous wiretap calls in which he used coded language to discuss drug transactions with co-defendant Jamal LOCKLEY. *Id.* at ¶¶ 124–31.

- Lawfully obtained GPS tracking data frequently placed ANDERSON at the residence overnight. MVA records show that ANDERSON's wife resides at the residence. Law enforcement officers observed ANDERSON exit the residence, enter a vehicle, and then return to the residence's front steps. *Id.* at ¶¶ 121, 134.

- Based on the affiant's extensive experience in investigating drug trafficking crimes, violent crimes, and firearms offenses, the affiant knew that drug traffickers often maintain, among other things, drugs, drug trafficking paraphernalia, proceeds of drug crimes, books and ledgers, cell phones, and firearms and ammunition in their homes and vehicles. *Id.* at ¶¶ 4–12.

Based on the totality of the circumstances, there was probable cause to believe that ANDERSON was involved in drug trafficking, and that evidence of that crime would be found in the target residence.   The affiant set forth his extensive experience in drug trafficking investigations, transcribed the relevant portions of the wiretap calls, and explained in detail why he interpreted the coded language in the calls the way he did.   Although ANDERSON complains that the language in the calls was susceptible to different interpretations, Judge Copperthite was certainly entitled to draw reasonable inferences about the nature of those calls.   *See Gates,* 462 U.S. at 240.

With respect to ANDERSON's business premises on Wabash Avenue, in addition to the facts outlined above, the affidavit explained the following:

- The affiant has extensive training, knowledge, and experience in investigating drug trafficking crimes, violent crimes and firearms offenses and is aware that, among other things: (1) drug traffickers maintain books, records, receipts, notes, ledgers, and other papers relating to the distribution of controlled substances in their places of business; (2) drug traffickers maintain the profits derived from drug trafficking in their places of business; (3) it is common for drug traffickers to secrete illegal drugs and other contraband, records of drug transactions, amounts of currency, financial instruments, and other items of value which are proceeds of drug transactions in secure locations within their place of business; and (4) when drug traffickers amass proceeds from the sale of drugs, the drug traffickers attempt to legitimize those proceeds and that, to accomplish this goal, drug traffickers utilize shell corporations and business fronts, and that drug traffickers commonly keep records of these transactions in their places of business. Ex. 13, at ¶ 12.

- ANDERSON was the registered owner of "We Cater to You Motors L.L.C," which was located at the target address.  ANDERSON was also listed as the leasee of the target address.  *Id.* at ¶¶ 132–33.

- In September 2016, law enforcement officers visited the target address and observed that there were no vehicles located on the lot or in the "wash bay."  *Id.* at ¶ 133.

Again, the agents had probable cause to believe that ANDERSON was committing the crimes charged, and that evidence of those crimes would be found in the target location.  As the Fourth Circuit has held, "the nexus between the place to be searched and the items to be seized may be established by the nature of the item and the normal inferences of where one would likely

keep such evidence." *United States v. Anderson*, 851 F.2d 727, 729 (4th Cir. 1988). Here, the affidavit established such a nexus and provided a substantial basis for the issuing judge to determine that the warrant should be issued.

> **i. Motions to Suppress Fruits of January 17, 2017 Search Warrant on Electronic Devices, by Dante Bailey (ECF 409), Jacob Bowling (ECF 423), and Jamal Lockley (ECF 495)**

BAILEY, BOWLING, and LOCKLEY move to suppress evidence recovered from their cell phones (and one laptop) pursuant to a search warrant signed by U.S. Magistrate Judge A. David Copperthite on January 17, 2017. *See* Exhibit 14 (Search Warrant, 36 Electronic Devices). Each of them argues that the affidavit failed to demonstrate probable cause to believe that evidence of the alleged crimes would be found in the particular electronic devices at issue. These motions should be denied.

The search warrant was amply supported by probable cause to believe that evidence of drug trafficking and racketeering conspiracy would be found in the subject devices. The affidavit began by explaining that a federal grand jury had recently indicted BAILEY, BOWLING, and LOCKLEY on charges of drug trafficking conspiracy and racketeering conspiracy. Ex. 14, at 5. It included a lengthy description of the many ways in which drug traffickers and gang members use cell phones and laptops to further their criminal activities. *Id.* at 3–5. And it provided specific evidence of each defendant's involvement in the charged conspiracies and connection to the subject devices, including the following:

- With respect to BAILEY, the affidavit described the July 3, 2015 traffic stop of Tiffany BAILEY that led to the recovery of distribution quantities of heroin and cocaine; the July 3, 2015 search warrant at the BAILEYS' residence and the recovery of two stolen firearms from a car parked outside; and the series of jail calls made by Dante BAILEY on July 4, 2015 instructing others to continue the drug trafficking business while he was incarcerated. *Id.* at 23–24. The affidavit went on to explain that investigators executed a federal search warrant at BAILEY's residence at 7607 Reserve Circle, Apt. 203, Woodlawn, Maryland on May 17,

2016, where they recovered roughly 94 grams of heroin, MMP gang paperwork and paraphernalia, three cell phones, and a laptop. These three cell phones and laptop were the subject of the January 17, 2017 search warrant. *See id.* at 25–26.

- With respect to BOWLING, the affidavit described how a confidential source had contacted BOWLING via cell phone to arrange for a controlled purchase of roughly 34 grams of crack cocaine on July 28, 2016. In addition, on September 27, 2016, investigators executed a federal search warrant at BOWLING's residence at 6808 Townbrook Drive, Gwynn Oak, Maryland, where they recovered a Glock magazine, drug packaging material, a digital scale and razor blade, photos of BOWLING with other members of MMP, and a cell phone. This cell phone was the subject of the January 17, 2017 search warrant. *See id.* at 7–9.

- With respect to LOCKLEY, the affidavit explained that a confidential source had contacted LOCKLEY via cell phone to arrange for a controlled purchase of roughly 28 grams of crack cocaine on March 10, 2016. In addition, the affidavit described four wiretap calls intercepted in July 2016 between LOCKLEY, JENKINS, ANDERSON, and LASHLEY in which they used coded language to discuss their drug trafficking activities. On September 27, 2017, investigators executed a search warrant at LOCKLEY's residence at 1868 Oxford Square Road, Bel Air, Maryland, where they recovered three cell phones. A fourth cell phone was recovered from LOCKLEY's car parked outside after a drug dog scanned the vehicle and gave a positive alert for the presence of narcotics. These four cell phones were the subject of the January 17, 2017 search warrant. *See id.* at 10–19.

It was not necessary for the affidavit to attest to personal observations of BAILEY, BOWLING, or LOCKLEY using the specific cell phones at issue—or even cell phones generally—in furtherance of their criminal activities. As the Fourth Circuit has repeatedly explained, the "nexus between the place to be searched and the items to be seized may be established by the nature of the item and the normal inferences of where one would likely keep such evidence." *United States v. Anderson*, 851 F.2d 727, 729 (4th Cir. 1988); *see also Servance*, 394 F.3d at 230; *Williams*, 548 F.3d at 319; *Grossman*, 400 F.3d at 217. And it is well-established that cell phones are tools of the drug trade. *See, e.g.*, *United States v. Gibson*, 547 Fed. Appx. 174, 185 n.1 (4th Cir. 2013) (Davis, J., concurring in part and concurring in the judgment) (recognizing the frequent use of cell phones in the drug trade); *United States v. Fisher*, 2015 WL 1862329, at *2 (D. Md. Apr. 22, 2015) ("[c]ell phones . . . are acknowledged tools of drug-traffickers"); *United*

*States v. Saunders*, 2017 WL 1234149, at *4 (N.D.W.V. Apr. 3. 2017) (noting that "circuits throughout the country have recognized that cellphones are tools of the drug trafficking trade," and collecting cases); *United States v. Slater*, 971 F.2d 626, 637 (10th Cir. 1992) (a cell phone is a "recognized tool of the trade in drug dealing"); *cf. United States v. Garcia-Lagunas*, 835 F.3d 479, 490 (4th Cir. 2016) (describing multiple cell phones as "tools of the drug trade").

Here, the affidavit went far beyond what was required under governing Fourth Circuit precedent.  As discussed above, it clearly articulated the ways in which drug traffickers and gang members use cell phones and laptops to further their criminal activities.  *See* Ex. 14, at 3–5.  It explained that an extensive wiretap investigation had "revealed that the TARGET SUBJECTS used multiple cell phones to further the racketeering conspiracy and drug trafficking conspiracy" at issue.  *Id.* at 7.  And it provided numerous specific examples of such use by BOWLING, *see id.*, at 7–9, 13–14, and LOCKLEY, *see id.* at 10–17; *cf. id.* at 24 (describing BAILEY's use of a jail phone to further the drug trafficking conspiracy).

### j.   Motion to Suppress Fruits of Search Warrant for DNA Executed on January 3, 2017, by Sydni FRAZIER (ECF 592)

FRAZIER has moved to suppress DNA obtained from him pursuant to a state search warrant that was signed by Judge Owens of the District Court of Maryland for Baltimore City on December 27, 2016, and executed by BPD Homicide Detective Gary Niedermeier on January 3, 2017.  *See* Ex. 15 (Search Warrant, Frazier DNA).  FRAZIER claims that the warrant was not supported by probable cause.  This motion should be denied.

The search warrant for the FRAZIER's DNA was amply supported by probable cause.  The affidavit provided a detailed description of the investigation into the August 10, 2016 murder of Ricardo Johnson.  *Id.*, Aff. at 1–2.  It recounted how, less than twelve hours after the discovery of Johnson's body, BPD officers observed a black male with a backpack pushing a green dirt bike.

When the officers approached, the male fled on foot and evaded capture, but he dropped the backpack and a pair of gloves.[19]   The backpack contained two firearms which were a ballistic match to those used in the murder of Johnson earlier that day.   The backpack also contained a jacket, and a DNA sample from the jacket was matched to a profile for Sydni FRAZIER in the Combined DNA Index System (CODIS).   *Id.* at 2.   As explained in the affidavit, the investigation also revealed that the victim had a heated argument with Dwight JENKINS a week prior to his murder, and that FRAZIER and JENKINS had ties to the same drug organization in Forest Park/Windsor Mills.   *Id.* at 2.

Contrary to FRAZIER's claim, the affiant established a clear connection both between FRAZIER and the jacket—the CODIS hit—and between the jacket and the crime—its location in a backpack with the murder weapons.   FRAZIER also complaints that the "affidavit provides no information as to how the CODIS information was obtained" and "what from the 2007 murder matched the alleged profile."   ECF 592, at 1.   But the *reason* for FRAZIER's DNA being in CODIS was irrelevant to the probable cause determination.   The affiant did not purport to rely on the 2007 murder investigation, or the underlying crime that led to FRAZIER's DNA being uploaded into CODIS, in order to establish probable cause.   FRAZIER has provided no reason why the affiant should be required to look behind the CODIS match before seeking a warrant for DNA.   It is well-settled that an affidavit need not provide every detail of the investigation in order to establish a fair probability that evidence of a crime will be found in a particular place.   *See, e.g.*, *United States v. Colkley*, 899 F.2d 297, 300 ("An affiant cannot be expected to include in an affidavit every piece

---

[19]   Although the affidavit states that the backpack "contained two 9mm handguns, a set of gloves and a jacket," the affiant later learned that the gloves were recovered next to, but not inside of, the backpack.   FRAZIER does not contend, nor could he, that this error had any significance to the probable cause determination.

of information gathered in the course of an investigation."); *United States v. Clenney*, 631 F.3d 658, 665 (4th Cir. 2011) ("[T]he worst course of action would be to pick apart warrant affidavits from the pristine perch of hindsight or to penalize officers for securing what the law requires."). Measured under any standard, the evidence contained in the affidavit was more than sufficient to establish probable cause.

### k. Motion to Suppress Fruits of February 10, 2017 Search Warrant on Three Cell Phones, by Sydni Frazier (ECF 591)

Sydni FRAZIER moves to suppress the fruits of a search warrant executed on three cell phones that were seized from his person incident to his arrest on January 25, 2017. The warrant was signed by U.S. Magistrate Judge J. Mark Coulson on February 10, 2017. *See* Ex. 16 (Search Warrant, Frazier Cell Phones). FRAZIER argues that the affidavit failed to allege that FRAZIER was involved in drug trafficking, thereby defeating probable cause to search the phones. ECF 591, at 1, 3. This argument does not withstand scrutiny.

The affidavit established probable cause to believe that the cell phones would contain evidence of *both* drug trafficking *and* illegal possession of firearms. It began with a detailed summary of evidence of FRAZIER's involvement in the August 10, 2016 murder of Ricardo Johnson. Ex. 16, at ¶¶ 12–21. Most notably, less than 12 hours after the victim's body was discovered, BPD officers recovered a backpack containing the two murder weapons from a fleeing suspect who resembled FRAZIER. *Id.* at ¶¶ 17–19. Next to the backpack was a pair of gloves that had FRAZIER's DNA on the insides and the victim's DNA on the outsides.[20] *Id.* at ¶¶ 20. At

---

[20]     In a footnote, FRAZIER quibbles with the description of the DNA match in the affidavit. He points out that the DNA sample yielded a partial DNA profile consistent with a mixture of at least four contributors, and contends that it was "therefore inappropriate to assume only Frazier's DNA was recovered." ECF 591, at 2 n.1. The affidavit, however, does not state that *only* FRAZIER's DNA was recovered. It simply states, accurately, that there was a match between FRAZIER's DNA and DNA from the inside of the gloves. The fact that others may also have

the time, FRAZIER was prohibited from possessing firearms because of a 2014 felony drug conviction. *Id.* at ¶ 22. Based on the foregoing, U.S. Magistrate Judge Beth P. Gesner issued a criminal complaint and arrest warrant charging FRAZIER with possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g). *Id.* at ¶ 23.

The affidavit went on to explain that ATF agents arrested FRAZIER on January 25, 2017, as he was exiting a residence at 7002 Upper Mills Circle, Catonsville, Maryland. A search of FRAZIER's person incident to his arrest resulted in the recovery of a plastic bag containing approximately 3.5 grams of crack cocaine, a plastic bag containing marijuana, and the three subject cell phones. *Id.* The affidavit went on to describe the many ways in which drug traffickers use cell phones to further their drug trafficking activities. *Id.* at ¶ 24. Notably, it explained that "[i]ndividuals involved in drug trafficking often use multiple cellular telephones, including individual phones used for particular customers or co-conspirators." *Id.* at ¶ 24.c.

The obvious implication of these paragraphs was that FRAZIER's possession of 3.5 grams of crack cocaine, marijuana, and three cell phones at the time of his arrest indicated that he was involved in drug trafficking. Although FRAZIER complains that the affidavit did not expressly articulate this conclusion, the Supreme Court has held that the statement of probable cause in a search warrant affidavit need not be written with "[t]echnical elaborate specificity." *United States v. Ventresca*, 380 U.S. 102, 108 (1965). Rather, a "magistrate has the authority … to draw such reasonable inferences as he will from the material supplied to him by applicants for a warrant," *Bynum*, 293 F.3d at 197. Judge Coulson was certainly permitted to draw the reasonable inference

---

contributed DNA to the insides of the gloves is immaterial to the probable cause analysis. Indeed, the affiant included facts alerting the issuing judge that there were likely others involved in the murder—by explaining that the victim was kidnapped and bound and that at least two firearms were used. As discussed above, an affiant need not include every shred of information known to him. *See Clenney*, 631 F.3d at 665; *Colkley*, 899 F.2d at 300.

that FRAZIER intended to distribute the crack cocaine and marijuana found on his person, and

that he was using the three cell phones in furtherance of his drug trafficking activities.

>    **l.   Motion to Suppress Fruits of Search Warrant Executed at 7002 Upper Mills Circle on January 25, 2017, by Sydni Frazier (ECF 590)**

FRAZIER has moved to suppress evidence recovered pursuant to a state search warrant

executed at 7002 Upper Mills Circle on January 25, 2017.  The search warrant was signed by Judge

Scurti of the District Court of Maryland for Baltimore City on January 25, 2017.  *See* Ex. 17

(Search Warrant, 7002 Upper Mills Circle).  FRAZIER claims that the warrant lacked probable

cause because (1) the search warrant was issued "approximately six months after the murder;" and

(2) there was not a sufficient nexus between the items sought and the murder.  ECF 590, at 3-4.

This motion should be denied.

The affidavit included many of the same facts as the DNA and cell phone warrants

described above, including the police encounter that led to the recovery of the guns used to kill

Ricardo Johnson; the DNA match to FRAZIER on the gloves found next to the backpack; and

FRAZIER's arrest, just after exiting the subject residence, while in possession of 3.5 grams of

crack cocaine, marijuana, and three cell phones.  *See* Ex. 17 at ¶¶ 15–24.  In addition, the affidavit

explained that:

- The murder victim's phone was not recovered from the crime scene. A tracking warrant for the phone revealed that it was connecting to the internet in the area of 900 Bennett Place, an area known to be frequented by FRAZIER based on his arrest history. *Id.* at  ¶ 18.

- Both FRAZIER and his girlfriend, Ariel Johnson, advised investigators that FRAZIER stayed at the residence at 7002 Upper Mills Circle on numerous occasions.

These facts demonstrated probable cause to believe that FRAZIER was involved in the murder of

Ricardo Johnson, and that evidence of those crimes would be found in the target residence.

FRAZIER's staleness argument should be rejected.  The Fourth Circuit has stated "[t]he

vitality of probable cause cannot be quantified by simply counting the number of days between the occurrence of the facts supplied and the issuance of the affidavit." *United States v. McCall*, 740 F.2d 1331, 1336 (4th Cir. 1984) (quoting *United States v. Johnson*, 461 F.2d 285, 287 (10th Cir. 1972)). "Rather, we must look to all the facts and circumstances of the case, including the nature of the unlawful activity alleged, the length of the activity, and the nature of the property to be seized." *Id.*  In this case, the property to be seized includes the kind of items that are not ordinarily destroyed—firearms, cell phones, clothing, and paperwork. *See McCall,* 740 F.2d at 1337 (noting that the critical issue is "whether there was probable cause [at the time of issuance of the warrant] to believe that the evidence was then located at the premises named in the warrant"); *United States v. Rhynes*, 196 F.3d 207, 234 (4th Cir. 1999), *opinion vacated in part on reh'g en banc*, 218 F.3d 310 (4th Cir. 2000), *and on reh'g in part*, 218 F.3d 310 (4th Cir. 2000) (holding that because the police were authorized to search for records and documents "which are not ordinarily destroyed or moved about from one place to another" there was probable cause despite the money laundering allegations from two years prior).  Furthermore, the affidavit explained that the victim's cell phone was being used in the weeks following his murder, providing additional evidence that the phone was retained and not destroyed.  The affidavit provided sufficient probable cause to believe that, despite the passage of time, evidence of the murder was still likely to be recovered from the target residence.

The warrant also established a clear nexus between the items to be seized and the place to be searched.  Again, the warrant authorized law enforcement to search for "firearms, ammunition, clothing, cell phones, pictures/paperwork and other items that would help further [the] investigation" into murder.  The defendant claims that "the items listed are never mentioned in the body of the affidavit," but he is mistaken.  The affidavit establishes not only that FRAZIER was

in possession of firearms on August 10, 2016 (when he fled from pursuing officers), but it also establishes that, at the time the warrant was issued, he was pending federal charges for being a felon in possession of firearms.  The warrant also makes clear, as stated above, that the homicide victim's cell phone was missing and had been last used in a location associated with FRAZIER. As the Fourth Circuit has held, "the nexus between the place to be searched and the items to be seized may be established by the nature of the item and the normal inferences of where one would likely keep such evidence." *Anderson*, 851 F.2d at 729.  It was well within the issuing judge's discretion to infer that individuals involved in murder may maintain evidence of the crime, such as firearms, ammunition, and cell phones, in their homes.  Here, there was certainly a substantial basis for the issuing judge to determine that the warrant should be issued.

### m.  Motion to Suppress Fruits of Search Warrant Executed at 800 Arncliffe Road on May 15, 2017, by Randy BANKS (ECF 751)

BANKS has moved to suppress "any narcotic, money, or other evidence obtained because of any search or seizure discussed" in a "non-exhaustive" laundry list of events.  One such event is BANKS' arrest on May 15, 2017, after he had been a fugitive for roughly eight months.  On that date, the ATF and the U.S. Marshal Service executed a search warrant at 800 Arncliffe Road, Essex, Maryland, arrested BANKS, and recovered two items of mail and two cell phones.  Although BANKS does not identify any particular piece of evidence he wishes to suppress, or put forward any colorable claim for suppression, he indicates his intent to "challenge any seizure."

The search warrant, which was issued by U.S. Magistrate Judge Beth P. Gesner, Ex. 18 (Search Warrant, 800 Arncliffe Road), was facially valid and established probable cause to believe that the subject residence would contain a person wanted on a federal arrest warrant (BANKS), as well as evidence of the crimes with which he was charged.  The facts supporting probable cause included the following:

- The affiant has extensive training, knowledge, and experience in investigating drug trafficking crimes, violent crimes and firearms offenses and is aware that drug traffickers often maintain, among other things, contraband, currency, proceeds of drug crimes, cell phones and financial instruments in their homes. Ex. 18, at ¶¶ 6–8.

- A federal grand jury for the District of Maryland issued an indictment charging BANKS with racketeering conspiracy and drug trafficking conspiracy.  The investigation revealed that BANKS was a ranking member of MMP, and the leader of MMP's drug shop located in Gwynn Oaks/Liberty Heights.  *Id*. at ¶¶ 9–10.

- BANKS was a fugitive from the above charges.  *Id*. at ¶¶ 11–12.

- On April 12, 2017, BANKS was observed engaging in activities consistent with drug trafficking.  When law enforcement attempted to stop BANKS' vehicle, the vehicle fled.  *Id*. at ¶ 12.

- A reliable confidential source provided a phone number for BANKS. A tracking warrant for that phone yielded GPS location data showing that the phone was being used inside the subject residence.  *Id*. at ¶¶ 13–14.

- BANKS' girlfriend lived at the target residence, and was seen entering and exiting the subject residence. *Id*. at ¶ 15.

There is no question, therefore, that the police had probable cause to believe that both BANKS and evidence of the charged crimes would be found in the target residence.  There was certainly a substantial basis for Judge Gesner to determine that the warrant should be issued.

### 3.   The Officers Relied on the Warrants in Good Faith

Even if the court has doubts about the quantum of probable cause supporting any of the warrants discussed above, the motions to suppress should be denied because in each case, the executing officers relied in good faith on a facially valid warrant.  *Leon*, 486 U.S. 897.  There is no suggestion that the issuing judges were anything but neutral and detached, *see Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 326–27 (1979), or that they were misled by information in the affidavit that the affiants knew was false or would have known was false except for their reckless disregard of the truth, *see Franks v. Delaware*, 438 U.S. 154 (1978).   Moreover, the affidavits contained "sufficient indicia of probable cause so as not to render reliance on [them] entirely unreasonable."

80

*Bynum*, 293 F.3d at 197–99; *United States v. Clutchette*, 24 F.3d 577, 582 (4th Cir. 1994).  Indeed, the Fourth Circuit has applied the *Leon* good faith exception to the exclusionary rule in circumstances where the statement of probable cause was far more bare bones than the ones at issue here.  *See, e.g.*, *United States v. Williams*, 548 F.3d 311 (4th Cir. 2008) (bare assertion that the targeted dwelling was known to be the defendant's, without explaining how); *United States v. Harris*, 215 Fed. Appx. 262, 272 (4th Cir. 2007) (unpub.) (no indication that the defendant lived in the targeted premises, let alone grounds for believing so).

    **D.**    **Motions to Suppress Social Media Evidence Seized Pursuant to Warrants Issued under 18 U.S.C. § 2703(a) and (b)(1)(A)**

Over the course of the investigation, the government obtained warrants to search twenty-seven social media accounts belonging to the defendants.  Specifically, on May 2, 2016, U.S. Magistrate Judge William Connelly issued a warrant to search Dante BAILEY's Instagram account with username "5almighty_gang2."  Ex. 19 (Search Warrant, Bailey Instagram).  On August 16, 2016, U.S. Magistrate Judge J. Mark Coulson issued a warrant to search BAILEY's Apple iCloud account associated with email address wolfmobb@icloud.com. Ex. 20 (Search Warrant, Bailey iCloud).  On January 20, 2017, U.S. Magistrate Judge A. David Copperthite issued a warrant to search twenty-three Facebook, Instagram, and YouTube accounts belonging to the defendants, including Jamal LOCKLEY's Instagram account with username "dirtyboydroyd."  Ex. 21 (Search Warrant, 23 Social Media Accounts).  On January 17, 2017, Baltimore City Circuit Court Judge Barry G. Williams issued a warrant to search Sydni FRAZIER's Facebook account with username "Sydni.Frazier.7."  Ex. 22 (Search Warrant, Frazier Facebook).  And, finally, on February 22, 2017, U.S. Magistrate Judge A. David Copperthite issued a warrant to search FRAZIER's Instagram account with username "getmneyboy."  Ex. 23 (Search Warrant, Frazier Instagram).

Defendants BAILEY, LOCKLEY, and FRAZIER have moved to suppress evidence obtained from their social media accounts pursuant to these warrants on two grounds: (1) the magistrate judges lacked jurisdiction under Federal Rule of Criminal Procedure 41 to issue warrants for property located outside the District of Maryland, and (2) the warrants were not supported by probable cause.  For the reasons discussed below, these motions should be denied.

### 1.    The Magistrate Judges Had Jurisdiction to Issue the Warrants Pursuant to the Stored Communications Act

The defendants' jurisdictional argument demonstrates a fundamental misunderstanding of the nature of the social media warrants, which were not traditional warrants to search and seize property under Rule 41, but rather warrants requiring the disclosure of information held by third party service providers pursuant to the Stored Communications Act.

The Stored Communications Act, 18 U.S.C. §§ 2701–2712 ("SCA"), regulates how stored wire and electronic communications may be lawfully accessed or disclosed.  Section 2703 of the SCA permits the government, in specified circumstances, to compel service providers to disclose records or information pertaining to their customers, as well as the contents of their customers' stored electronic communications.  Relevant here, Section 2703 provides that "[a] governmental entity may require . . . a provider of electronic communication service" or "a provider of remote computing service to disclose the contents of any wire or electronic communication" if it "obtains a warrant issued using the procedures described in the Federal Rules of Criminal Procedure . . . by a court of competent jurisdiction," 18 U.S.C. § 2703(a), (b)(1)(A).  Section 2711, in turn, defines "court of competent jurisdiction" to include "any district court of the United States (including a magistrate judge of such a court)" that "has jurisdiction over the offense being investigated" or "is in . . . a district in which the provider of a wire or electronic communication service is located or in which the wire or electronic communications, records, or other information are stored."   18

U.S.C. § 2711(3)(A)(i).

Although the SCA adopts Rule 41's probable cause standard for warrants compelling the disclosure of the contents of communications, an SCA warrant is a "distinct procedural mechanism from a traditional Rule 41 search warrant." *In re Search of Information Associated with [redacted]@gmail.com that is Stored at Premises Controlled by Google Inc.* ("*Google*"), Case No. 16-mj-00757(BAH), 2017 WL 3445634 (D.D.C. July 31, 2017). For instance, whereas traditional Rule 41 warrants typically must be executed by law enforcement officers (and commonly authorize law enforcement officers to enter private property without the consent of the owner or occupant), SCA warrants, in contrast, are executed simply by serving the warrant upon the designated provider, an act which is typically accomplished remotely by email or fax. *See* 18 U.S.C. § 2703(g) (stating that the presence of an officer is not required for service or execution of a § 2703 warrant); *United States v. Bach*, 310 F.3d 1063, 1068 (8th Cir. 2002) (search of email by service provider without presence of law enforcement did not violate Fourth Amendment). In addition, obtaining an SCA warrant obviates the need to give notice to the subscriber. *Compare* 18 U.S.C. § 2703(b)(1)(A), *with* Fed. R. Crim. P. 41(f)(1)(C). Most important here, although traditional Rule 41 search warrants are limited to "a search of property . . . within the district" of the authorizing magistrate judge, Fed. R. Crim. P. 41(b), SCA warrants may be issued by any court that "has jurisdiction over the offense being investigated," 18 U.S.C. § 2711(3)(A)(i).

The defendants are correct that under Rule 41(b), with some exceptions not relevant here, a judge in one district cannot issue a search warrant for property located in another district. But the text, structure, and legislative history of the SCA make clear that the operative language in 18 U.S.C. § 2703(a) and (b)(1)(A)—"using the procedures described in the Federal Rules of Criminal Procedure . . . by a court of competent jurisdiction"—incorporates only the procedures described

in Rule 41, such as Rule 41(d)'s requirement of a sworn statement of probable cause, and not the limitations on the territorial reach of a search warrant under Rule 41(b).  Thus, every court to have considered the jurisdictional issue has held that Section 2703 properly authorizes out-of-district warrants for stored communications such as email and social media content.  *See, e.g.*, *United States v. Berkos*, 543 F.3d 392, 398 (7th Cir. 2008) (jurisdictional provision of "Rule 41(b) deals with substantive judicial authority—not procedure—and thus does not apply to § 2703(a)."); *United States v. Kernell*, No. 3:08-CR-142, 2010 U.S. Dist. LEXIS 32802, at *12–13 (E.D. Tenn. Apr. 2, 2010) ("If there was any doubt about the intent of the 2001 Amendment in issue . . . one need only look to its title, 'Nationwide Service of Search Warrants for Electronic Evidence.'"), *report and recommendation adopted*, No. 3:08-CR-142(TWP), 2010 WL 1491861 (E.D. Tenn. Apr. 13, 2010); *In re Search Warrant*, No. 6:05-MC-168-ORL-31JGG, 2005 WL 3844032, at *6 (M.D. Fla. Feb. 13, 2006) ("[S]ubsection (b) of Rule 41, because it is not procedural, does not impair the ability of a district court to issue out-of-district warrants under Section 2703(a)."); *Google*, 2017 WL 3445634, at *20 (same); *United States v. Scully*, 108 F. Supp. 3d 59, 75-83 (E.D.N.Y. 2015) (same); *In re Search of Yahoo, Inc.*, No. 07-3194-MB, 2007 WL 1539971 (D. Ariz. May 21, 2007) (same); *Hubbard v. MySpace, Inc.*, 788 F. Supp. 2d 319, 325 (S.D.N.Y. 2011) (same); *United States v. Noyes*, No. 1:08-CR-55(SJM), 2010 WL 5139859, at *9 n.8 (W.D. Pa. Dec. 8, 2010) (same); *United States v. Freeman*, No. CRIM. 10-68(JRT)(RLE), 2010 WL 4386897, at *12 n.6 (D. Minn. May 13, 2010) (same), *report and recommendation adopted*, No. CRIM. 10-68(JRT)(LIB), 2010 WL 4386894 (D. Minn. Oct. 28, 2010); *In re United States*, 665 F. Supp. 2d 1210, 1219 (D. Or. 2009) (same).[21]

---

[21]     In a recent, highly publicized decision, the Second Circuit held that an SCA warrant may not be used to require providers to disclose electronic communications stored on servers outside the United States.  *In the Matter of a Warrant to Search a Certain E-Mail Account Controlled and*

Here, the court had jurisdiction pursuant to the SCA to issue warrants requiring the disclosure of information stored in the Northern District of California because Facebook and Instagram are providers of electronic communications service and/or remote computing service,[22] and the court "has jurisdiction over the offense[s] being investigated," namely, violations of 18 U.S.C. § 1962(d), 18 U.S.C. § 922(g), and 21 U.S.C. §§ 841 and 846 that occurred in the District of Maryland. The defendants' reliance on *United States v. Owens*, No. 16-CR-38-JPS, 2016 WL 7053195 (E.D. Wis. Dec. 5, 2016), is misdirected, because *Owens* did not involve a warrant issued

---

*Maintained by Microsoft Corp.* ("*Microsoft I*"), 829 F.3d 197 (2d Cir. 2016), *reh'g denied*, 855 F.3d 53 (2d Cir. 2017) ("*Microsoft II*"). Every other court to consider the issue has reached the opposite result. *See, e.g.*, *Matter of Search of Content Stored at Premises Controlled by Google Inc.*, Case No. 16-mc-80263-RS, 2017 WL 3478809 (N.D.Cal. Aug. 14, 2017); *In re Search of Information Associated with [Redacted]@gmail.com that is Stored at Premises Controlled by Google, Inc.*, Case No. 16-mj-00757 (BAH), 2017 WL 3445634 (D.D.C. July 31, 2017); *In re Search Warrant No. 16-960-M-1 to Google*, MJ No. 16-960, MJ No. 16-1061, 2017 WL 3535037 (E.D.Pa. Aug. 17, 2017). In any case, even the Second Circuit acknowledged that the SCA permits magistrate judges "to issue warrants to be executed in other 'districts'"—just "not overseas." *Microsoft I*, 829 F.3d at 213.

[22] The SCA defines "electronic communication service" as "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15). A "remote computing service" is defined as one that is responsible for "the provision to the public of computer storage or processing services by means of an electronic communications system." 18 U.S.C. § 2711(2). An "electronic communications system" is defined, in turn, as "any wire, radio, electromagnetic, photooptical or photoelectronic facilities for the transmission of wire or electronic communications, and any computer facilities or related electronic equipment for the electronic storage of such communications." 18 U.S.C. § 2510(14). Although the case law applying these definitions is somewhat muddled, it is clear that Facebook (which controls Instagram) and YouTube are either providers of electronic communication service, remote computing service, or both, depending on the particular service at issue. *See Viacom Int'l, Inc. v. YouTube Inc.*, 253 F.R.D. 256, 264 (S.D.N.Y. 2008) (characterizing YouTube as a provider of remote computing service); *Crispin v. Christian Audigier, Inc.*, 717 F. Supp. 2d 965, 980–90 (C.D. (continued from previous page) Cal. 2012) (holding that Facebook is a provider of both electronic communications service and remote computing service); *In re Zynga Privacy Litigation*, 750 F.3d 1098, 1104 (9th Cir. 2014) (characterizing Facebook as a provider of remote computing service); *In re Facebook Privacy Litigation*, 791 F. Supp. 2d 705, 713–14 (N.D. Cal. 2011) (characterizing Facebook as a provider of electronic communications service), *summarily aff'd*, 572 Fed. Appx. 494 (9th Cir. 2014).

pursuant to the SCA.  The warrant at issue in *Owens* authorized the FBI to use what is known as a "Network Investigative Technique" or "NIT" to transmit instructions to out-of-state computers that were being used to access a child pornography website called "Playpen."  *Id.* at *1–2.  These instructions caused the computers to transmit location information such as IP addresses back to the FBI, allowing the FBI to find and apprehend the child pornographers.  *Id.*  Thus, the warrant authorized the FBI to conduct an actual, physical search of the out-of-state computers, in violation of the territorial limits on a magistrate judge's jurisdiction under Rule 41(b).  *See id.* at *4 ("The NIT searches the user's computer to discover the IP address associated with that device."); *see also id.* at *6 ("At all relevant times, Mr. Owens's computer was located in Wisconsin, and therefore it was not located in the Eastern District of Virginia, as it must be for the magistrate judge to have the authority to issue the warrant under Rule 41(b)(1) or 41(b)(2).").  The warrant did *not* simply require the disclosure of information held by third party service providers, as did the SCA warrant at issue here.

Although the warrant applications here did not expressly state that the SCA was the source of the court's out-of-district jurisdiction, it was clear from the citations to the SCA in the application paperwork and the nature of the requests.  For instance, the affidavits noted that the government had submitted preservation requests to Facebook and Instagram for some of the subject accounts pursuant to the Section 2703(f) of the SCA.  *See, e.g.*, Ex. 21, Aff. at ¶¶ 37, 41, 43, 45.  In addition, the affidavits were accompanied by requests for orders prohibiting Facebook and Instagram from notifying the subscribers of the subject accounts about the existence of the warrants pursuant to the Section 2705(b) of the SCA.  *See, e.g., id.* at 39.  The applications were styled as requests for authorization to require the *disclosure* of information held by third parties, *not* requests for authorization to *search* a particular place or *seize* particular things.  *See id.*, Aff.

86

at ¶ 1 (seeking "warrants requiring Instagram . . . and Facebook . . . to disclose to the government records and other information in their possession"); *see also Google*, 2017 WL 3445634, at *16 (explaining that compelled disclosure under the SCA "does not amount to a 'search' or a 'seizure' in any meaningful sense, because such providers routinely control [subscriber information] without infringing on 'any expectation of privacy' or 'meaningfully interfer[ing] with the customer's possessory interests").  And although the affidavits stated that the applications were being submitted "pursuant to Federal Rule of Criminal Procedure 41," *see, e.g.*, Ex. 21, Aff. at ¶ 1, that was not an incorrect statement of the law, since, as discussed above, the SCA expressly provides that the government should "obtain a warrant using the *procedures* described in the Federal Rules of Criminal Procedure."  18 U.S.C. § 2703(a), (b)(1)(A) (emphasis added).

Even if the source of the court's jurisdiction was unclear from the application materials, it would not render the warrant invalid.  There is no legal requirement that a warrant application expressly invoke the source of the court's jurisdiction, and many warrant applications do not do so.  It is a long-established principle of jurisprudence that a court must determine for itself whether it has jurisdiction before deciding the merits of a question, regardless whether any jurisdictional issue is raised by the parties.  *See, e.g.*, *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 95–98 (1998) (reaffirming "two centuries of jurisprudence" holding that a court must "satisfy itself of its own jurisdiction . . . even though the parties are prepared to concede it"); *Ex parte McCardle*, 7 Wall. 506, 514 (1868) ("[T]he first and fundamental question is that of jurisdiction, first, of this court, and then of the court from which the record comes.  This question the court is bound to ask and answer for itself, even when not otherwise suggested, and without respect to the relation of the parties to it.").  Here, Judge Copperthite was unquestionably familiar with the SCA, and he evidently satisfied himself that he had jurisdiction before deciding to issue the warrant.

There are no grounds upon which to upset that decision.

Even if the failure to cite the SCA was somehow fatal to the court's jurisdiction—and it was not—it would not justify suppression of the social media evidence because the agents relied in good faith on facially valid warrants. *See Leon*, 468 U.S. 897. The defendants are wrong to suggest that the *Leon* good faith exception to the exclusionary rule does not apply because the warrants were "void *ab initio*." ECF 213-1, at 4. The Supreme Court has held that *Leon* applies to an officer's objectively reasonable belief that a warrant was valid, *even if there was never any such warrant*. *See United States v. Herring*, 555 U.S. 135 (2009). In *Herring*, a police officer mistakenly believed, as a result of the "negligent bookkeeping error" by another officer, that there was an outstanding arrest warrant for the defendant. *Id.* at 144. Notwithstanding the Fourth Amendment violation, the Supreme Court held that the exclusionary rule did not apply to the drug and gun evidence seized from the defendant's person and vehicle in the search incident to his unconstitutional arrest. *Id.* The Court explained that, "[t]o trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Id.* at 136. A negligent bookkeeping error did not rise to this level.

If *Leon* applies to a *constitutional* violation resulting from a mistaken-but-reasonable belief in the *existence* of a warrant, it certainly applies to a violation of a *non-constitutional* jurisdictional rule resulting from a mistaken-but-reasonable belief in the *validity* of a warrant. The Supreme Court has held that the violation of statutory requirements that go beyond the Constitution's demands does not justify the suppression of evidence unless the statute itself specifies this remedy. *See United States v. Caceres*, 440 U.S. 741, 754–57 (1979). Here, the SCA expressly provides that suppression is not a remedy "for nonconstitutional violations of this chapter." 18 U.S.C. §

2708. Indeed, in the very case the defendants rely upon, *Owens*, the court denied the defendant's motion to suppress under *Leon*, holding that the exclusionary rule could not be invoked based on the issuing magistrate judge's lack of jurisdiction. *Owens*, 2016 WL 7053195 at *8; *see also United States v. Berkos*, 543 F.3d 392, 396 (7th Cir. 2008) (allowing a defendant to go free based on a violation of Rule 41(b)'s jurisdictional requirements would be "wildly out of proportion to the wrong"); *United States v. Cazares-Olivas*, 515 F.3d 726, 730 (7th Cir. 2008) (violations of Rule 41 "do not justify the exclusion of evidence that has been seized on the basis of probable cause, and with advance judicial approval").

Here, there is no suggestion that the agents deliberately misled the magistrate judge regarding his jurisdictional authority or otherwise acted in bad faith. The failure to expressly invoke the court's jurisdiction under the SCA, if it was an error, was at most a negligent one, and it certainly did not amount to a Fourth Amendment violation. Suppression of the evidence would be wildly out of proportion to the wrong. *Owens*, 2016 WL 7053195 at *8; *Berkos*, 543 F.3d at 396; *Cazares-Olivas*, 515 F.3d at 730.

### 2. The Warrants Were Supported by Probable Cause

#### a. Motions to Suppress Fruits of May 2, 2016 Warrant on Instagram Account "5almighty_gang2," by Dante Bailey (ECF 403, 411, 755)

In two identical motions to suppress (ECF 403 and 4011), and one supplemental filing (ECF 755), Dante BAILEY argues that the government failed to establish probable cause to believe that evidence of his alleged crimes would be found on his Instagram account "5almighty_gang2." These motions should be denied.

The search warrant affidavit was based on largely the same probable cause statement as that contained in the affidavit supporting the tracking warrants for the BAILEYS' phones. *See* Ex. 19. As discussed in Section III.C.2.c, *supra*, the government provided a lengthy catalog of

evidence of BAILEY's historical involvement in drug trafficking and illegal possession of firearms—including the recovery of distribution quantities of heroin and cocaine from the BAILEYS' vehicle on July 3, 2015; the subsequent recovery of two stolen firearms from a car parked outside their residence; and the series of jail calls made by Dante BAILEY on July 4, 2015 in which he used coded language to direct drug transactions.

BAILEY nitpicks the probable cause statement, arguing, for example, that the coded language referenced in the affidavit was susceptible to different interpretations. *See* ECF 755, at 6–10. But the bar for probable cause is not nearly as high as BAILEY seems to think it is. Probable cause requires only "a fair probability that contraband or evidence of a crime will be found in a particular place," *Gates*, 462 U.S. at 235; it "does *not* require that the officer's belief be more likely true than false," *Humphries*, 372 F.3d at 657 (emphasis added). BAILEY also complains that the affiant, Task Force Officer Brad Hood, neglected to differentiate between how many hours of experience he had in drug trafficking investigations versus gang investigations. Again, however, BAILEY demands the type of "[t]echnical elaborate specificity" that the Supreme Court has held is not required. *Ventresca*, 380 U.S. at 108.

The affidavit also went well beyond what was necessary to establish a nexus between BAILEY's alleged criminal activity and the subject accounts. As discussed above, the Fourth Circuit has held "that the nexus between the place to be searched and the items to be seized may be established by the nature of the item and the normal inferences of where one would likely keep such evidence." *Servance*, 394 F.3d at 230. The affidavit need not contain "factual assertions directly linking the items sought" to the placed to be searched. *Grossman*, 400 F.3d at 217.

As BAILEY acknowledges, the affiant, TFO Hood, provided a rather lengthy explanation of the ways in which drug traffickers and gang members commonly use social media platforms

like Instagram in furtherance of their criminal activities.  *See* Ex. 19, at ¶¶ 8–9.  But more importantly, TFO Hood provided dozens of *concrete examples* of BAILEY's use of the subject Instagram account to, among other things, publicize a "takeover" by gun-wielding MMP members, *id.* at ¶ 29; brag about illegal possession of firearms, *id.* at ¶ 29; and advertise drugs for sale, *id.* at ¶¶ 30–31.  It is difficult to imagine any clearer indication that the account would contain evidence of BAILEY's involvement in the alleged crimes.  In any event, Judge Connelly was entitled to draw his own commonsense inferences about the likelihood that drug traffickers and gang members will store evidence of their criminal activity in their social media accounts, whether or not it was "explicitly articulated by the applying officer."  *United States v. Williams*, 548 F.3d 311, 319 (4th Cir. 2008).

Finally, BAILEY argues that the government exceeded the scope of the warrant by obtaining records from Instagram outside the window of "January 1, 2016 to the present," as authorized by the warrant.  *See* ECF 403, at 2–3; Ex. 19, at 21.  The records provided by Instagram, however, expressly state that they are limited to the date range from "2016-01-01 00:00:00 UTC to 2016-05-02 23:59:59 UTC"—exactly as authorized by the warrant.  *See* Ex. 24 (Excerpts from Bailey Instagram Returns), at 1.  Although the records include some comments and messages from 2015, these are simply part of comment or message threads that *continued* into 2016, and were therefore responsive to the request.  *See id.* at 2–5 (2016 profile picture with comments dating back to 2015).  In any event, this argument is rendered moot because the government later obtained a warrant to search the same Instagram account and seize records dating back to the start of the racketeering conspiracy on January 1, 2011.  *See* Ex. 21, at 1, 31.  BAILEY has not challenged this later warrant.

### b. Motions to Suppress Fruits of August 16, 2016 Warrant on iCloud Account Associated with Email Address "wolfmobb@icloud.com," by Dante Bailey (ECF 410, 755)

In two separate motions to suppress, BAILEY argues that the government failed to establish a sufficient nexus between his alleged criminal activity and his iCloud account associated with email address wolfmobb@icloud.com.  This argument should be rejected.

The statement of probable cause provided a wealth of evidence that BAILEY was using his cell phone to post evidence of his criminal activities to his Instagram account—including an actual video of him shooting a handgun on May 3, 2016.  *See* Ex. 20, at ¶¶ 10–20.  The affidavit also explained that records obtained from Instagram pursuant to a warrant indicated that BAILEY's Instagram account was registered to email address wolfmobb@icloud.com and that he was using a cell phone with number (802) 839-8109.  *Id.* at ¶ 16.  (In addition, an earlier search warrant executed on a phone seized from BAILEY on July 3, 2015, indicated that he had used email address wolfmobb@icloud.com to communicate with co-conspirator Takuma TATE.  *Id.* at ¶ 25.)

The affidavit went on to explain that on May 17, 2016, ATF agents executed a search warrant at BAILEY's residence at 7607 Reserve Circle, Apt. 203, Windsor Mill, Maryland, where they recovered over 90 grams of heroin, a digital scale, numerous items of gang-related paraphernalia and paperwork, and several cell phones, including BAILEY's iPhone.  *Id.* at ¶¶ 21–23.  As stated in the affidavit, because the iPhone was locked, the ATF was not able to access its contents.  However, investigators issued a subpoena to Apple for subscriber information for the phone, the results of which confirmed that BAILEY was assigned Apple ID wolfmobb@icloud.com, that his "Account Type" was "Full iCloud," and that he was using phone number (802) 839-8109 and address 7607 Reserve Circle, Apt. 203, Windsor Mill, Maryland.  *Id.*

at ¶ 24.  Furthermore, the Apple records showed that "BAILEY's iPhone connected to the Apple iCloud account associated with wolfmobb@icloud.com numerous times in May 2016 prior to his arrest by ATF."  *Id.*  Based on these connections, the affiant concluded that "data from Dante BAILEY's iPhone is stored in the Apple iCloud account associated with the email address wolfmobb@icloud.com."  *Id.*

Together, these factors clearly established a "fair probability" that evidence of BAILEY's involvement in drug trafficking and illegal possession of firearms would be found on his Apple iCloud account.  *See Montieth*, 662 F.3d at 664.  BAILEY again nitpicks the affidavit, arguing that even if he "connected" his iPhone to his iCloud account, this does not necessarily mean that he "uploaded any data to the iCloud account."  ECF 755, at 13.  Again, however, BAILEY asks the Court impose a standard far more exacting than what probable cause requires.  Judge Coulson was certainly entitled to "draw [the] reasonable inference[]"—which proved correct—that BAILEY had connected his iPhone to his iCloud account in order to upload content from his iPhone, and that evidence of his criminal activities would be found there.  *See Bynum*, 293 F.3d at 197.

### c.  Motion to Suppress Fruits of January 19, 2017 Warrant on Instagram Account "dirtyboydroyd," by Jamal Lockley (ECF 494)

LOCKLEY argues that the warrant for his Instagram account "dirtyboydroyd" was not supported by probable cause, as the affidavit "lacked sufficient detail" and omitted that "no drugs, paraphernalia, or weapons" were seized from his residence when the takedown warrant was executed on September 27, 2016.  ECF 494, at 2–3.  This motion should be denied.

The affidavit in support of the warrant established probable cause to believe both that LOCKLEY was the user of the Instagram account and that evidence of racketeering conspiracy would be found there.  With respect to the former, the affidavit explained that the username for the account, "dirtyboydroyd," was a reference to LOCKLEY's street name, "Droyd" or "Droid,"

and the profile picture associated with the account was a photograph of LOCKLEY.  Ex. 21, at ¶ 8.  With respect to the latter, the affidavit provided that: (1) the profile picture showed LOCKLEY with another member of the charged racketeering conspiracy, Charles BLACKWELL, and (2) in the picture, the two of them were holding up 5 and 2 fingers, respectively—a reference to MMP's headquarters in the 5200 block of Windsor Mill Road.  *See id.*  This was a clear indication that the account would contain evidence of LOCKLEY's affiliation with MMP and involvement in the charged racketeering and drug trafficking conspiracies.  The affidavit also included a lengthy description of the numerous ways in which individuals involved in drug trafficking and criminal gangs use social media platforms like Instagram to further their illegal activities, *see id.* ¶¶ 27–28, and provided concrete examples of such use by members of MMP, *id.* ¶¶ 31–47.  Nothing more was required.  *See  Servance*, 394 F.3d at 230; *Grossman*, 400 F.3d at 217.

>    **d.    Motion to Suppress Fruits of January 17, 2017 Warrant on Facebook Account "sydni.frazier.7" (ECF 594)**

FRAZIER moves to suppress the fruits of a warrant on his Facebook account "sydni.frazier.7" on the ground that the affiant, BPD Homicide Detective Gary Niedermeier, failed to set forth what, if any, expertise he had in Facebook.  This motion lacks merit.

The affidavit established probable cause to believe that evidence of murder would be found in FRAZIER's Facebook account, namely:

- On August 10, 2016, BPD officers observed a male pushing a green dirt bike, who fled when approached and dropped the dirt bike and a backpack.

- The backpack was found to contain two firearms, which were ballistically matched to shell casings from the scene of the murder of Ricardo Johnson earlier that same morning.

- DNA recovered from a jacket inside the backpack was matched to Sydni FRAZIER by BPD's Trace Analysis Unit.

- A Facebook account under FRAZIER's name displayed a photograph of him

94

operating a green dirt bike that resembled the dirt bike recovered with the murder weapons.

*See* Ex. 22, at 4.  In other words, plainly visible on the publicly accessible portion of the subject Facebook account was a photograph that tended to link FRAZIER to the murder weapons.  In these circumstances, Det. Niedermeier did not need to profess any "expertise" in "Facebook" in order to draw the commonsense conclusion that further evidence of FRAZIER's involvement in Ricardo Johnson's murder would be found on the account.

> **e.    Motion to Suppress Fruits of February 22, 2017 Warrant on Instagram Account "getmneyboy," by Sydni Frazier (ECF 594)**

FRAZIER also moves to suppress the fruits of a warrant on his Instagram account "getmneyboy" on the ground that the affidavit is devoid of facts supporting the inference that FRAZIER was involved in drug trafficking.  This is incorrect.

The affidavit described how ATF agents arrested FRAZIER on January 25, 2017, and recovered approximately 3.5 grams of crack cocaine, marijuana, and three cell phones from his person.  Ex. 23, Aff. at ¶ 41.  The affiant explained that this quantity of cocaine, as well as FRAZIER's use of multiple cell phones, was "indicative of drug distribution." *Id.*

The affidavit went on to explain that, on February 5, 2017, while housed in the Chesapeake Detention Center, FRAZIER made a recorded jail call to a male associate in which he used coded language to discuss a stash of drugs.  *Id.* at ¶ 46.  In the same call, FRAZIER told the associate to go on his Instagram account and "delete all my pictures"—presumably, in an attempt to destroy evidence and obstruct the investigation.  *Id.* at ¶ 47.  The affiant further explained that he believed FRAZIER was using the Instagram account with username "getmneyboy" because the profile picture associated with the account was a photograph of FRAZIER holding a large stack of U.S. currency, and the "tagline" included his name, "Sydni." *Id.* ¶ 45.

Together, these facts established a "fair probability" that evidence of FRAZIER's involvement in drug trafficking would be found on his Instagram account. *See Montieth*, 662 F.3d at 664; *Bynum*, 293 F.3d at 197.

### 3.   The Officers Relied on the Warrants in Good Faith

Assuming, *arguendo*, that any of the social media warrants were *not* supported by probable cause, they still contained "sufficient indicia of probable cause so as not to render reliance on [them] totally unreasonable." *Clutchette*, 24 F.3d at 582 (applying good faith exception and reversing decision to suppress evidence). Accordingly, the motions to suppress should be denied pursuant to the *Leon* good faith doctrine. *Leon*, 486 U.S. 897.

### E.  Motion to Suppress Cell Site Location Information Seized Pursuant to Court Order Issued under 18 U.S.C. § 2703(d) (ECF 525)

LOCKLEY moves to suppress historical cell site location data for his cell phone with number (443) 709-7780, with service provided by T-Mobile. The government obtained this data from T-Mobile via a court order issued by U.S. Magistrate Judge Stephanie A. Gallagher pursuant to the Stored Communications Act, specifically, 18 U.S.C. § 2703(d). *See* Ex. 25 (2703(d) Order, Lockley Phone). As discussed in Section II.F above, the data show that LOCKLEY's phone was hitting off a cell tower in the area where Anthony Hornes was killed around the time of his murder.

LOCKLEY argues that the warrantless acquisition of his cell site location data violated the Fourth Amendment, notwithstanding the Fourth Circuit's decision in *United States v. Graham*, 824 U.S. 421 (4th Cir. 2016) (en banc), which held that the government does not violate the Fourth Amendment by obtaining historical cell site location information from a cell phone service provider pursuant to a § 2703(d) order, rather than a warrant. LOCKLEY points out that the Supreme Court recently granted certiorari in *Carpenter v. United States*, 137 S. Ct. 2211 (2017), and the question under review in that case is whether the Fourth Amendment's warrant

96

requirement applies to historical cell site location data obtained from a third-party service provider.

LOCKLEY's motion should be denied.  The Supreme Court has held that the exclusionary rule does not apply to "searches conducted in objectively reasonable reliance on binding appellate precedent," *Davis v. United States*, 564 U.S. 229, 232 (2011), or to those conducted in objectively reasonable reliance on subsequently invalidated statutes, *Illinois v. Krull*, 480 U.S. 340 (1987). Here, the government acted in objectively reasonable reliance on *both* a duly enacted statute *and* binding Fourth Circuit precedent when it obtained LOCKLEY's cell site data through a § 2703(d) order, rather than a warrant.  *See* 18 U.S.C. § 2703(d) (providing that the government may obtain non-content cell phone records, including location data, by demonstrating "specific and articulable facts showing that there are reasonable grounds to believe that . . . the records . . . are relevant and material to an ongoing criminal investigation"); *Graham*, 824 U.S. at 428 ("[T]he Government's acquisition of [historical cell site location information] pursuant to § 2703(d) orders, rather than warrants, did not violate the Fourth Amendment.").  LOCKLEY does not contend that the government failed to meet the requirements of the Stored Communications Act, or otherwise acted in bad faith.  Accordingly, the cell site location data for his cell phone should not be suppressed.

### F.  Motions to Suppress Statements, by Dante Bailey (ECF 28), Corloyd Anderson (ECF 397), Jacob Bowling (ECF 421), Dontray Johnson (ECF 489), Jamal Lockley (ECF 496), Ayinde Deleon (ECF 543), Sydni Frazier (ECF 593), Randy Banks (ECF 750), Devon Dent (ECF 754), and Malcolm Lashley (ECF 757)

Dante BAILEY, Corloyd ANDERSON, Jacob BOWLING, Dontray JOHNSON, Jamal LOCKLEY, Ayinde DELEON, Sydni FRAZIER, Randy BANKS, Devon DENT, and Malcolm LASHLEY have filed motions to suppress various statements they made to law enforcement.[23]

---

[23]     BANKS, DELEON, and LOCKLEY have not identified any custodial statements they seek to suppress.  *See* ECF 496, 543, 750.  Because the government does not intend to introduce evidence of any custodial statements by BANKS, DELEON, or LOCKLEY in its case in chief at

They assert their general right against self-incrimination under the Fifth Amendment and their right to a hearing to determine the voluntariness of any custodial statement that the government seeks to admit as evidence at trial.[24]

We begin with a statement of the applicable law. We then describe the statements made to law enforcement by the above-named defendants that the government intends to use in its case in chief. Finally, we explain why all these statements are voluntary and admissible.

### 1.    Applicable Law

The Fifth Amendment guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In order to protect this right, the Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 444 (1966), adopted prophylactic procedural rules that must be followed in custodial interrogations. *United States v. Parker*, 262 F.3d 415 (4th Cir. 2001). In general, any statements elicited from a suspect without first advising the suspect of his rights to remain silent and to counsel are inadmissible in the prosecution's case-in-chief. *Id.* An individual is "in custody" for *Miranda* purposes when, under the totality of the circumstances, "a suspect's freedom of action is curtailed to a degree associated with formal arrest." *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984). "Interrogation" for *Miranda* purposes means "words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an

---

trial, their motions should be denied as moot.

[24]      Some of the above-named defendants have moved to suppress "any and all statements," without limitation, which would include non-custodial statements made in recorded jail calls and wire calls, or statements made to co-conspirators. *See, e.g.*, ECF 421, at 2 (BOWLING); ECF 750, at 2 (BANKS). With the exception of JOHNSON's motion to suppress a recorded jail visit, *see* ECF 488, which is discussed *infra* at Section III.G, none of the defendants have identified any particular non-custodial statements they seek to suppress, or made any colorable claims for suppression of non-custodial statements. Therefore, to the extent the defendants are seeking suppression of non-custodial statements, these motions should be denied.

incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).  On

the other hand, "volunteered statements"—that is, statements "given freely and voluntarily without

any compelling influences"—"are not barred by the Fifth Amendment and their admissibility is

not affected by" the Supreme Court's holding in *Miranda*.  *Miranda*, 384 U.S. at 478.

      Statements made after a *Miranda* waiver must also be voluntary.  The Supreme Court has

held that "[c]oercive police activity is a necessary predicate to the finding that a confession is not

voluntary."  *Colorado v. Connelly*, 479 U.S. 157, 167 (1986); *see also United States v. Cristobal*,

293 F.3d 134, 140 (4th Cir. 2002).  Examples of coercive police activity include prolonged

detention and interrogation without sleep or rest, administration of "truth serums," physical abuse,

and threats of physical abuse.  *See Cristobal*, 293 F.3d at 140.  "The mere existence of threats,

violence, implied promises, improper influence, or other coercive police activity, however, does

not automatically render a confession involuntary." *United States v. Braxton*, 112 F.3d 777, 780

(4th Cir. 1997) (en banc).  Rather, "[t]he proper inquiry 'is whether the defendant's will has been

'overborne' or his 'capacity for self-determination critically impaired'" by police conduct.  *United

States v. Pelton*, 835 F.2d 1067, 1071 (4th Cir. 1987) (quoting *Schneckloth v. Bustamonte*, 412

U.S. 218, 225 (1973)); *see also Braxton*, 112 F.3d at 780.  In applying this test, "courts must

consider the 'totality of the circumstances,' including the characteristics of the defendant, the

setting of the interview, and the details of the interrogation.'" *Braxton*, 112 F.3d at 780 (quoting

*Pelton*, 835 F.2d at 1071).  Ordinarily, courts do not suppress post-Miranda statements unless they

are "coerced confessions procured by means 'so offensive to a civilized system of justice that they

must be condemned.'"  *Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir. 1994) (quoting *Miller

v. Fenton*, 474 U.S. 104, 109 (1985)).

2.      **Relevant Facts**

a.      **Statements by Devon Dent on May 10, 2012 (ECF 754)**

On May 10, 2012, DENT was arrested for a state violation of probation in Baltimore City. After his arrest, he was interviewed by BPD Homicide Detective Gary Niedermeier.  The interview was audio recorded.   Prior to any questioning, DENT acknowledged that he had previously reviewed an explanation and waiver of rights.  *See* Ex. 26 (Transcript, Dent Interview, May 10, 2012), at 1–2.  DENT was then provided a Miranda waiver form, which he read aloud.  After reading each right, DENT stated that he understood that right and placed his initials on the form. DENT then signed the form, indicating his willingness to talk to law enforcement.  *See* Ex. 27 (Miranda Waiver Form, Dent, May 10, 2012).  After doing so, DENT answered questions about the homicide of Torey Garrison, a/k/a Forty.  During the course of the interview, DENT admitted that he "hustle[d]" (*i.e.*, sold drugs) "every day" in the vicinity of "Liberty Heights and Gwynn Oak, in front of Big T's."  *See* Ex. 26, at 5.

b.      **Statements by Dontray Johnson on July 31, 2015 (ECF 489)**

On July 31, 2015, the Baltimore County Police Department executed a search warrant at a residence shared by JOHNSON and his wife, Toi Cutchember.  Detective Sholter read *Miranda* warnings to JOHNSON and Cutchember once they were detained inside the residence.  JOHNSON indicated that he understood and waived his rights. JOHNSON was then asked whether there was any illegal contraband in the residence, and he replied that there were items of drug paraphernalia located in a kitchen cabinet above the refrigerator.  During a search of the residence, officers recovered numerous items of evidence, including a locked safe which was located in the master bedroom.   JOHNSON initially declined to provide the combination to the safe when asked. However, when the officers retrieved a sledgehammer and indicated that they would need to break

open the safe by force, JOHNSON voluntarily provided the combination. Inside the safe, the officers found ammunition, heroin, money, and paperwork.

At the conclusion of the search warrant, JOHNSON was arrested and taken to a Baltimore County police precinct. Once there, he was, again, read his *Miranda* rights and then interviewed by Detective Dimitri Goodwin and Special Agent Lyndon George of Homeland Security Investigations (HSI). In response to police questioning, JOHNSON stated that a friend had given him some heroin to sell to help him get back on his feet after he was released from federal prison. He then terminated the interview, stating that he would prefer to simply take his charges rather than answer further questions.

### c.    Statements by Dontray JOHNSON on October 4, 2015 (ECF 489)

The government does not intend to introduce any statements made by JOHNSON during his arrest on October 4, 2015 in its case in chief. Therefore, this motion to suppress should be denied as moot.

### d.    Statements by Dante Bailey on May 17, 2016 (ECF 28)[25]

On March 17, 2016, Dante BAILEY and his wife Tiffany BAILEY were detained while ATF agents searched their residence pursuant to a federal search warrant. ATF TFO Paul Geare read *Miranda* warnings to both Dante and Tiffany BAILEY, reciting them from a *Miranda* card. BAILEY acknowledged that he understood his rights and verbally waived them. BAILEY was then asked if there was anything illegal in the home, and he replied that there was not. A few minutes later, law enforcement officers asked BAILEY what was in the brown bag next to the bed

---

[25]    In addition to the statements discussed in this section, Dante BAILEY made statements to law enforcement during warrantless arrests on April 23, 2015 and June 18, 2015 (ECF 512). Because BAILEY has moved to suppress those statements on the grounds that they were "the product of an illegal search and seizure," they are addressed *infra* at Section H.1.a and H.1.c.

in the master bedroom.  BAILEY responded that it was roughly 50 grams of heroin that belonged to him and not Tiffany.  BAILEY also stated that he had brought it into the apartment with him when he arrived home the night before.  BAILEY was then transported to the ATF field office and interviewed.  This interview was audio and video recorded.  At the beginning of the interview, BAILEY acknowledged that he had been read his *Miranda* warnings during the execution of the search warrant earlier that day.  TFO Bradley Hood again read BAILEY his *Miranda* warnings, and BAILEY initialed a Miranda waiver form.  *See* Ex. 28 (Miranda Waiver Form, Bailey, May 17, 2016).  BAILEY stated that he understood his rights, but declined to sign the bottom of the form.  Despite this, BAILEY continued to speak to TFO Hood; he never asked for an attorney, asked to stop the interview, or refused to answer questions.  During the roughly 90-minute interview, BAILEY discussed, among other things, MMP and his possession of firearms and drugs.

     e.     **Statements by Jacob BOWLING on September 27, 2016 (ECF 421)**

On September 27, 2016, BOWLING was arrested in connection with the execution of a search warrant at his residence.  While at the residence, ATF Special Agent Pafford read BOWLING his Miranda rights, which he acknowledged and waived. Shortly thereafter, BOWLING was transported to the ATF field office and interviewed by Special Agent Christian Aanonsen and TFO Hood. The interview was audio and video recorded. BOWLING first acknowledged that *Miranda* warnings had been given to him earlier that day.  He further acknowledged that he had been read those warnings on previous occasions.  Agent Aanonsen and TFO Hood then read BOWLING *Miranda* warnings again, and BOWLING initialed a Miranda waiver form.  *See* Ex. 29 (Miranda Waiver Form, Bowling, Sept. 27, 2016).  BOWLING stated that he understood his rights, signed the form, and agreed to speak to law enforcement.  He then participated in an approximately 75-minute interview, during which he admitted that he sold drugs,

but falsely denied being a member of MMP.

### f.  Statements by Corloyd Anderson on September 27, 2016 (ECF 397)

On September 27, 2016, at approximately 6:00 a.m., the ATF executed a federal search warrant at Corloyd ANDERSON's residence at 38 Windbluff Court, Owings Mills, Maryland. ANDERSON was arrested inside the residence and then brought to an ATF vehicle outside. At approximately 6:15 a.m., Special Agent Christian Aanonsen read ANDERSON his Miranda rights from a card. ANDERSON stated that he understood his rights. Agent Aanonsen then asked ANDERSON if there was anything in the house that the search team should be aware of. ANDERSON replied that there was a pistol under his bed.  At approximately 6:31 a.m., Agent Aanonsen provided ANDERSON with a Miranda waiver form, which he initialed and signed. *See* Ex. 30 (Miranda Waiver Form, Anderson, Sept. 27, 2016).  ANDERSON was then asked whether the firearm in the residence was his and whether anyone else in the residence had knowledge of it. ANDERSON replied that the firearm was his and that his wife did not know about it.  He also provided a written statement with further information about the gun and about his involvement in heroin trafficking.  *See* Ex. 31 (Anderson Written Statement, Sept. 27, 2016).

Once the agents had finished executing the search warrant, ANDERSON was brought back to the ATF field office, where he participated in a roughly 23-minute interview that was audio and video recorded.  At the beginning of the interview, Agent Aanonsen showed ANDERSON the Miranda waiver form that he had signed previously, and ANDERSON acknowledged his signature and confirmed that he understood his rights.  In response to questioning, ANDERSON repeated much of what he had said in the vehicle earlier and made some further admissions, but falsely denied any involvement in MMP.  At no point between the execution of the search warrant at approximately 6:00 a.m. and the conclusion of the interview at approximately 8:59 a.m. did the

agents make any threats or promises to induce ANDERSON to talk to them.

### g.   Statements by Devon Dent on October 26, 2016 (ECF 754)

On October 26, 2016, ATF TFOs Ivo Louvado, Paul Geare, and Michael Pratt transported DENT from the Maryland Correctional Institute in Hagerstown, Maryland, where he was serving a state sentence, to the federal courthouse in Baltimore, Maryland for an initial appearance on the Superseding Indictment in this case.  During the ride to the courthouse, the officers did not ask DENT any questions, and DENT did not make any relevant statements.  After his initial appearance, DENT was transported back to Hagerstown by the ATF TFOs.  During the return trip, DENT began to talk to the officers about a Mercedes that he saw following the transport vehicle. DENT asked the TFOs if the individuals in the Mercedes were "his people."  TFO Louvado responded that he did not know, but that the Mercedes was a "nice vehicle."  DENT followed this up by informing the officers that he paid $54,000 for his Mercedes and stating, "It would surprise you how much we were making."  At that time, TFO Ivo Louvado advised DENT of his *Miranda* rights.  After the advisement, DENT nodded his head, indicating that he understood his rights. After approximately one minute of silence, DENT began speaking and made a number of statements, including implicating himself and others in drug trafficking.  *See* Ex. 1.

### h.   Statements by Malcolm LASHLEY on November 22, 2016 (ECF 757)[26]

On November 22, 2016, a search warrant was executed at Malcolm LASHLEY's residence in Baltimore City.  LASHLEY was detained inside the residence, and BPD Detective Romey read *Miranda* warnings to him.  *See* Ex. 32 (Miranda Form, Lashley, Nov. 22, 2016).  LASHLEY verbally acknowledged that he understood his rights.  Subsequently, LASHLEY informed law

---

[26]   LASHLEY has also moved to suppress statements he made to law enforcement on April 3, 2012 and June 8, 2017.  The government does not intend to introduce any such statements in its case in chief at trial, so this motion should be denied as moot.

enforcement that the heroin and marijuana recovered in the house belonged to him.

### i.   Recorded Interview by Sydni FRAZIER on January 25, 2017 (ECF 593)

On January 25, 2017, FRAZIER was arrested outside of his residence pursuant to a federal arrest warrant.  When FRAZIER was detained, ATF Special Agent Timothy Moore advised him of his right under *Miranda*.  FRAZIER was then transported to the ATF field office, where he was interviewed by BPD Homicide Detective Gary Niedermeier and Agent Moore. The interview was audio and video recorded.[27]   At the start of the interview, Detective Niedermeier again advised FRAZIER of his Miranda rights, and FRAZIER initialed and signed a Miranda waiver form, indicating that he understood his rights.  *See* Ex. 33 (Frazier Miranda Waiver, Jan. 25, 2017). FRAZIER then made a number of false exculpatory statements in response to police questioning.

### 3.   The Defendants Statements Followed Valid Miranda Waivers (Or Were Unprompted By Police Questioning), and Were Made Voluntarily

The admissibility of the defendants' statements in this case is not a close question.  First, with the exception of one unprompted remark by DENT on October 26, 2016, all of the defendants' statements were preceded by a proper Miranda advisement and a knowing and voluntary waiver of those rights.  Indeed, BAILEY, BOWLING, FRAZIER, JOHNSON, and ANDERSON were advised of their Miranda rights *multiple* times.   After being properly advised, each defendant indicated that he understood his rights and agreed to answer questions.  *See* Exs. 26–34.[28]  At no

---

[27]   Due to a malfunction, the recording equipment failed to capture audio during the Miranda rights advisement, but the video clearly shows FRAZIER reviewing and signing the Miranda waiver form.

[28]   BAILEY's decision to initial, but not sign, the Miranda advisement form does not invalidate his waiver of his rights.  The Fourth Circuit has held that in order "[t]o effectuate a waiver of one's *Miranda* rights, a suspect need not utter any particular words."  *United States v. Umana*, 750 F.3d 310, 344 (4th Cir. 2014) (quoting *Burket v. Angelone*, 208 F.3d 172, 198 (4th Cir. 2000)).  Rather, "[a] suspect impliedly waives his *Miranda* rights when he acknowledges that he understands the *Miranda* warning and subsequently is willing to answer questions."  *Id*. at 344

time did the police make any threats or promises to induce the defendants to waive their rights.

DENT's pre-*Miranda* remark regarding the Mercedes on October 26, 2016 is also admissible, as it was a "volunteered statement" unprompted by police questioning. *See Miranda*, 384 U.S. at 478; *Innis*, 446 U.S. at 301. TFO Louvado's comment that a Mercedes is a "nice car" is not the type of statement that is "reasonably likely to elicit an incriminating response from the suspect." *Innis*, 446 U.S. at 301 (conversation between two officers in the defendant's presence was not interrogation for *Miranda* purposes); *see also United States v. Payne*, 954 F.2d 199, 203 (4th Cir. 1992) (agent's declaratory statement that a gun was found in the defendant's house was not *Miranda* interrogation). Thus, DENT's motion to suppress, insomuch as it encompasses the pre-*Miranda* statement, should be denied.

Second, all the statements at issue were voluntary. There are no circumstances indicating that any defendant's "will [was] overborne or [that] his capacity for self-determination [was] critically impaired." *Braxton*, 112 F.3d at 780 (quoting *Pelton*, 835 F.2d at 1071). As discussed above, each defendant was legally detained and properly advised of his rights—in most cases, more than once. At no time did any defendant request that the interview be stopped for any reason. In each case, the police were cordial and professional; they did not make threats or promises or otherwise engage in coercive conduct. *See Connelly*, 479 U.S. at 167 ("[C]oercive police activity is a necessary predicate to the finding that a [statement] is not 'voluntary' within the meaning of the Due Process Clause."). This is not a case where law enforcement officers "attempted to 'wring[] a confession out of an accused against his will,'" *Cristobal*, 293 F.3d at 141 (quoting *Blackburn v. Alabama*, 361 U.S. 199, 206–07 (1960)), or "went to extraordinary lengths to extract

---

(citing *United States v. Frankson*, 83 F.3d 79, 82 (4th Cir. 1996)).  That is exactly what happened here: BAILEY placed his initials next to each Miranda advisement, indicating that he understood his rights, and then agreed to speak with investigators.

from [the defendant] a confession by psychological means," *Braxton*, 112 F.3d at 786 (quoting *Ferguson v. Boyd*, 566 F.2d 873, 877 (4th Cir. 1977) (per curiam)).

Only JOHNSON and ANDERSON make specific arguments regarding the voluntariness of their admissions. JOHNSON argues that his statements were involuntary because they were made after "threats by police and/or while the defendant was under the influence of alcohol and narcotics." ECF 489, at 5. This argument should be rejected. First, JOHNSON's decision to provide the combination to the locked safe in the master bedroom rather than see it destroyed was not occasioned by any improper police conduct. The warrant authorized the search team to force open the safe, which was large enough to contain—and did contain—the objects of the search, namely, ammunition. *See United States v. Ross*, 456 U.S. 798, 820–21 (1982) ("[A] warrant that authorizes an officer to search a home for illegal weapons also provides authority to open closets, chests, drawers, and containers in which the weapon might be found."). Accordingly, when the officers warned JOHNSON that they would break into the safe if he did not provide the combination, they were truthfully relaying what they were legally entitled to do. As the Fourth Circuit has held, "[t]ruthful statements about [the defendant's] predicament are not the type of coercion that threatens to render a statement involuntary." *Braxton*, 112 F.3d at 782 (quoting *Pelton*, 835, F.2d at 1073) (truthful statement that defendant could get five years in prison for false statements if he did not "come clean" was not a threat that rendered defendant's confession involuntary); *see also United States v. Mitchell*, 514 F. App'x. 319, 322 (4th Cir. 2013) (truthful statement that defendant's girlfriend might lose custody of her children if the drugs and firearms in their shared residence were attributed to her did not affect the voluntariness of defendant's confession).

Second, JOHNSON's unsupported claim that he was under the influence of alcohol and

narcotics does not render the statement involuntary.  The Fourth Circuit has held that "a deficient mental condition (whether the result of a pre-existing mental illness or, for example, pain killing narcotics administered after emergency treatment) is not, without more, enough to render a [Miranda] waiver involuntary." *Cristobal*, 293 F.3d at 141 (statement taken from defendant on narcotic painkiller the morning after surgery, but who appeared to be lucid, held voluntary). Instead, the inquiry focuses on whether "police overreaching occurred" or "law enforcement officials exploited [the defendant's] weakened condition with coercive tactics." *Id.*   There is nothing about the police conduct in this case that supports a claim *either* that JOHNSON was intoxicated *or* that the police exploited his condition in any way.  His answers to police questions were both coherent and responsive, and his capacity for self-determination was not impaired, as evidenced by his decision to terminate the interview rather than answer more questions.

ANDERSON challenges the voluntariness of his admissions on the grounds that (1) the agents threatened "that his wife would be also charged with the gun found under the bed unless he confessed," and (2) he "had been in police custody for several hours."  ECF 397, at 2.  These arguments should be rejected.  First, the agents made no such threat.  Indeed, as described above, ANDERSON confessed that he had a gun under his bed *before* the search team found it.  But even if the agents *had* made such a statement, it would not amount to coercive police conduct.  The gun, which was stolen, was found under the bed in the master bedroom shared by ANDERSON and his wife.  It was therefore reasonable to assume that ANDERSON and his wife jointly possessed the weapon, absent circumstances indicating otherwise.  A truthful statement that both ANDERSON and his wife could be arrested does not amount to a "threat" that affects the voluntariness of a subsequent confession.  *See Braxton*, 112 F.3d at 782; *United States v. Savage,* 161 Fed. App'x. 256 (4th Cir. 2006) (officer's statement that "everyone in the house could be arrested if any guns

or illegal narcotics were found" was "not sufficient to render [the defendant's] statement involuntary"); *Mitchell*, 514 F. App'x at 322 (confession voluntary despite officer's statement that the defendant's girlfriend could lose custody of the children permanently unless he claimed responsibility for the drugs and gun in their home).

Turning to the recorded interview, the length of ANDERSON's detention does not render his statement involuntary.  Although ANDERSON had been in custody for approximately 2.5 hours when the interview began, the delay was attributable to the length of time it took to complete two search warrants at his residence and business, and was not a tactic designed to coerce ANDERSON into providing a statement.  *See United States v. Abraham*, 213 F. App'x 240, 249 (4th Cir. 2007)  (roughly three-hour delay was not "significant in any way" where defendant was interviewed "as soon as the search of the residence was complete").  Indeed, most of ANDERSON's incriminating admissions were made very soon after he was arrested, and the recorded interview covered little new ground.  Moreover, ANDERSON never expressed a desire to stop the interview or indicated that he was too tired to continue.  He does not, and cannot, point to any evidence that the passage of time caused his will to be overborne.  Accordingly, his statements were voluntary.

In sum, the custodial interviews in this case were routine, benign, and free from improper police influence.  All the statements at issue were either preceded by valid Miranda waivers or unprompted by police questioning (in the case of DENT's October 26, 2016 statement about the Mercedes).  And in each case, the totality of the circumstances weighs heavily in favor of a finding of voluntariness.  Accordingly, the defendants' motions should be denied.

### G.    Motion to Suppress Recorded Jailhouse Conversation on September 29, 2015, by Dontray JOHNSON (ECF 488)

Dontray JOHNSON has moved to suppress a recorded conversation between himself and

Dante BAILEY in the visiting room of the Baltimore County Detention Center.  He argues that the conversation was "intercepted and recorded in violation of Title III [of the Omnibus Crime Control and Safe Streets Act of 1968]," and that neither "the Defendant nor Bailey consented to the recording of the conversation."  ECF 488, at 2–3.  This motion should be denied.

### 1.      Relevant Facts

On September 29, 2015, at approximately 7:30p.m., JOHNSON visited BAILEY at the Baltimore County Detention Center in Towson, Maryland, where BAILEY was detained pending trial on state gun and drug charges.  The visit occurred in Visiting Booth 1, a "no-contact" booth that required JOHNSON and BAILEY to communicate through a glass partition using a handset resembling a telephone.  The conversation was recorded.  Before the conversation began, an automated message played advising BAILEY and JOHNSON: "This call may be recorded and is subject to monitoring at any time."  *See* Ex. 34 (Transcript, Sept. 29, 2015 Jail Visit).  At the end of the automated message, BAILEY and JOHNSON began speaking.  During the conversation, JOHNSON used coded language to recount his murder of Brian Johnson, a/k/a Nutty B, earlier that day.  (This murder is discussed in more detail in Section II.E above.)  BAILEY expressly approved the murder, saying: "I told you about this . . . Blow a fu**ing head off! Blow another nig**'s head off! I said I'm through. . . . Don't play with 'em. Make 'em scared!"  *Id.*

In response to a subpoena, the Baltimore County Detention Center provided a certified log of Dante BAILEY's jail visits between July 31, 2015 and April 5, 2016, as well as certified copies of the recordings of those visits.  *See* Ex. 35 (Bailey Visitation Log, Baltimore County Detention Center).

### 2.      The Jail Visit Was Not Intercepted in Violation of the Federal Wiretap Statute

The federal wiretap law, codified by Title III of the Omnibus Crime Control and Safe

Streets Act of 1968 (sometimes referred to as "Title III," for short), protects only those statements that meet the statutory definition of wire or oral communications. *See* 18 U.S.C. § 2510, *et seq*. The recording at issue here does not implicate the wiretap law because it does not meet the statutory definition of either a wire communication or an oral communication. Even if it did meet either definition, the conversation would come within both the consent exception and the law enforcement exception to the wiretap protections.

In order to be a protected "wire communication," a conversation must be transmitted via facilities "furnished or operated by any person engaged in providing or operating such facilities for the transmission of interstate or foreign communications or communications affecting interstate or foreign commerce." 18 U.S.C. § 2510(1). Here, JOHNSON and BAILEY communicated through an internal jailhouse communication device connecting only the inmate and visitor. Although the device physically resembled a telephone handset, it was an entirely internal system and *not* a facility capable of transmitting interstate or foreign communications. Accordingly, the visitation conversation was not a wire communication protected by Title III. *See United States v. Peoples*, 250 F.3d 630, 637 (8th Cir. 2001) (holding that similar communication device in jailhouse visiting room, although it "physically resembe[d] a telephone handset," was an "entirely internal system . . . not connected to any facility capable of transmitting interstate or foreign communications," and therefore that "the visitation conversations were not wire communications protected by the federal wiretap law").

The conversation also was not an "oral communication" protected by Title III. The wiretap statute defines an "oral communication" as "any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception *under circumstances justifying such expectation.*" 18 U.S.C. § 2510(2) (emphasis added). The "circumstances

111

justifying such expectation" for purposes of the federal wiretap law have been held to be coextensive with the circumstances justifying a "reasonable expectation of privacy" under the Fourth Amendment. *See Peoples*, 250 F.3d at 637 ("Before the interception of a conversation can be found to constitute . . . an 'oral communication' under the federal wiretap law . . ., the individuals involved must show that they had a reasonable expectation of privacy in that conversation.").

Here, JOHNSON did not have a reasonable expectation of privacy in the jailhouse visiting room. It is well-settled that prison inmates and pretrial detainees have substantially diminished privacy rights. *Lanza v. State of New York*, 370 U.S. 139, 143 (1962) ("[I]t is obvious that a jail shares none of the attributes of privacy of a home, an automobile, an office, or a hotel room. In prison, official surveillance has typically been the order of the day.");[29] *Bell v. Wolfish*, 441 U.S. 520, 537 (1979) ("[L]oss of freedom of choice and privacy are inherent incidents of confinement."). In light of this body of case law, several circuit courts have held that intercepted conversations in jailhouse visiting rooms are not "oral communications" subject to the protections of Title III. *See Peoples*, 250 F.3d at 637 (holding that Title III did not apply to recorded conversations between visitors and inmates at a pretrial detention facility); *United States v. Harrelson*, 754 F.2d 1153, 1169–70 (5th Cir. 1985) (refusing to apply Title III to conversation between husband and wife in jail visiting room that was recorded by FBI informant who occupied cell next to husband's); *cf. United States v. Willoughby*, 860 F.2d 15, 21–22 (2d Cir. 1988) (recognizing that "[c]ontacts between inmates and noninmates may justify otherwise impermissible intrusions into the noninmates' privacy," and therefore that "noninmate visitors may

---

[29]    In *Lanza*, the Supreme Court strongly implied that the Fourth Amendment's protections against search and seizure do not extend to "the visitors' room of a public jail." *See Lanza*, 370 U.S. at 143–44.

have their conversations with inmates monitored").

The fact that JOHNSON was a *visitor* as opposed to an *inmate* does not change this analysis. As the Eighth Circuit explained in *Peoples*, "there is no reason to believe that a visitor who converses with an incarcerated person has any more reasonable basis for his expectation that the conversation will remain private than has the inmate." *Peoples*, 250 F.3d at 637. Here, as in *Peoples*, the jail's practice of monitoring and recording inmate-visitor conversations "was a reasonable means of achieving the legitimate institutional goal of maintaining prison security," and "those conversing in a prison setting are deemed to be aware of the necessity for and the existence of such security measures." *Id.* This is all the more true where, as here, JOHNSON was specifically advised that the visitation conversation would be subject to monitoring and recording.

Even if the Court were to determine that the jailhouse conversation constitutes a wire or oral communication protected by Title III, the motion to suppress should still be denied because (1) the initial interception was lawful pursuant to both the consent and law enforcement exceptions to the general injunction prohibiting use of wiretaps, and (2) the government's acquisition of the recording was lawful. 18 U.S.C §§ 2510(5)(a)(ii), 2511(2)(c); *United States v. Hammond*, 286 F.3d 189, 192 (4th Cir. 2002).

Pursuant to the "consent" exception to the federal wiretap statute, "[i]t shall not be unlawful under this chapter for a person acting under color of law to intercept a wire, oral, or electronic communication, where . . . one of the parties to the communication has given prior consent to such interception." 18 U.S.C. § 2511(2)(C). In *Hammond*, the Fourth Circuit held that "the 'consent' exception applies to prison inmates … required to permit monitoring as a condition of using prison telephones." 286 F.3d at 192. Here, as in *Hammond*, BAILEY and JOHNSON were specifically informed, via the automated recording, that their conversation may be monitored and recorded,

113

and they were required to permit such monitoring and recording as a condition of participating in the visit.  *See id.*; *see also United States v. Frink*, 328 Fed. App'x. 183 (4th Cir. 2009) (holding that consent exception applied to jail calls where "a recorded message is played that notifies the callers that their conversation is 'subject to monitoring and recording,'" reasoning that "[g]iven this warning, it would be difficult to find that [the inmate] did not give his consent to the recording").  Both BAILEY and JOHNSON consented to being recorded when they opted to speak after being given the automated warning, and therefore, the protections of Title III do not apply.

The "law enforcement" exception also applies.  As codified in the wiretap statute, the exception permits recordings made "by an investigative or law enforcement officer in the ordinary course of his duties." 18 U.S.C. § 2510(5)(a)(ii).  In *Hammond*, the Fourth Circuit held that routine recordings made by the Bureau of Prisons of an inmate's personal calls were covered by the law enforcement exception.  *Hammond*, 286 F.3d at 192; *see also Frink*, 328 Fed. App'x. at 183; *United States v. Bagguley*, 838 F.2d 468, 1987 WL 35045, *4–5 (4th Cir. 1987); *Abraham v. County of Greenville*, 237 F.3d 386, 389 (4th Cir. 2001) ("We do not impugn the County's need to monitor for law enforcement purposes calls relating to Detention Center inmates and employees.").  Here, as in *Hammond*, the Baltimore County Department of Corrections was acting pursuant in the ordinary course of its duties in recording the no-contact visit between BAILEY and JOHNSON.  Such visits are routinely subject to monitoring and recording, as evidenced by the standard automated message played at the beginning of each conversation.  Accordingly, the law enforcement exception applies.

Finally, the recording was acquired by the government pursuant to a lawfully issued subpoena and, thus, was "lawfully obtained" as required by 18 U.S.C §§ 2510(5)(a)(ii) and 2511(2)(c).  Because the conversation is not a covered wire or oral communication, and, even if it

was, the consent and law enforcement exceptions apply, the defendant's motion to suppress should be denied.

### H.   Motions to Suppress Fruits of Warrantless Searches

Defendants Dante BAILEY (ECF 512), Dontray JOHNSON (ECF 486), and Randy BANKS (ECF 751) have filed motions to suppress evidence obtained pursuant to various warrantless searches. The circumstances of those searches and seizures are discussed below.

### 1.   Motion to Suppress Warrantless Searches and Seizures of Evidence, by Dante BAILEY (ECF 512)

#### a.   Warrantless Seizure of Heroin from Bailey's Lexus on April 23, 2015

BAILEY has moved to suppress heroin recovered from his vehicle on April 23, 2015, claiming that the "warrantless search was conducted without reasonable and articulable suspicion or probable cause."  He has also moved to suppress his statements to the arresting officers as the "product of an illegal search and seizure."

This motion should be denied.  The stop of the vehicle was supported by probable cause to believe that driver had committed a traffic offense.  The scan of the vehicle by a drug dog did not measurably prolong the stop.  Moreover, the officers had reasonable suspicion to believe that BAILEY and the occupants were engaged in drug trafficking, which justified a brief detention while a drug dog was called.  The dog's alert established probable cause to search the vehicle. Finally, BAILEY's statements were made voluntarily after a knowing waiver of *Miranda* rights.

#### i.   Relevant Facts

On April 23, 2015, BCPD Detectives Young and Melnyk were conducting surveillance near Vosges Road and Rolling Road in Baltimore County, Maryland.  The officers had previously received an anonymous complaint about drug activity in that area, specifically, that a black male was walking from Twin Lake Circle to the rear parking lot, meeting cars in that parking lot, and

selling drugs to their occupants.  At approximately 4:00 p.m., the detectives officers observed Altoneyo Edges, a black male, walking from Twin Lake Circle onto Vosges Road. Edges walked slowly through the parking lot while talking on a cell phone. The detectives had been observing Edges for over 10 minutes when a dark Lexus with illegal tint pulled up to the stop sign at Courtland Manor Road.  At approximately 4:12 p.m., Edges got into the rear passenger seat, behind the driver, and the vehicle drove away.  The detectives followed the Lexus to the Exxon Gas Station at Rolling Road and Windsor Mill Road, where they saw the Lexus pull next to a gas pump; none of the occupants exited the vehicle to enter the store or to pump gas.  After a minute or two, Edges got out of the Lexus, walked over to a grey Toyota Camry parked nearby, and got into the Camry in the rear seat behind the driver.  Edges remained in the Camry for approximately 10 seconds and then returned to the Lexus.  The Lexus left the gas station.  Believing that the occupants of the Lexus were engaged in drug trafficking, Detectives Young and Melnyk called for another officer to conduct a traffic stop of the vehicle.

At approximately 4:32 p.m., Officer Vicarini stopped the Lexus at the intersection of Windsor Mill Road and Beverly Avenue based on a window tint violation.  The occupants of the vehicle were asked to exit.  Dante BAILEY was identified as the driver.  There were three other people in the car, including Edges.  Office Vicarini filled out Safety Equipment Repair Order for the traffic violation and discovered that BAILEY was in possession of a learner's permit, making him unlicensed to drive a vehicle without a valid operator inside.  The officers also requested a drug dog.  A short time later, while the officers were still conducting routine license and wanted person checks, Office Tubaya responded with and his K-9 Yago, who was trained and certified in detecting the odor of narcotics.  Yago scanned the vehicle and gave a positive alert for the presence of narcotics. The vehicle was then searched.  From the rear seat of the vehicle, Detective Melnyk

116

recovered a gray sweater jacket containing 23 plastic bags of heroin.  BAILEY and the other occupants were placed under arrest and transported to the police station.

At approximately 6:24 p.m., Detectives Young and Melnyk read BAILEY his Miranda rights.  BAILEY indicated that he understood his rights and agreed to speak to law enforcement. BAILEY informed law enforcement that he was on his way to work and was driving his girlfriend's cousin's vehicle. The detectives showed BAILEY the gray sweater jacket and asked if it belonged to him.  BAILEY stated that the jacket was his, but denied that the heroin belonged to him.

### ii.  Legal Analysis

As a preliminary matter, the initial traffic stop was lawful because Office Vicarini observed BAILEY driving a vehicle with window tint that was beyond the legal limit of 35%, in violation of Maryland state law.  *See* MD Code Ann., Transportation § 22-406.  It is well settled that a traffic stop is justified when an officer observes a violation of the applicable traffic laws, even if it is only a minor violation.  *See United States v. Branch*, 537 F.3d 328, 335 (4th Cir. 2008), *cert. denied*, 555 U.S. 1118 (2009); *United States v. Bullock*, 94 F.3d 896, 897 (4th Cir. 1996); *Jeffus*, 22 F.3d at 556–57; *United States v. Hassan-El*, 5 F.3d 726, 730 (4th Cir. 1993).

Nor did the dog scan convert the traffic stop into an unlawful seizure.  The Supreme Court has held that a dog scan does not violate a motorist's Fourth Amendment rights where a lawful traffic stop is not extended beyond the time necessary to conduct the "ordinary inquiries incident to such a stop," regardless whether there is reasonable suspicion to believe the occupants are engaged in drug trafficking.  *Caballes*, 543 U.S. at 408.  Here, the drug dog responded while the officers were still conducting routine license and wanted person checks, and did not prolong the stop, so the dog scan was lawful.

In any event, the officers *did* have reasonable suspicion to believe that the occupants of

the vehicle were involved in drug trafficking, justifying a brief detention while the drug dog responded to the scene.  Reasonable suspicion "is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence."  *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000).  Reasonable suspicion means "specific and articulable facts which, taken together with rational inferences from those facts, evince more than an inchoate and unparticularized suspicion or hunch of criminal activity."  *Branch*, 537 F.3d at 336. "Judicial review of the evidence offered to demonstrate reasonable suspicion must be commonsensical, focused on the evidence as a whole, and cognizant of both context and the particular experience of officers charged with the ongoing tasks of law enforcement."  *Id.* at 337.

Here, the information that the BCPD officers possessed more than satisfies this standard. To recap, the officers received information from a tipster that drug trafficking activity was occurring in a specific location. The tipster provided information that the seller was a black male, that he sold drugs in the rear of the parking lot, and that he walked to the parking lot from Twin Lakes Circle. The detectives conducted surveillance in the location and corroborated the tip; they observed a black male in the parking lot walking from Twin Lakes Circle and further observed him walking through the parking lot.  The detectives watched this person for approximately 12 minutes before they saw him enter a Lexus with heavily tinted windows. They followed the vehicle to a gas station and saw the Lexus pull next to a gas pump, but, notably, none of the occupants exited the car to pump case or make purchases of any kind. A few minutes later, the individual who they had been observing exited the car, entered the rear passenger seat of another car, remained there for only 10 seconds, and then reentered the Lexus.  The Lexus left the gas station. The Lexus was stopped and the four occupants were asked to exit the vehicle.[30] The

---

[30]       Once the vehicle was lawfully detained for the traffic violation, "the police may order the

118

driver, BAILEY, provided only a Learner's Permit.

These were specific, articulable facts, which, in combination with the officers' training and experience, provided reasonable suspicion to believe that the occupants of the Lexus were engaged in drug trafficking.  Thus, the officers were justified in detaining the occupants while they "diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant."  *United States v. Sharpe*, 470 U.S. 675, 686 (1985) (20-minute detention justified where police had reasonable suspicion to believe defendant was involved in drug trafficking, and there was "no evidence that the officers were dilatory in their investigation"); *see also United States v. Branch*, 537 F.3d 328, 340 (4th Cir. 2008) (30-minute detention, even if not "necessary to perform the routine functions attendant to a traffic stop," was justified based on reasonable suspicion of narcotics activity).  In this case, Officer Vicarini immediately requested K-9 assistance, and the K-9 arrived at the scene in short order.  The officers acted diligently, and there is no suggestion that they engaged in dilatory tactics.

Once Officer Tubaya and his K-9 Yago arrived, scanned the vehicle, and gave a positive alert for the presence of narcotics, there was probable cause to search the Lexus. As discussed previously, when a trained narcotics dog alerts to an item, this fact alone constitutes probable cause to search the vehicle. *Caballes*, 543 U.S. at 409–10; *Mason,* 628 F.3d at 130; *Jeffus,* 22 F.3d at 556–57.  Because the warrantless search of the vehicle was preceded by a lawful vehicle stop, a lawful detention based on reasonable suspicion, and a positive drug dog alert, there was probable cause to search and the motion to suppress the physical evidence recovered should be denied.

---

driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures."  *Ohio v. Robinette*, 519 U.S. 33, 38–39 (1996) (quoting *Pennsylvania v. Mimms*, 434 U.S. 106, 111 n.6 (1977)).

Finally, because BAILEY's statements followed a lawful arrest, and were not the product of an unlawful seizure, they should not be suppressed. Furthermore, the statements were preceded by a proper *Miranda* advisement. After being advised of his rights, BAILEY signed a Miranda form indicating that he understood them, and agreed to answer questions. An interview was then conducted in a non-coercive manner. BAILEY was not subjected to improper police influence, and he cannot point to any circumstances indicating his will was overborne. Under the totality of the circumstances, the statements made by were voluntary and admissible.

### b.  Arrest on April 28, 2015

BAILEY has moved to suppress evidence recovered during his arrest on April 28, 2015. Because no property was recovered from BAILEY on that date, his motion should be denied as moot.

### c.  Warrantless Seizure of Marijuana from Bailey's Lexus on June 18, 2015[31]

At approximately 11:00 p.m. on June 18, 2015, BPD officers received a call from the 911 dispatcher of an armed person in the 1900 block of West Forrest Park Avenue. The caller provided a description of the suspect. BPD Officers Frank Friend, Michael McNish, and Benjamin Critzer responded to that location, which they knew to be an area plagued by violence and drug activity. Upon arrival, the officers observed an individual who matched the description provided by the caller. The individual was standing in a group with four other male subjects, one of whom was Dante BAILEY. They were all looking at something on a cell phone. The officers also saw a dark Lexus nearby with the engine on and no one inside. The officers approached and asked the individuals in the group if they had any weapons. They replied that they did not. The officers

---

[31]     Although the defendant has moved to suppress evidence recovered during a search on July 18, 2015, the government believes that the defendant is mistaken and is, in fact, referring to BAILEY's arrest on June 18, 2015. The June 18 seizure is addressed below.

conducted pat downs for officer safety, and confirmed that none of the subjects had weapons.  The officers then inquired as to who owned the nearby Lexus.  BAILEY stated that the vehicle was his.  Officer McNish approached the vehicle, shined a flashlight in the window, and observed two clear plastic bags containing suspected marijuana inside the vehicle.  Officer Friend approached the vehicle and observed the same thing.  At that point, the officers placed BAILEY under arrest.

As the officers were placing BAILEY under arrest, BAILEY stated that the marijuana was not his.  He then yelled to Ivan Potts, who was part of the group standing in the area, and told Potts that he needed to take the marijuana charge.  Potts then approached the officers and told them that the marijuana belonged to him.  The officers conducted a search of the Lexus and recovered a clear plastic bag containing approximately 4.7 grams of marijuana from the front center console, a clear plastic bag containing approximately 29 grams of marijuana from the rear center console, and a digital scale with marijuana residue from the rear center console.

BAILEY moves to suppress the marijuana and other items recovered, claiming that the "warrantless search was conducted without reasonable and articulable suspicion or probable cause."  He also moves to suppress his statement admitting to ownership of the vehicle as the "product of an illegal search and seizure."  These motions should be denied.  The search of the vehicle was supported by probable cause, and the statements were voluntary and were not the product of custodial interrogation.

First, BPD Officers Friend and McNish had probable cause to search the vehicle because they observed contraband in plain view inside. "[T]he plain view doctrine authorizes warrantless seizure of incriminating evidence when (1) the officer is lawfully in a place from which the object may be plainly viewed; (2) the officer has a lawful right to access the object itself; and (3) the object's incriminating character is immediately apparent." *United States v. Jackson*, 131 F.3d 1105,

1109 (4th Cir. 1997) (citing *Horton v. California*, 496 U.S. 128, 136–37 (1990)).  Furthermore,

under the automobile exception to the warrant requirement, if an officer has probable cause to

believe that a "readily mobile" car contains contraband or evidence of a crime, a warrantless search

is permissible.  *Maryland v. Dyson*, 527 U.S. 465, 466 (1999); *United States v. Johnson*, 599 F.3d

339, 347 (4th Cir. 2010).  Assuming probable cause exists, law enforcement may conduct a

warrantless search "that is as thorough as a magistrate could authorize in a warrant."  *United States

v. Ross*, 456 U.S. 798, 800 (1982).

Here, Officers Friend and McNish observed plant material that they were readily able to

identify as marijuana in plain view inside the Lexus, giving them probable cause to search the

vehicle and seize the contraband.  The fact that they used a flashlight to illuminate the inside of

the car did not impinge on BAILEY's Fourth Amendment rights.  *See United States v. Dunn*, 480

U.S. 294, 305 (1987) ("[I]t is 'beyond dispute' that the action of a police officer in shining his

flashlight to illuminate the interior of a car, without probable cause to search the car, 'trenched on

no right secured by the Fourth Amendment.'") (quoting *Texas v. Brown*, 460 U.S. 730, 739–40

(1983)).

BAILEY's statements were also voluntary and admissible.  When BAILEY informed the

officers that the vehicle belonged to him, he was not in custody for *Miranda* purposes.  He had not

been detained or placed in handcuffs, and he was free to leave at any time.  *See United States v.

Keshuk,* 65 F.3d 1005, 1008–09 (4th Cir. 1995) ("*Miranda* warnings not required when a person

is questioned during a [*Terry*] stop.").  Moreover, the statements BAILEY made to Potts in the

presence of law enforcement were spontaneous, and not the result of police interrogation. *Miranda

v. Arizona*, 384 U.S. 436 (1996).  The officers had asked no questions and had made no statements

designed to illicit an incriminating response. *See Rhode Island v. Innis*, 446 U.S. 291, 300 (1980)

("Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility [is not implicated by *Miranda*].").  Neither statement was extracted by any threat or violence or obtained as the result of any promise.  Because the statements were voluntary and not the product of custodial interrogation, the motion to suppress should be denied.

### 2. Motion to Suppress Evidence Recovered on October 3 and October 4, 2015, by Dontray JOHNSON (ECF 486)

JOHNSON has moved to suppress evidence recovered from his person on October 3 and October 4, 2015.  The government does not intend to present evidence of this search or the evidence recovered. Accordingly, this motion should be denied as moot.

### 3. Motion to Suppress Tangible and Derivative Evidence, by Randy BANKS (ECF 751)

As discussed above in Section III.C.2.m, BANKS has moved to "challenge any seizures" associated with a "non-exhaustive" list of events that he refers to as "a summary of the relevant incidents."  Most of these events did not involve the seizure of any evidence from BANKS' person or property, and therefore, to the extent BANKS challenges these "seizures," his motion should be denied as moot.  Below, we address two of the listed events during which evidence was seized from BANKS by law enforcement.[32]

#### a. Warrantless Arrest and Seizure of Heroin and U.S. Currency on March 24, 2015

BANKS has moved to suppress the seizure of heroin and money from his person by BPD officers on March 24, 2015.  The government does not intend to present any evidence of this seizure. Accordingly, this motion should be denied as moot.

---

[32]     In his summary of relevant incidents, BANKS has included a single line stating that he was apprehended on May 15, 2017.  Because evidence was seized from him pursuant to a federal search warrant on that date, this portion of the motion is addressed in Section III.C.2.m.

### b.  Warrantless Arrest and Seizure of U.S. Currency on May 12, 2016

On May 12, 2016, BPD Officer Jason Dipaola was observing a vacant dwelling at 5509 Gwynn Oak Avenue, Baltimore, Maryland, a building known to be used for the sale of controlled substances.  At approximately 9:00 p.m., Officer Dipaola observed Glenn Shelton approach Eric Jordan, who was standing on the side of the building.  Shelton handed Jordan money, in exchange for which Jordan handed Shelton a small object. Shelton then left the yard. Officer Dipaola observed that the item was consistent in size and shape with pre-packaged controlled substances. Based on his training and experience, he believed that he had witnessed a hand-to-hand narcotics transaction.  Officer Dipaola informed his fellow officers, who stopped Shelton and recovered a white rock substance—suspected crack cocaine—from the ground where they observed Shelton drop it.

Officer Dipaola continued to watch the location and soon saw BANKS arrive at 5509 Gwynn Oak Avenue.  BANKS had a short conversation with Jordan, and then walked around the back of the building, out of Officer Dipaola's line of sight.  Shortly thereafter, four additional people arrived.  Jordan stood near the front corner of the building, and BANKS walked back and forth between the front and back yards.

At this time, Trevonne James drove up to the location, got out, and approached the building. As she approached, BANKS pointed to the front corner of the building where Jordan was waiting. James walked toward Jordan, who pointed her to the rear of the building. James walked to the rear of the building, out of Officer Dipaola's line of sight, and the quickly exited from the rear of the building. She immediately entered her car and left the location. Officer Dipaola informed his fellow officers, who stopped James and recovered a white rock substance—suspected crack cocaine—after she spit it out of her mouth.

While the officers were stopping James, BANKS was on the front steps of the location, looking up and down the street as if scanning for police activity.  At this time, Brian Kennedy parked at the location and approached the building.  BANKS sent Kennedy to the front corner of the building where Jordan was waiting. Jordan pointed Kennedy to the rear of the building. Kennedy went to, and quickly returned from, the rear of the building, before entering his vehicle and leaving the area. Officer Dipaola informed his fellow officers, who stopped Kennedy and recovered a white rock substance—suspected crack cocaine—from Kennedy's hand.

At approximately 9:30 p.m., Officer Dipaola called for Foxtrot, the BPD helicopter unit, to respond to the location.  When Foxtrot arrived, BANKS and Jordan ran from the location. Officer Dipaola observed BANKS running from the rear yard of 5517 Gwynn Oaks Avenue and ordered BANKS to the ground. BANKS complied, and Officer Dipaola placed BANKS under arrest.  In a search incident to arrest, Officer Dipaola recovered $519.00 from BANKS' person.

BANKS has moved to suppress the U.S. currency recovered from his person. Because Officer Dipaola had probable cause to arrest and search BANKS, the motion should be denied.  As an initial matter, Officer Dipaola had probable cause to arrest BANKS. Warrantless arrests, and searches incident thereto, are permitted where there is probable cause to believe a felony is being or has been committed by the arrested individual, based upon the "totality of the circumstances." *Illinois v. Gates*, 462 U.S. 213, 230–31 (1983).  As the Fourth Circuit has explained, probable cause to arrest must take into account "facts and circumstances within the officer's knowledge [which] would warrant the belief of a prudent person that the arrestee had committed or was committing an offense." *United States v. Manbeck*, 744 F.2d 360, 376 (4th Cir. 1984).  Here, the arresting officer observed BANKS in a high crime area at a dwelling known for drug activity; he observed BANKS acting as a lookout and directing buyers to others in order to complete the sales;

125

he knew that crack cocaine had been recovered from the buyers; and he observed BANKS flee from the police.  Together, these factors were more than sufficient to establish probable cause to arrest BANKS for distributing drugs.  *See United States v. Humphries*, 372 F.3d 653, 657 (4th Cir. 2004) ("In assessing the totality of the circumstances, it is appropriate to consider specifically: an officer's practical experience and the inferences the officer may draw from that experience; or the context of a high-crime area; or an individual's presence in a high-crime area coupled with his '[h]eadlong flight' upon noticing police; … or even 'seemingly innocent activity' when placed in the context of surrounding circumstances").  Furthermore, it is well established that searches incident to lawful arrests are permissible.  *See e.g.*, *Chimel v. California*, 395 U.S. 752, 763 (1969). Therefore, because BANKS was lawfully arrested, and lawfully searched incident to that arrest, the motion should be denied.

## I.   Miscellaneous Trial Motions

### 1.   Motion to Suppress Artwork and Music Videos, by Shakeen Davis (ECF 690)

DAVIS moves to exclude "artwork that was purportedly created by him" and "video recordings in which he appears dancing with co-defendants" under Federal Rules of Evidence 401, 402, and 403, on the ground that they "are more prejudicial than probative" and "would support an unwarranted argument of guilt by association."  *See* ECF 690.  DAVIS does not identify any specific piece of artwork or video recording that he seeks to exclude, nor does he elaborate on his theory of inadmissibility.  Moreover, because DAVIS's motion implicates trial rights, and is better styled as a motion in limine, the government requests that this motion be held in abeyance until closer to trial.

The government does intend to introduce certain YouTube videos featuring the defendants as part of its case-in-chief at trial.  Several of these videos are alleged as overt acts in furtherance

of the racketeering conspiracy charged in Count One. *See* ECF 515, at ¶¶ 33(10), 33(11), 33(67); *see generally id.* at ¶ 10 ("MMP used social media websites such as Instagram, Facebook, and YouTube to assert its claim to particular drug territories, intimidate rival gangs and drug traffickers, enhance MMP's status, and enhance individual members' status within the gang."). The government expects that other defendants may file motions *in limine* to exclude certain of these videos, or portions of them. Indeed, the government intends to file its own motion *in limine* identifying which videos it intends to introduce and explaining why they are relevant to the charges and why their probative value outweighs the danger of unfair prejudice. We submit that DAVIS's motion will be better addressed as a group with these other motions *in limine* at a later date.

### 2. Motion in Limine, Law Enforcement Personnel, by Shakeen Davis (ECF 388)

DAVIS has moved to preclude the government from qualifying the case agent as an expert witness to interpret drug and other code. At this time, the government does not intend to call the lead case agents, ATF Special Agents Timothy Moore or Christian Aanonsen, as experts in this field. Therefore, the defendant's motion should be denied as moot.

### 3. Motion for Government to Provide Notice of Expert Witnesses, by Shakeen David (ECF 389)

DAVIS has moved for (1) notice from the government for its intent to call expert witnesses and (2) production of expert resumes, records, and summaries. The government will disclose, in accordance with Rule 16 of the Federal Rules of Criminal Procedure, the name, resume, relevant reports, and a summary of the testimony of any experts witnesses that it intends to call during its case in chief. The government will make reasonable efforts to make this disclosure within 30 days of the trial date.

**4.      Motion for Rule of Completeness, Recorded Conversations, by Shakeen Davis (ECF 390)**

DAVIS has moved for an order requiring the government to "play and publish transcripts" of any conversations related to recordings introduced at trial. At this time, the government is not equipped to adequately respond to the defendant's motion and asks that the Court deny the motion as not ripe.

The government will seek to introduce certain recorded conversations of the defendant and to the extent possible will provide the defendant notice of which calls it seeks to introduce and any transcripts of those calls that the government intends to publish to the jury prior to their introduction. Should the defendant request that related calls be introduced or played prior, the government is hopeful that the parties can come to an agreement or, in the alternative, raise the issue with the Court at that time. Accordingly, the motion should be dismissed as not ripe.

**5.      Motion for Production of Summary Charts Prior to Trial, by Shakeen Davis (ECF 391)**

Similarly, DAVIS has moved for an order requiring the government to "produce for examination and comment by the defense, any summary chart(s) of audio recordings." To the extent that the government will seek to introduce any summary exhibits, the government will provide the defendant, prior to trial, copies of such exhibits for inspection. Should the defendant take objection to such summary exhibit or chart, the government is hopeful that the parties can come to an agreement or, in the alternative, raise the issue with the Court at that time. Accordingly, the motion should be dismissed as not ripe.

**J.    Motion for Bill of Particulars, by Shakeen Davis (ECF 694)**

DAVIS claims he is entitled to a bill of particulars detailing his involvement in the racketeering conspiracy charged in Count One and the drug trafficking conspiracy charged in Count Two.  The Court should reject this motion as well.

It has long been the law that criminal defendants are not entitled to a bill of particulars as a matter of right.  *Wong Tai v. United States*, 273 U.S. 77, 82 (1927).  Instead, "[a] bill of particulars is a defendant's means of obtaining specific information about charges brought in a vague or broadly-worded indictment."  *United States v. Dunnigan*, 944 F.2d 178, 181 (4th Cir. 1991) (citing *United States v. Debrow*, 346 U.S. 374, 378 (1953), *rev'd on other grounds*, 507 U.S. 87 (1993)).  As a general matter, an indictment is sufficient if it alleges the essential elements of the crime with which a defendant is charged in a manner that permits the defendant to prepare a defense and plead double jeopardy in any future prosecution for the same offense.  *See United States v. Hooker*, 841 F.2d 1225, 1227 (4th Cir. 1988); *United States v. American Waste Fibers Co.*, 809 F.2d 1044, 1046 (4th Cir. 1987).  As long as the indictment fulfills these purposes, a bill of particulars is unnecessary and its denial does not constitute an abuse of discretion.  *United States v. Butler*, 885 F.2d 195, 199 (4th Cir. 1989); *United States v. Jackson*, 757 F.2d 1486, 1491 (4th Cir. 1985).

DAVIS has not demonstrated that the indictment against him is vague, nor can he.  The Second Superseding Indictment is a 77-page "speaking" indictment that provides far more detail than necessary.  It clearly spells out the elements of the charged offenses, and provides a non-exhaustive list of 151 "overt acts" by the defendants in furtherance of the racketeering conspiracy charged in Count One.  With respect to DAVIS, the "overt acts" section alleges the following specific acts:

129

On or about September 12, 2012, in the 1900 block of Forest Park Avenue, Shakeen DAVIS possessed a stolen Smith & Wesson .45 caliber firearm (serial number TAK3106).

On or about May 30, 2015, Shakeen DAVIS attempted to murder D.J. and D.G. DAVIS fired at least nine rounds at D.J. and D.G. with a 5.56x45mm caliber rifle as they sat in their car in the 2100 block of North Forest Park Avenue.  D.J. suffered two graze wounds to his back, and both victims suffered cuts to their arms and hands from broken glass.

On or about June 12, 2015, Shakeen DAVIS agreed to help Kenneth TORRY sell 100 grams of heroin.

On or about July 6, 2015, Kenneth TORRY sent Shakeen DAVIS a text message offering to supply him with 10 grams of heroin for distribution.  Later in the day, DAVIS sent TORRY a text message indicating that customers were saying they did not like the quality of the heroin.

On or about July 9, 2015, Kenneth TORRY sent a text message to Shakeen DAVIS indicating that he had a supply of high-quality heroin for sale.  TORRY stated: "Got all 9s on this…..still a little soft but good they gonna like it."  In a reply text message, DAVIS asked TORRY to "[c]ome holla at me."

On or about August 28, 2015, in a recorded telephone call, William JONES asked Melvin LASHLEY where Shakeen DAVIS was.  LASHLEY told JONES that DAVIS was driving around with a "shoulder strap" (*i.e.*, long gun).

On or about February 25, 2016, Shakeen DAVIS posted a photograph to his Instagram account, "creams_dinero," that pictured DAVIS holding a firearm with an extended magazine, along with the comment "30 piece."

On or about February 25, 2016, Shakeen DAVIS posted a photograph to his Instagram account that pictured DAVIS making an MMP gang sign, along with the comment "MURDERLAND MAFIA MOBB THE WORLD IS OURS."

On or about April 26, 2016, near the intersection of Security Boulevard and Gwynn Oak Avenue, Shakeen DAVIS possessed a stolen Glock .40 caliber handgun (serial number HHC901) and a loaded AR-15 rifle (serial number F071734).

On or about August 6, 2016, in a recorded telephone call, Melvin LASHLEY and William JONES talked about collecting money from MMP members to pay for JONES' legal fees.  LASHLEY said: "If nig**s don't have any money . . . they're going to get beat and rolled out."  LASHLEY said he would "holler at Creams," *i.e.*, Shakeen DAVIS, to see if he would contribute money.

> On or about January 26, 2017, in a recorded telephone call, Sydni FRAZIER asked Shakeen DAVIS to call one of FRAZIER's drug customers and collect a $1,000 drug debt for him. DAVIS agreed. FRAZIER added: "He know my name by my other name [*i.e.*, "Perry"]. He ain't gonna know my legit name."

> On or about February 24, 2017, Shakeen DAVIS possessed with intent to distribute approximately 25 grams of cocaine base and possessed a loaded, stolen Sig Sauer .22 caliber firearm (serial number T148576) and $1,373 in U.S. currency.

ECF 516, at ¶¶ 33(3), 33(25), 33(28), 33(44), 33(45), 33(82), 33(83), 33(124), 33(149), 33(150). The government has provided DAVIS with the police reports, cell phone downloads, jail calls, and Instagram records supporting these allegations.

Where, as here, the indictment fully complies with the requirements of the Fifth and Sixth Amendments and Federal Rule of Criminal Procedure 7(c), "[a] bill of particulars is not to be used to provide detailed disclosure of the government's evidence in advance of trial." *United States v. Automated Med. Lab., Inc.*, 770 F.2d 399, 405 (4th Cir. 1985); *United States v. Fletcher*, 74 F.3d 49, 53 (4th Cir. 1996). As another circuit has stated:

> A bill of particulars, unlike discovery, is not intended to provide the defendant with the fruits of the government investigation . . . Rather; it is intended to give the defendant only that minimum of information necessary to permit the defendant to conduct his own investigation.

*United States v. Smith*, 776 F.2d 1104, 1111 (3d Cir. 1985) (citations omitted) (emphasis in original); *United States v. Burgin*, 621 F.2d 1352, 1359 (5th Cir. 1980) (a bill of particulars "is not designed to compel the government to detailed exposition of its evidence or to explain the legal theories upon which it intends to rely at trial"); *Hemphill v. United States*, 392 F.2d 45, 49 (8th Cir. 1968) ("[a]cquisition of evidentiary detail is not the function of the bill of particulars").

A bill of particulars is still more inappropriate where, as here, the government has supplemented the indictment with extensive discovery. In this case, the government has provided the defendants, including DAVIS, with extensive discovery, including wiretap affidavits,

applications, and orders, progress reports, recordings of intercepted calls, line sheets, police reports, lab reports, copies of search warrant affidavits, detailed reports documenting the execution of search warrants and a list of physical evidence seized during the investigation, cell phone downloads, surveillance footage, recorded jail calls and visits, intercepted jail mail, videos of controlled purchases, and custodial interviews.  The government has also met with almost all of the defendants, including DAVIS, to conduct "reverse proffers" showcasing the government's key evidence, explaining the government's theory concerning each defendant's role in the racketeering conspiracy, providing a high-level overview of anticipated testimony by cooperating witnesses at trial, and allowing an opportunity for questions.  As the Fourth Circuit held in *United States v. SIGMA*, 624 F.2d 461, 466 (4th Cir. 1979), such "extensive disclosure by the Government" renders a bill of particulars unnecessary.

The defendants are not entitled to a play-by-play of the government's entire trial strategy, or to the names of the government's witnesses (particularly in a criminal gang conspiracy case with serious witness security concerns).  Therefore, in light of the case law and the specific circumstances of this case, a bill of particulars simply is not warranted and DAVIS's motion should be denied.

### K.   Motion to Dismiss RICO Count Based on Multiple Conspiracies, by Shakeen Davis (ECF 689)

DAVIS moves to dismiss Count One of the Superseding Indictment, which charges him with racketeering conspiracy in violation of 18 U.S.C. § 1962(d), pursuant to Federal Rule of Criminal Procedure 12(b)(3).  He argues that Count One improperly combines multiple conspiracies in a single count, because it alleges many different transactions with different methods and goals, not all of which were known to him, and because he is not named in many of the overt acts his co-defendants are alleged to have committed in furtherance of the racketeering

132

conspiracy.   This motion should be denied.

A case involving multiple transactions may nevertheless constitute a single conspiracy "where the conspirators are shown to share the same objectives, the same methods, the same geographic spread, and the same results." *United States v. Smith*, 451 F.3d 209, 218 (4th Cir. 2006); *see also United States v. Stockton*, 349 F.3d 755, 762 (4th Cir. 2003).  As the Fourth Circuit has explained, the determination rests on whether there is an "overlap of key actors, methods, and goals." *United States v. Leavis*, 853 F.2d 215, 218 (4th Cir. 1988).  Indeed, the Fourth Circuit has held that a conspiracy can be a "loosely-knit association of members linked only by their mutual interest in sustaining the overall enterprise of catering to the ultimate demands of a particular drug consumption market." *United States v. Banks*, 10 F.3d 1044, 1054 (4th Cir. 1993).  "The question whether the evidence shows a single conspiracy or multiple conspiracies "is one of fact and is properly the province of the jury." *Leavis*, 853 F.2d at 218; *see also United States v. McGrath*, 613 F.2d 361, 367 (2d Cir. 1979) (question is "singularly well-suited to resolution by the jury"), *cert. denied*, 446 U.S. 967 (1980).

Here, Count One alleges that all of the defendants, including DAVIS, were members and associates of MMP.  As discussed above, MMP members swore an oath of allegiance to the gang and adhered to a hierarchical structure and written code of conduct.  They shared the same objectives, among them, enriching themselves by distributing controlled substances in the Windsor Mill/Forrest Park and Gwynn Oak/Liberty Heights neighborhoods, preserving their territory, preventing detection by law enforcement, providing financial support to incarcerated members, and promoting the gang's status.  *Id.* at ¶ 13.  They accomplished these goals by, among other means, attending gang meetings, paying dues to the gang consisting of the proceeds of their criminal activity, maintaining a cache of weapons, and using violence and threats of violence to

intimidate or eliminate rival drug dealers and would-be witnesses against them.  *Id.* at ¶ 15.  In short, Count One alleges a single racketeering conspiracy involving the same core participants, the same drug turf, the same methods, and the same objectives.  *See Smith*, 451 F.3d at 218; *Leavis*, 853 F.3d at 762; *Banks*, 10 F.3d and 1054.

It is irrelevant that DAVIS is not alleged to have participated in, or even known about, every racketeering act or overt act committed by other members of the conspiracy.  *See United States v. Johnson*, 54 F.3d 1150, 1154 (4th Cir. 1995) ("One may be a member of a conspiracy without knowing its full scope, or all its members, and without taking part in the full range of its activities or over the whole period of its existence."); *Banks*, 10 F.3d at 1054.  A racketeering conspiracy may—and often does—have many different criminal objectives, and members with their own specialized functions.  *See United States v. Urbanik*, 801 F.2d 692, 696 (4th Cir. 1986) ("The principals may have performed their roles at different points in the distribution network, but the evidence suffices to support the inference of a single large conspiracy."); *Banks*, 10 F.3d at 1054.  What matters is that the indictment alleges—and the government will prove—that DAVIS participated in "one overall agreement" with the same "key actors, methods, and goals."  *Leavis*, 853 F.3d at 218.

L.   **Motion to Compel Early Disclosure of Brady, Giglio, Jencks, and Other Relevant Material, by Randy Banks (ECF 749, 750, 751)**

Randy BANKS moves to compel the government to disclose "Brady, Giglio, Jencks, and Other Relevant Material," as well as "a witness and exhibit list," sixty days before trial.  ECF 749, at 1, 6.  In separate filings, he also requests that the government "provide … contact information" for "all law enforcement witnesses" so that he may depose them prior to the motions hearing.  ECF 750, at 3; ECF 751, at 4.  BANKS argues that the Court has inherent supervisory power to override the timing provisions of the Jencks Act, and that it should do so in this case to enable him to

effectively prepare for trial and cross-examine witnesses against him.  These requests should be denied.

The Jencks Act, codified at 18 U.S.C. § 3500, provides that statements made by prospective government witnesses may not be the subject of subpoena, discovery, or inspection until after that witness has testified on direct examination at trial.  *See* 18 U.S.C. § 3500(a).[33]  Under the plain language of the statute, "[t]he district court may not require the government to produce Jencks Act material relating to one of its witnesses until *after* the witness has testified."  *United States v. Lewis*, 35 F.3d 148, 151 (4th Cir. 1994) (emphasis in original); *see also United States v. Peterson,* 524 F.2d 167, 175 (4th Cir. 1975), *cert. denied,* 423 U.S. 1088 (1976); *see generally Palermo v. United States,* 360 U.S. 343, 351 (1959).

The Jencks Act was initiated "out of concern for witness intimidation, subornation of perjury, and other threats to the integrity of the trial process."  *See, e.g.*, *United States v. Tarantino*, 846 F.2d 1384, 1417 (D.C. Cir. 1988).  Those concerns are particularly acute in this case, where the indictment alleges numerous instances in which the defendants have murdered, attempted to murder, or conspired to murder suspected witnesses and informants against them.

As the Fourth Circuit has noted, "nothing in the Jencks Act prevents the government from voluntarily disclosing covered material prior to trial."  *Lewis*, 35 F.3d at 151.  Here, the government entered into a discovery agreement with all defense counsel in the case, including BANKS, which provides for the disclosure of Jencks material—including payments, promises of immunity, and other impeachment evidence—no later than one week before trial.  *See* Ex. 36 (R. Banks,

---

[33]     After the witness has testified on direct examination and upon the defendant's motion, the court must order the government to produce any statement made by the witness that comports with § 3500(e).  *See id.* § 3500(b); Fed. R. Crim. P. 26.1.  It is then within the court's discretion whether and for how long to recess proceedings for such time as is necessary for the defendant to examine the statement.  *See id.* § 3500(c).

Discovery Agreement).  The government believes this agreement strikes the right balance between protecting against witness tampering and obstruction of justice, on the one hand, and allowing defense counsel adequate time to prepare for cross-examination such that trial runs smoothly and without delay, on the other.  *Compare United States v. Howard*, 811 F.2d 1505, 1507 (4th Cir. 1987) (finding no error in allowing disclosure of four-page witness statement until day of witness's cross examination and noting that the "[t]he [Jencks] Act required nothing more than that the defendants be given time to incorporate information gleaned from the written statement of the government witness into their cross-examination of that witness"); *with United States v. Holmes*, 722 F.2d 37, 40 (4th Cir. 1983) (summary order) (new trial granted where the trial court did not allow sufficient time for defense to review an eight-inch stack of Jencks material provided on the day before trial began).

The parties' discovery agreement also provides that if any routine motion seeking such discovery is filed with the Court, the government will consider the agreement void, and will then provide such material only as required by the Jencks Act—a circumstance much less advantageous to the defendants than the terms of the existing agreement.  The government submits that it is in all parties' best interest to abide by the terms of the discovery agreement, and strongly suggests that BANKS withdraw his motion.  Alternatively, the Court should deny the motion, both because it is barred by statute and because it is entirely unreasonable in a racketeering conspiracy case against a criminal gang that engaged in habitual violence against witnesses and suspected witnesses.

**M.   Motion for Disclosure of Statements of Co-Conspirators Intended to be Offered Pursuant to Fed. R. Evid. 801(d)(2)(E), by Jamal Lockley (ECF 499)**

LOCKLEY seeks an order from the Court requiring the government to identify any evidence it intends to offer at trial of statements made by co-conspirators in furtherance of the conspiracy pursuant to Federal Rule of Evidence 801(d)(2)(E).

The Fourth Circuit has held that the statements of co-conspirators whom the government intends to call as witnesses are governed by the Jencks Act, 18 U.S.C. § 3500, rather than Federal Rule of Criminal Procedure 16(a)(1)(A).  *See United States v. Roberts*, 811 F.2d 257, 258–59 (4th Cir. 1987).   Insofar as LOCKLEY seeks identification of the government's witnesses and disclosure of their Jencks material, his request runs counter to the Jencks Act and the parties' discovery agreement, in which the parties agreed that Jencks material would be turned over one week prior to trial.  The government intends to abide by the provisions of the discovery agreement.

Furthermore, it is worth noting that the government is not required to prove the existence of the conspiracy or LOCKLEY's membership in it prior to offering evidence at trial of statements made by co-conspirators in furtherance of the conspiracy.  In *Bourjaily v. United States*, 483 U.S. 171 (1987), the Supreme Court specifically addressed and dismissed the claim that the admissibility of co-conspirators acts and statements hinges on proof of the conspiracy by independent evidence.  In doing so, the Court stated: "[T]he Confrontation Clause does not require a court to embark on an independent inquiry into the reliability of statements that satisfy the requirements of Rule 801 (d)(2)(E)."  *Bourjaily*, 483 U.S. at 183–84.  Likewise, the Fourth Circuit in *United States v. Blevins*, 960 F.2d 1252 (4th Cir. 1992) noted:

> This circuit has rejected the formalistic requirement that there must be a hearing to determine the existence of a conspiracy before statements can be admitted under Rule 801(d)(2)(E).  *United States v. Hines*, 717 F.2d 1481, 1488 (4th Cir. 1983).  Instead we allow a trial court to conditionally admit co-conspirators statements subject

to the subsequent satisfaction of the requirements for their admission.

*Id.* at 1256; s*ee also United States v. Caudle*, 758 F.2d 994 (4th Cir. 1985) (noting that the Fourth Circuit has never required a pretrial determination of the existence of the conspiracy); *United States v. Jackson*, 757 F.2d 1486 (4th Cir. 1985) (trial court need not hold a hearing, away from the jury to determine question of admissibility of co-conspirators' out-of-court statements).

Thus, in light of the Jencks Act, the parties' discovery agreement, *Bourjaily*, and the settled law in this circuit, LOCKLEY's motion should be denied as moot or, at best, premature.

## N. Motions for Notice Pursuant to Fed. R. Evid. 404(b), by Shakeen Davis (ECF 386), Corloyd Anderson (ECF 400), Dante Bailey (402, 414), Jacob Bowling (ECF 419), and Jamal Lockley (ECF 498)

The government does not intend to present any Rule 404(b) evidence in this case.  It is the government's position that each of the overt acts listed in Count One of the indictment was committed in furtherance of the charged racketeering and drug trafficking conspiracies, and each piece of evidence presented in the government's case-in-chief at trial will be used to establish the defendants' participation in the charged racketeering and drug trafficking conspiracies.  However, in the event the Court should determine otherwise, the government will seek admission of the evidence pursuant to Federal Rule of Evidence 404(b).  Either way, notice has been provided pursuant to Rule 404(b) as requested by the defendants.  The government has produced voluminous discovery relating to the murders, shootings, robberies, assaults, drug trafficking offenses, and firearms offenses committed by the defendants that it intends to prove at trial, and the government does not intend to use any evidence in its case-in-chief that has not been produced in discovery.

In an abundance of caution, and without conceding that it falls within the ambit of Rule 404(b), the government provides notice of the following acts that preceded the dates of the alleged racketeering conspiracy, and as to which it may introduce evidence in its case-in-chief at trial:

138

- In 2006, while an inmate at the Maryland Correctional Institution in Hagerstown, Dante BAILEY mailed a series of letters to an associate named Kevin Gardner, in which he discussed the history of the Bloods gang and his plans to form a Bloods chapter in Baltimore, with "Forest Heights/Forest Park & Windsor Mill" as the "headquarters." BAILEY explained that he had been "plugged into the mainstream of the United Blood Nation" and had "full support from New York & California & Chicago." BAILEY also touted his efforts to avenge the deaths of certain Bloods "soljahs," writing that he had "shot, hopped out & stabbed so many people" and had "caused many deaths, by words or by my own hand." These letters have been produced in discovery at JM-0079 to JM-0094.

- On June 30, 2006, while an inmate at the Maryland Correctional Institution in Jessup, Ayinde DELEON and other members of the Bloods gang attempted to murder T.F. because he was believed to have "snitched" on two Bloods members for stabbing him on a previous occasion. DELEON and his co-conspirators attacked T.F. and stabbed him repeatedly in the face and upper body, causing life-threatening injuries including the loss of an eye. Due to concern for T.F.'s safety, the reports associated with this incident have been produced in discovery only to DELEON, who is the only party against whom the government would seek to admit this evidence. The government intends to produce these reports to all counsel no later than 60 days before trial.

- On December 30, 2006, Corloyd ANDERSON and Adrian Jamal SPENCE were arrested in the 1900 block of Forest Park Avenue in joint possession of a loaded, stolen 9mm caliber handgun with serial number 109059, as well as $1,333 in drug proceeds. The reports associated with this arrest have been produced in discovery at R-BPD-0047 to R-BPD-0061.

As laid out in the parties' discovery agreement, government acknowledges its continuing duty to disclose Rule 404(b) evidence should it become aware of any. *See* Ex. 36, at 2.

### O.  Motions for Notice Pursuant to Fed. R. Evid. 609, by Shakeen Davis (ECF 387) and Jacob Bowling (ECF 419)

Citing Federal Rule of Evidence 609, Jacob BOWLING has moved for notice of prior criminal convictions of prospective government witnesses, as well as for notice of the government's intention to introduce evidence of BOWLING's prior criminal convictions. ECF 387. Shakeen DAVIS has filed a notice of his own intention to introduce evidence of any government witness's prior convictions. ECF 387. Other defendants have filed motions to adopt these motions.

Per the parties' discovery agreement, discussed in Sections III.I and III.J, *supra*, the government will turn over criminal records of prospective government witnesses one week before trial. *See* Ex. 36.

Should any of the defendants testify at trial, the government hereby provides notice that it intends to use the following convictions for impeachment purposes pursuant to Federal Rule of Evidence 609:

| Defendant | Case Number(s) | Date of Conviction | Offense(s) |
|---|---|---|---|
| **Bailey, D.** | 95CR3716, Baltimore County Circuit Court | 12/01/1995 | Handgun: Wear/Carry |
| | 597078039–40, Baltimore City Circuit Court | 07/16/1997 | Reckless Endangerment |
| | 597120012, Baltimore City Circuit Court | 07/16/1997 | Robbery with Deadly Weapon; Handgun on Person: Carry/Wear |
| | 802338001, Baltimore City Circuit Court | 04/02/2003 | Assault 2nd Degree |
| | 6B01382667, Baltimore City District Court | 02/06/2003 | Deadly Weapon Conceal |
| | WDQ-04-0254, U.S. District Court, District of Maryland | 11/05/2004 | Possession of Firearm by Convicted Felon |
| **Johnson** | 104120060, Baltimore City Circuit Court | 06/01/2004 | CDS: Possess with Intent to Distribute |
| | 804202025, Baltimore City Circuit Court | 07/21/2004 | CDS: Unlawful Possession |
| | 104194045, Baltimore City Circuit Court | 11/16/2004 | CDS: Distribute |
| | WDQ-05-0545, U.S. District Court, District of Maryland | 02/02/2005 | Possession of Firearm by Convicted Felon |
| | 206125010, Baltimore City | 10/30/2006 | CDS: Possession with Intent to Distribute |

| | | | |
|---|---|---|---|
| | Circuit Court | | |
| | T090350X, Prince George's County Circuit Court | 08/04/2010 | False Statement: Identity |
| **Spence** | 2110168015, Baltimore City Circuit Court | 07/15/2010 | CDS: Possession with Intent to Distribute |
| | RDB-15-0541, U.S. District Court, District of Maryland | 09/09/2016 | Conspiracy to Distribute One Kilogram or More of Heroin |
| **Banks, R.** | 298335038, Baltimore City Circuit Court | 04/23/1999 | CDS: Possession with Intent to Distribute |
| | 298162008, Baltimore City Circuit Court | 04/23/1999 | CDS: Conspiracy |
| | 3B00303467, Baltimore City Circuit Court | 06/02/1999 | Assault: 2nd Degree |
| | 299041003, Baltimore City Circuit Court | 04/23/1999 | CDS: Possession with Intent to Distribute |
| | 203043032, Baltimore City Circuit Court | 10/15/2003 | CDS: Possession with Intent to Distribute (Cocaine) |
| | 203043033, Baltimore City Circuit Court | 10/15/2003 | CDS: Possession of Firearm |
| | 809345014, Baltimore City Circuit Court | 12/14/2009 | Deadly Weapon: Conceal |
| **Anderson** | 03CR0661, Baltimore County Circuit Court | 10/08/2003 | Handgun: Wear/Carry |
| | 03K04001432, Baltimore County Circuit Court | 04/18/2005 | CDS: Possession with Intent to Distribute (Cocaine) |
| | 204300034, Baltimore City Circuit Court | 09/01/2005 | CDS: Possession with Intent to Distribute |
| | 105096011, Baltimore City Circuit Court | 09/01/2005 | CDS: Distribute; CDS: Conspiracy |
| **Deleon** | 204015005, Baltimore City Circuit Court | 12/13/2003 | Handgun in Vehicle |

| | | | |
|---|---|---|---|
| | 204216032, Baltimore City Circuit Court | 07/12/2005 | Narcotic Possession with Intent: Large Amount |
| | K20062852, Anne Arundel County Circuit Court | 11/27/2007 | Conspiracy to Commit 1st Degree Murder; Assault: 1st Degree |
| **Lockley** | 597330016, Baltimore City Circuit Court | 02/19/1998 | CDS: Possession with Intent to Distribute |
| | 299165006, Baltimore City Circuit Court | 12/10/1999 | CDS: Possession with Intent to Distribute; Conspiracy |
| | 299132018, Baltimore City Circuit Court | 12/10/1999 | CDS: Possession with Intent to Distribute |
| | 201101001, Baltimore City Circuit Court | 02/14/2003 | CDS: Possession with Intent to Distribute |
| | 106256012, Baltimore City Circuit Court | 01/25/2008 | CDS: Possession with Intent to Distribute |
| | 105096013, Baltimore City Circuit Court | 01/25/2008 | CDS: Possession of Firearms |
| | Baltimore City Circuit Court | 03/12/2008 | Possession of Contraband: Place of Confinement |
| | 816011024, Baltimore City Circuit Court | 02/10/2016 | CDS: Possession |
| **Bowling** | 805238017, Baltimore City Circuit Court | 08/29/2005 | CDS: Possession |
| | 106073030, Baltimore City Circuit Court | 03/12/2007 | Assault: 1st Degree |
| | 106073031, Baltimore City Circuit Court | 03/12/2007 | Assault: 2nd Degree |
| | 106073032, Baltimore City Circuit Court | 03/12/2007 | CDS: Possession with Intent to Distribute (Cocaine) |
| | 112121032, Baltimore City Circuit Court | 05/07/2013 | Conspiracy to Wear/Carry/Transport Handgun |
| | 212278024, Baltimore City | 01/16/2013 | Possession of Contraband Cell Phone While Confined |

|  |  |  |  |
|---|---|---|---|
|  | Circuit Court |  |  |
|  | 113192009, Baltimore City Circuit Court | 04/04/2014 | Handgun in Vehicle |
| **Dent** | 108185039, Baltimore City Circuit Court | 10/06/2008 | Possession with Intent to Distribute Marijuana |
|  | 810096013, Baltimore City Circuit Court | 08/11/2010 | Unauthorized Removal of Property |
|  | 0C00321328, Baltimore City District Court | 03/19/2010 | Fraud: Personal Identification—Avoid Prosecution; CDS: Possession-Not Marijuana |
|  | 210302006, Baltimore City Circuit Court | 12/02/2010 | CDS: Possession with Intent to Distribute |
|  | 112326003, Baltimore City Circuit Court | 07/23/2013 | CDS: Possession with Intent to Distribute |
|  | 115169003, Baltimore City Circuit Court | 09/16/2016 | CDS: Distribution |
| **Davis** | 3B02191227, Baltimore City District Court | 11/01/2012 | Handgun on Person |
| **Frazier** | 813149010, Baltimore City Circuit Court | 09/03/2013 | Burglary: 4th Degree |
|  | 114233017, Baltimore City Circuit Court | 05/29/2015 | CDS: Possession with Intent to Distribute |
| **Lashley, Ma.** | 810188035, Baltimore City Circuit Court | 07/08/2010 | CDS: Unlawful Possession |
|  | 511080009, Baltimore City Circuit Court | 10/28/2011 | Intimidate/Influence Juror—Felony Offense |

P.  **Motions to Adopt Motions of Other Defendants by Corloyd Anderson (ECF 395), Dante Bailey (407, 756), Jacob Bowling (ECF 417), Adrian Spence (ECF 434), Dontray Johnson (ECF 490), Jamal Lockley (ECF 500), Shakeen Davis (ECF 746, 759), Ayinde Deleon (ECF 747), Randy Banks (ECF 748), Devon Dent (ECF 752), and Malcolm Lashley (ECF 758)**

Several defendants have filed motions to adopt relevant motions filed by their co-

143

defendants.  Although the government does not object to the adoption of motions of general applicability, it is the government's position that the defendants should be required to particularize their basis for adopting co-defendants' motions to the extent they are relying on different facts or legal authorities.  Otherwise, the government is left in the impossible position of having to guess about the issues to which it should respond and what evidence will need to be presented at the motions hearing.  *See United States v. Hickok*, 481 F.2d 377, 378–79 (9th Cir. 1973) (a motion to suppress evidence must set forth allegations of relevant factual issues "with definiteness, clarity, and specificity"); *United States v. Randle*, 966, F.2d 1209, 1212 (7th Cir. 1992) ("A defendant who seeks to suppress evidence bears the burden of making a *prima facie* showing of illegality.  Reliance on vague, conclusory allegations is insufficient."); *cf. United States v. Peterson*, 524 F.2d 167, 178 (4th Cir. 1975) (defendants who failed to present specific grounds for suppressing evidence at motions hearing could not raise claims for the first time during trial).

### Q.  Motions for Leave to File Additional Motions by Dante Bailey (ECF 30), Jacob Bowling (418), Dontray Johnson (ECF 491), and Jamal Lockley (ECF 501)

The government takes no position as to the motions by BAILEY, BOWLING, JOHNSON, and LOCKLEY for leave to file additional motions after the deadline imposed by the Court in this case.  However, to the extent the defendants are allowed to file additional motions, the government respectfully requests at least two weeks to respond.

## IV.   CONCLUSION

For the foregoing reasons, all of the pending motions should be denied.

Respectfully submitted,

Robert K. Hur
United States Attorney

By: _____

144

Christina A. Hoffman
Lauren E. Perry
Assistant United States Attorneys
36 South Charles Street
Fourth Floor
Baltimore, Maryland  21201
(410) 209-4800

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on May 15, 2018, I caused a copy of the foregoing Government's Consolidated Motions Response to be filed electronically with the Court using the CM/ECF system and served to all counsel of record.

_____
Christina A. Hoffman
Assistant United States Attorney